1   BRIAN M. BOYNTON
    Principal Deputy Assistant Attorney
2   General
    MARCIA BERMAN
3   Assistant Branch Director
    CORMAC A. EARLY (D.C. Bar No.
4   1033835)
    Trial Attorney, U.S. Department of Justice
5   Civil Division, Federal Programs Branch
6   1100 L Street, N.W.
    Washington, D.C. 20005
7   Telephone: (202) 616-7420
    E-mail: cormac.a.early@usdoj.gov
8

9   Attorneys for Defendant
    U.S. Department of Justice,
10  Office of Justice Programs
11
12
13

THOMAS R. BURKE (State Bar No.
141930)
DAVIS WRIGHT TREMAINE LLP
50 California Street, 23rd Floor
San Francisco, California 94111
Telephone: (415) 276-6500
Facsimile: (415) 276-6599
Email: thomasburke@dwt.com

SARAH E. BURNS (State Bar No.
324466)
DAVIS WRIGHT TREMAINE LLP
865 South Figueroa Street, Suite 2400
Los Angeles, California 90017
Telephone: (213) 633-6800
Facsimile: (213) 633-6899
Email: sarahburns@dwt.com

LEENA M. CHARLTON (*pro hac vice*)
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, New York 10020
Telephone: (212) 489-8230
Facsimile: (212) 489-8340
Email: leenacharlton@dwt.com

*Attorneys for Plaintiffs*
The Appeal, Inc., and Ethan Corey

14

15

UNITED STATES DISTRICT COURT

16

FOR THE CENTRAL DISTRICT OF CALIFORNIA

17

EASTERN DIVISION

18

19

20   THE APPEAL, INC. and ETHAN
     COREY,

21                          Plaintiffs,

22                  v.

23

24   UNITED STATES DEPARTMENT OF
     JUSTICE'S OFFICE OF JUSTICE
25   PROGRAMS,
                            Defendant.

26

27

28

No. 5:22-cv-02111-JFW (AFMx)

JOINT BRIEF ON SUMMARY
JUDGMENT MOTION

Motion Hearing: July 12, 2024
Time: 11:00 a.m.
Courtroom: 9B
First Street Courthouse
350 W. First Street
Los Angeles, CA 90012

Hon. Wesley L. Hsu
United States District Judge

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

DEFENDANT'S INTRODUCTION ................................................................. 1

PLAINTIFFS' INTRODUCTION ................................................................. 1

DEFENDANT'S STATEMENT OF FACTS ...................................................... 2

    A.    THE CRIME CONTROL ACT OF 1968 ...................................... 2

    B.    THE DCRA AND THE MCI PROGRAM ...................................... 4

    C.    PLAINTIFF'S FREEDOM OF INFORMATION ACT REQUESTS ......... 6

    D.    THE "K-ANONYMITY" REDACTION METHOD ............................. 7

PLAINTIFFS' STATEMENT OF FACTS ...................................................... 11

    A.    The Death in Custody Reporting Acts ....................................... 11

    B.    Plaintiffs FOIA Requests and Procedural History ....................... 12

LEGAL STANDARD ............................................................................. 13

ADDITIONAL LEGAL STANDARDS ......................................................... 14

ANALYSIS ........................................................................................ 15

    I.    Search Adequacy (Defendant's Position) .................................... 15

    II.    Exemption 3 (Defendant's Position) ........................................... 15

    III.    Exemptions 6 and 7(C) (Defendant's Position) ............................ 21

        A. Disclosure of the records Plaintiff seeks would constitute a clearly unwarranted invastion of personal privacy ............................ 23

i

B.  The privacy interests at stake outweigh the public interest in disclsoure ................................................................................25

C.  BJS appropriately redacted the records ................................................26

PLAINTIFFS' ARGUMENT ..........................................................................15

A.      DOJ's Search Appears Inadequate ................................................29

B.      Exemption 3 Does Not Apply ........................................................30

1.  The Records Were Furnished Under DCRA, Not Chapter 101 ............31

2.  The Records Do Not Identify "Any Specific Private Person"................35

3.  The Records Will Be Disclosed for The Purpose For Which They Were Obtained ................................................................................36

4.  Federal Employees And Recipients Of Grants Have Disclosed Data, Which Would Otherwise Be Prohibited Under Sec. 10231 ..............37

C.      Exemptions 6 and 7 are Not Properly Invoked ............................38

1.  The records are not for "law enforcement purposes." ............................38

2.  DOJ did not properly invoke Exemption 6 ................................................40

3.  DOJ Has Not Identified a Foreseeable Harm ................................................45

D.      DOJ Has Failed to Reasonably Segregate Data ............................47

PLAINTIFFS' CONCLUSION ........................................................................48

DEFENDANT'S CONCLUSION ....................................................................48

ii

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

## <u>CASES</u>

*ACLU v. DOJ,*
    750 F.3d 927 (D.C. Cir. 2014)..................................................................24, 42, 43

*Amiri v. Nat'l Sci. Found.,*
    664 F. Supp. 3d 1 (D.D.C. 2021)................................................................29, 46

*Animal Legal Def. Fund v. U.S. FDA,*
    836 F.3d 987 (9th Cir. 2016) ...........................................................................13

*Ardestani v. I.N.S.,*
    502 U.S. 129 (1991).........................................................................................31

*Baldridge v. Shapiro,*
    455 U.S. 345 (1982).........................................................................................16

*Berman v. CIA,*
    501 F.3d 1136 (9th Cir. 2007) .........................................................................14

*Berry v. DOJ,*
    733 F.2d 1343 (9th Cir. 1984).........................................................................46

*Bibles v. Or. Natural Desert Ass'n,*
    519 U.S. 355 (1997)..............................................................................25, 43, 44

*Cameranesi v. DOD,*
    856 F.3d 626 (9th Cir. 2017)...........................................................................41

*Campbell v. DOJ,*
    164 F.3d 20 (D.C. Cir. 1998)....................................................................24, 41

*Carter v. U.S. Dep't of Commerce,*

iii

830 F.2d 388 (D.C. Cir. 1987)..................................................27

*Charles v. Off. Of the Armed Forces Med. Exam'r*,

730 F. Supp. 2d 205 (D.D.C. 2010)..............................14, 29

*Church of Scientology of Ca. v. IRS*,

484 U.S. 9 (1987)..................................................................16

*Collord v. U.S. Dep't of Interior*,

154 F.3d 933 (9th Cir. 1998) ............................................19

*Consumers' Checkbook Ctr. for Study of Servs. v. HHS*,

554 F.3d 1046 (D.C. Cir. 2009)......................................27, 28

*Cordell v. Detective Publ'ns, Inc.*,

419 F.2d 989 (6th Cir. 1969) ............................................35

*Corley v. U.S.*,

556 U.S. 303 (2009)............................................................34

*Decker v. U.S.*,

140 F.2d 375 (4th Cir. 1944) ............................................31

*Dep't of Air Force v. Rose*,

425 U.S. 352 (1976)....................................................27, 46, 47

*Dep't of Interior v. Klamath Water Users Protective Ass'n*,

532 U.S. 1 (2001)................................................................14

*DOD v. Fed. Labor Relations Auth.*,

510 U.S. 487 (1994)......................................................23, 41

*DOJ v. Reporters Comm. for Freedom of the Press*,

489 U.S. 749 (1989)..................................................23, 26, 27

*Dep't of State v. Wash. Post Co.*,

iv

456 U.S. 595 (1982)................................................................................22

*Duffin v. Carlson,*

636 F.2d 709 (D.C. Cir. 1980).....................................................22, 40

*E.W. Bliss Co. v. U.S.,*

248 U.S. 37 (1918)..................................................................................31

*FBI v. Abramson,*

456 U.S. 615 (1982)................................................................................22

*Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.,*

554 U.S. 33 (2008)..................................................................................31

*Food Mktg. Inst. v. Argus Leader Media,*

588 U.S. 427 (2019)................................................................................17

*Forest Serv. Employees for Env. Ethics v. U.S. Forest Service,*

524 F.3d 1021 (9th Cir. 2008)...............................................................22

*Gannett Satellite Info. Network, LLC v. DOJ,*

2023 WL 2682121 (Mar. 29, 2023)........................................16, 17, 21

*Hamdan v. DOJ,*

797 F.3d 759 (9th Cir. 2015) ................................................................15

*Hernandez v. Ashcroft,*

345 F.3d 824 (9th Cir. 2003) ................................................................18

*Holt v. DOJ,*

734 F. Supp. 2d 28 (D.D.C. 2010)........................................................40

*Illinois v. Perkins,*

496 U.S. 292 (1990)................................................................................44

*Keller v. Finks,*

v

2014 WL 1283211 (C.D. Ill. Mar. 31, 2014) ......................................... 36

*Kingdomware Techs., Inc. v. U.S.*,

    579 U.S. 162 (2016)............................................................................ 31

*Kirby v. AT&T Corp.*,

    2022 WL 17184565 (S.D. Cal. Nov. 23, 2022)................................... 35

*Kirtsaeng v. John Wiley & Sons, Inc.*,

    568 U.S. 519 (2013)............................................................................ 17

*Lahr v. NTSB*,

    569 F.3d 964 (9th Cir. 2009)..............................14, 15, 23, 25, 45

*Landano v. U.S. Dep't of Justice*,

    956 F.2d 422 (3d Cir. 1992) ..........................................................26, 42

*Mingo v. DOJ*,

    793 F. Supp. 2d 447 (D.D.C. 2011)................................................... 40

*Minier v. CIA*,

    88 F.3d 796 (9th Cir. 1996) ..........................................................11, 14, 16

*Nat'l Archives & Records Admin. v. Favish*,

    541 U.S. 157 (2004)..............................23, 24, 25, 41, 42, 45

*New York Times Co. v. NASA*,

    920 F.2d 1002 (D.C. Cir. 1990).......................................................... 41

*Pinson v. DOJ*,

    236 F. Supp. 3d 338 (D.D.C. 2017).............................22, 39, 40, 42, 43

*Pratt v. Webster*,

    673 F.2d 408 (D.C. Cir. 1982).......................................................... 39

*Rep. Comm. for Freedom of the Press v. FBI*,

vi

3 F.4th 350 (D.C. Cir. 2021) ................................................................ 29, 46

*Rimmer v. Holder*,

700 F.3d 246 (6th Cir. 2012) ............................................................ 25, 26

*Rojas v. FAA*,

941 F.3d 392 (9th Cir. 2019) ........................................................ 23, 24, 25

*Seymour v. Barabba*,

559 F.2d 806 (D.C. Cir. 1977) .......................................................... 20, 35

*Shannahan v. I.R.S.*,

672 F.3d 1142 (9th Cir. 2012) ............................................................... 14

*Shaw v. FBI*,

749 F.2d 58 (D.C. Cir. 1984) ........................................................... 22, 40

*Stephan v. United States*,

319 U.S. 423 (1943) ............................................................................... 3

*Transgender L. Ctr. v. ICE*,

46 F.4th 771 (9th Cir. 2022) .................................................................. 15

*Trope v. United States*,

276 F. 348 (8th Cir. 1921) ..................................................................... 17

*Union Leader Corp. v. DHS*,

749 F.3d 45 (1st Cir. 2014) ................................................................... 26

*U.S. v. Dunne*,

173 F. 254 (9th Cir. 1909) ..................................................................... 35

*U.S. v. Schlette*,

842 F.2d 1574 (9th Cir. 1988) ......................................................... 42, 46

*Valencia-Lucena v. U.S. Coast Guard*,

vii

180 F.3d 321 (D.C. Cir. 1999) ................................................................ 30

*Wessler v. DOJ*,

381 F. Supp. 3d 253 (S.D.N.Y. 2019) ............................................. 44, 45

*Ysursa v. Pocatello Educ. Ass'n*,

555 U.S. 353 (2009) ................................................................ 33

## STATUTES

Death in Custody Reporting Act of 2000 ("DCRA 2000"), Pub. L. No. 106-297,
114 Stat. 1045 (Oct. 13, 2000) .................................................................. 4

Death in Custody Reporting Act of 2013, Pub. L. No. 113-285, 128 Stat. 2860
(Dec. 18, 2014) .................................................................................. 5

Omnibus Crime Control and Safe Streets Act, Pub. L. No. 90-351, Title I, 82 Stat.
198 (June 19, 1968) ............................................................................ 2

5 U.S.C. § 552 ........................................... 7, 13, 14, 16, 21, 22, 26, 30, 34, 38

5 U.S.C. § 558 ................................................................................ 29

18 U.S.C. § 4001 note ...................................................................... 5, 20

34 U.S.C. § 10132 ........................................................................ 3, 5, 17

34 U.S.C. § 10134 .......................................................................... 12, 36

34 U.S.C. § 10231 ................................................................ 3, 12, 16, 30, 31

34 U.S.C. § 10251 .............................................................................. 18

34 U.S.C. § 12104 .................................................................... 4, 11, 18, 30

34 U.S.C. § 60105 ..................................................................... 5, 12, 18, 20

38 U.S.C. § 3104 .............................................................................. 19

42 U.S.C. § 13704 ......................................................................... 4, 18

## OTHER AUTHORITIES

42 C.F.R. § 422.632 .......................................................................... 19

BJS, Corrections, Why Does Data Take So Long to Collect and Publish ..................... 17

BJS, FDCRP............................................................................................................. 6, 26

BJS, MCI Program (Formerly Deaths in Custody Reporting Program (DCRP)) ............ 4

DOJ, Overview of the Privacy Act of 1974 ......................................................... 36

L. Sweeney, k-anonymity: a model for protecting privacy. Int'l J. on Uncertainty,
 Fuzziness and Knowledge-based Systems, 10(5); 557-570 (2002) ....................... 8

Report of the Attorney General Pursuant to Section 6(e) of Executive Order No.
 14074: Department of Justice Implementation of the Death in Custody
 Reporting Act of 2013 ....................................................................................... 4, 5

S. Garfinkel, De-Identification of Personal Information, Nat'l Inst. of Stds. &
 Tech. (2015).......................................................................................................... 8

U.S. DOJ Office of the Inspector General, Review of the Department of Justice's
 Implementation of the Death in Custody Reporting Act of 2013 ................... 6, 20

**DEFENDANT'S INTRODUCTION**

This case concerns three Freedom of Information Act requests for death-in-custody information submitted by local, state, and federal authorities to the Department of Justice's Office of Justice Programs ("OJP") through its components the Bureau of Justice Statistics ("BJS") and the Bureau of Justice Assistance ("BJA"). OJP withheld the requested material in full because it is subject to a statutory confidentiality provision prohibiting disclosure, and thus to FOIA's Exemption 3. OJP has also processed the records for partial withholdings pursuant to Exemptions 6 and 7(C) to prevent unwarranted invasion of personal privacy. OJP now moves for summary judgment affirming its withholding in full pursuant to Exemption 3, or, should the Court determine that Exemption 3 does not apply, affirming its partial withholdings pursuant to Exemptions 6 and 7(C).

**PLAINTIFFS' INTRODUCTION**

After George Floyd was killed, the public demanded changes in policing. To better assess the problem, the Senate called for "full implementation" of the Death in Custody Reporting Act ("DCRA"), which requires state and federal law enforcement agencies to report certain information when a person dies in custody, providing some transparency into an area that generally lacks effective oversight.

This prodding did not work. The Attorney General, tasked with implementing the Act, has failed to maintain this "reliable metric" of in-custody deaths. Deaths have been severely underreported, and the AG has done nothing to compel compliance. Yet law enforcement funding has increased, as have the deaths in custody.

1

Plaintiffs Ethan Corey and *The Appeal*[1] made three separate FOIA requests for DCRA records, attempting to capture the completeness of this would-be national database. Perhaps to hide its failings, DOJ withheld the records in their entirety pursuant to Exemption 3 and further redacted data pursuant to Exemptions 6 and 7(C). Plaintiffs now move for summary judgment—and oppose DOJ's motion—as the records are not properly withheld. Exemption 3 does not apply because the records are not subject to Sec. 10231 of the Crime Control Act, BJS's authorizing statute. Exemptions 6 and 7(C) do not apply as the records are not "law enforcement records" and do not present a "clearly unwarranted invasion of privacy."

## DEFENDANT'S STATEMENT OF FACTS

### A.   THE CRIME CONTROL ACT OF 1968

Congress enacted the Omnibus Crime Control and Safe Streets Act of 1968 "to assist State and local" law enforcement by means including authorizing federal grants, and encouraging research into crime and the criminal justice system. Pub. L. No. 90-351, Title I, 82 Stat. 198 (June 19, 1968).

Congress created what is now OJP to administer the various programs created under Title I of the Act. Pub. L. No. 90-351, Title I, § 101, 82 Stat. 198. Through its component BJA, OJP is responsible for administering the Edward Byrne Memorial Justice Assistance Grant ("Byrne JAG") program, which is the leading source of federal justice funding to

---

[1] *The Appeal* "produce[s] fact-based reporting and analysis that…educates the public on how the criminal legal system works." *See* https://theappeal.org/about-us/

state and local jurisdictions.[2] As part of Title I, Congress also created BJS and authorized it to "collect and analyze statistical information, concerning the operations of the criminal justice system at the Federal, State, tribal, and local levels" as well as to "confer and cooperate with State, municipal, and other local agencies." 34 U.S.C. § 10132(c)(4), (d)(1)(B).

Congress included a provision dealing with "confidentiality of information" under Title I, which, as subsequently amended, now reads:

> No officer or employee of the Federal Government, and no recipient of assistance under the provisions of this title shall use or reveal any research or statistical information furnished under this title by any person and identifiable to any specific private person for any purpose other than the purpose for which it was obtained in accordance with this title.  Such information and copies thereof shall be immune from legal process, and shall not, without the consent of the person furnishing such information, be admitted as evidence or used for any purpose in any action, suit, or other judicial, legislative, or administrative proceedings.

34 U.S.C. § 10231(a).[3]

---

[2] *See* https://bja.ojp.gov/program/jag/overview (last visited April 29, 2024).

[3] The current codification of Title I's confidentiality provision, at 34 U.S.C. § 10231(a), says "furnished under this chapter," rather than "furnished under this title," as in the Statutes at Large. *See* Pub. L. No. 90-351, Title I, § 812(a), *formerly* § 818, *as added* Pub. L. No. 96-157, § 2, 93 Stat. 1213 (Dec. 27, 1979), *redesignated as* § 812 *by* Pub. L. No. 98-473, Title II, § 609(f), 98 Stat. 2093 (Oct. 12, 1984), *amended by* Pub. L. No. 109-162, Title XI, § 1115(c), 119 Stat. 3104 (Jan. 5, 2006). Because Congress enacted the language in the statute at large, including the phrase "furnished under this title," but has not enacted Title 34 of the U.S. Code as positive law, the language of the statutes at large prevails when the two are inconsistent. *See Stephan v. United States*, 319 U.S. 423, 426 (1943); 1 U.S.C. §§ 112, 204(a).

**B.     THE DCRA AND THE MCI PROGRAM**

The Death in Custody Reporting Act of 2000 ("DCRA 2000"), Pub. L. No. 106-297, 114 Stat. 1045 (Oct. 13, 2000), required states to report "information regarding the death of any person who is in the process of arrest, is en route to be incarcerated, or is incarcerated" in any state or local correctional facility. 42 U.S.C. § 13704(a)(2) (2000) (current version at 34 U.S.C. § 12104). DCRA 2000 did not apply to federal agencies, and it did not require local authorities to report directly to DOJ. *Id.* BJS launched the Mortality in Correctional Institutions ("MCI") program following the enactment of DCRA 2000. *See* Report of the Attorney General Pursuant to Section 6(e) of Executive Order No. 14074: Department of Justice Implementation of the Death in Custody Reporting Act of 2013, at 2 ("AG Report").[4] MCI collected data on deaths in custody consistent with DCRA 2000 but also more broadly. MCI collected data directly from each of the nation's 50 state prison systems and approximately 2,800 local jail jurisdictions, whereas DCRA 2000 only required reporting by states. BJS, MCI Program (Formerly Deaths in Custody Reporting Program (DCRP)).[5]

DCRA 2000 "expired in 2006." AG Report at 3. BJS nevertheless determined to keep MCI in operation as "one of its standard annual data collections on correctional

---

[4] Available at https://bja.ojp.gov/doc/DOJ-Implementation-of-DCRA-of-2013.pdf (last accessed April 29, 2024).

[5] *Available at* https://bjs.ojp.gov/data-collection/mortality-correctional-institutions-mci-formerly-deaths-custody-reporting-program (last accessed April 29, 2024).

institutions." *Id.* at 2. Although DCRA 2000's expiration meant that there was no statutory mandate requiring the submission of death-in-custody information, the organic statute governing BJS allows it to collect information about all aspects of the criminal justice system on a voluntary basis. *See* 34 U.S.C. § 10132(c)(4).

Congress reenacted DCRA, with certain modifications, in 2014. Death in Custody Reporting Act of 2013, Pub. L. No. 113-285, 128 Stat. 2860 (Dec. 18, 2014) ("DCRA 2013"). One crucial difference between DCRA 2000 and DCRA 2013 was the creation of a penalty for failure to report, in the form of a potential loss of Byrne JAG funds under Title I. *See* 34 U.S.C. § 60105(c)(2). As a result of that change, DOJ determined that BJS was not the appropriate component to collect state information under DCRA 2013, because the new enforcement mechanism was "incompatible with BJS's authorizing statute as a federal statistical agency." AG Report at 4. DOJ thus established a new DCRA data collection under BJA, the DOJ component responsible for Justice Assistance Grants, rather than BJS. *See id.* at 5. BJA began collecting data on reportable deaths on October 1, 2019. *Id.* BJA collects DCRA data only from the state agencies responsible for administering federal criminal-justice grants, whereas BJS collected MCI data directly from both state corrections departments *and* local jails. *See id.* at 8.

DCRA 2013 also included a requirement for federal law enforcement agencies to submit death-in-custody information "in such form and manner specified by the Attorney General," to include, "at a minimum," the information that DCRA 2013 requires states to submit. 18 U.S.C. § 4001 note. The Attorney General issued a memorandum to federal

law enforcement agencies on October 5, 2016, instructing them to submit the required information to BJS, and noting that BJS would provide "[f]urther guidance on the reporting procedures and what information agencies are required to report."[6] BJS created the Federal Law Enforcement Deaths in Custody Reporting Program ("FDCRP") to collect the required data.[7]

## C.  PLAINTIFF'S FREEDOM OF INFORMATION ACT REQUESTS

This case concerns three of Plaintiff's FOIA requests. The first seeks "data on jail deaths reported by local jail[]" facilities "participating in the [MCI] reporting program" from 2000 to 2018. JAF 1, 2. The second, submitted July 27, 2020, seeks three categories of data submitted starting October 1, 2019: "All DCR-1 quarterly summary forms submitted by federal, state, and local agencies" to OJP or its components; "[a]ll DCR-1A incident reports submitted by federal, state, and local agencies to OJP" or its components; and "[a]ll Edward Byrne Memorial Justice Assistance Grant ("JAG") Performance Management Tool reports submitted by state and local agencies using the online portal located at http://bjapmt.ojp.gov/ that include reporting pursuant to [DCRA 2013]." JAF 8. The third, submitted February 5, 2021, seeks "[a]ll [DCRA 2013] reports submitted by

---

[6] The Attorney General's October 2016 Memorandum on DCRA, available as Appendix 3 to U.S. DOJ Office of the Inspector General, Review of the Department of Justice's Implementation of the Death in Custody Reporting Act of 2013, https://oig.justice.gov/reports/2018/e1901.pdf (last accessed April 29, 2024).

[7] BJS, FDCRP, https://bjs.ojp.gov/data-collection/federal-law-enforcement-agency-deaths-custody-reporting-program-fdcrp (last accessed April 29, 2024).

federal law enforcement agencies (including the Bureau of Prisons) from FY2016 to FY2020." JAF 13.

OJP's searches located 182,611 pages of records potentially responsive to the first request, *see* JAF 22; 25,115 records potentially responsive to the second request, *see* JAF 30; and 2,179 records (consisting of 4,358 pages) potentially responsive to the third request, *see* JAF 35-36. In each case, OJP determined that the records contain research or statistical information identifiable to specific private persons, and were thus exempt from disclosure under the confidentiality provision of the Crime Control Act, codified at 34 U.S.C. § 10231. JAF 4-7, 12, 15. Plaintiff subsequently filed suit challenging the withholding of responsive records. *See* Compl., ECF 1. Pursuant to the schedule agreed by the parties, *see* ECF 37 at 5, OJP processed the responsive documents for all applicable FOIA exemptions (not just Exemption 3), and produced the redacted records to Plaintiff on January 31, 2024. JAF 7, 12, 15. Because Exemption 3 applies to all responsive records, the documents produced to Plaintiff were redacted in full. OJP has also processed the documents for withholding under Exemption 6 and 7(C), and moves for summary judgment on those exemptions in the event that the Court determines that Exemption 3 does not apply.

## D.   THE "K-ANONYMITY" REDACTION METHOD

BJS employed a method known as "k-anonymity" to partially redact the records produced to Plaintiff pursuant to Exemptions 6 and 7(C), *see* JAF 39, each of which protects against "unwarranted invasion[s] of personal privacy." 5 U.S.C. § 552(b)(6),

(7)(C).

"K-anonymity" is one of several "statistical disclosure avoidance methods" that can be used to "meet confidentiality standards" for "statistical datasets." JAF 40. The method was first developed in academic literature over twenty years ago, and is one of the "de-identification methods" discussed in the National Institute of Standards and Technology's "De-Identification of Personal Information" reference guide. JAF 41; *see also* S. Garfinkel, De-Identification of Personal Information, Nat'l Inst. of Stds. & Tech. (2015).[8] "K-anonymity" is a "suppression" method of data de-identification, meaning that it works by suppressing (*i.e.*, redacting) certain cells in a database, as distinct from methods such as "swapping" or "perturbation" that work by "alter[ing] the record in some way." JAF 42. BJS selected the k-anonymity method as "an efficient and objective optimization method that minimizes the number of redacted cells while protecting against the unwarranted invasion of privacy." JAF 43.

K-anonymity protects the privacy of "person-specific, field structured data" by ensuring that "the information for each person contained in the release cannot be distinguished from at least k-1 individuals whose information also appears in the release." L. Sweeney, k-anonymity: a model for protecting privacy. Int'l J. on Uncertainty, Fuzziness and Knowledge-based Systems, 10(5); 557-570 (2002).[9] The data-holder can

---

[8] *Available at* https://nvlpubs.nist.gov/nistpubs/ir/2015/NIST.IR.8053.pdf (last accessed March 15, 2024).

[9] *Available at* https://epic.org/wp-content/uploads/privacy/reidentification/Sweeney_Article.pdf (last accessed April 29, 2024).

select the value of "k" depending on the degree of protection desired; higher values of "k" mean each individual record is indistinguishable from a larger number of additional records, but at the price of redacting more information. Here, BJS selected a "k" value of 2 (the lowest possible value), meaning that the relevant variables for any given individual record are identical to at least one other record. JAF 56.

A real-life example from work by Latanya Sweeney, the creator of k-anonymity, illustrates the intuition behind the method. During the 1990s, the Massachusetts state government made available a research dataset containing insurance records of state employees who had been hospitalized. Garfinkel, at 18. To protect the employees' privacy, their names were redacted from the dataset, but their date of birth, ZIP code, and sex were all included to allow for statistical analysis. *Id.* Sweeney knew that then-Governor William Weld had recently been treated at a Massachusetts hospital, and could confirm his date of birth, sex, and ZIP code from voter registration records. *Id.* Because only one record in the dataset had the right combination of age, sex, and ZIP code, and because Sweeney knew Weld was included in the dataset, she was able to conclusively link Weld to the supposedly "de-identified" insurance records, which included highly sensitive information such as diagnoses, medications, and procedures. *Id.* That linkage would not have been possible if the dataset were sufficiently redacted to ensure that at least one other record would be indistinguishable from Weld's along the relevant variables of age, sex, and ZIP code. K-anonymity works by redacting datasets in just that way.

BJS applied the k-anonymity algorithm here as follows. First, it redacted all "direct

9

identifiers" in the dataset—such as the cells containing each inmate's full name and full date of birth. JAF 47-50. BJS then identified the variables that it considered to be "quasi-identifiers," meaning variables in a dataset that could be used to identify an individual when combined with other information, either on the MCI/DCRA datasets or any other available data sources (equivalent to age, sex, and ZIP code in the Weld example above). JAF 51-55. The goal of k-anonymity is to ensure that no record contains a unique combination of quasi-identifiers.

BJS opted for algorithm settings relating to the treatment of blank cells that minimized the overall number of redactions, and likewise instructed the algorithm to treat all cells as equally important, which minimized the number of cell suppressions. JAF 57-58. In addition, before running the algorithm, BJS first redacted any quasi-identifier value that was unique within its column, in order to limit the effect of rare values on the overall redaction results. JAF 59. Next, BJS redacted all the columns directly related to any quasi-identifier that was redacted by the algorithm, which was necessary to preserve the value of the redaction. JAF 60. For example, if the "state" variable were redacted but the "facility name" of "San Quentin State Prison" were to remain unredacted, the identity of the state would still be obvious.

Finally, BJS randomized the order of the rows. JAF 61. Because the underlying Excel file was sorted by column values (*e.g.*, in the "year" column, all the "2018"s followed by all the "2019"s), there would be little value in redacting a single "year" cell when the redacted value would be obvious from its surroundings.

Given the nature of the k-anonymity method, OJP's justifications for nondisclosure turn on the relationships between the quasi-identifier cells rather than on the particular contents of any specific cell. As result, OJP relies on the Declaration of Amy Lauger to provide Plaintiff with "sufficient information to present a full legal argument," rather than submitting a Vaughn index. *Minier v. CIA*, 88 F.3d 796, 804. (9th Cir. 1996).[10]

## PLAINTIFFS' STATEMENT OF FACTS

### A. The Death in Custody Reporting Acts

The Death in Custody Reporting Act was enacted in 2000 ("DCRA 2000") (current version at 34 U.S.C. § 12104). JAF 65. It required states to report to the Attorney General information regarding the death of any person held in custody by state and local law enforcement, including biographical information and the circumstances surrounding the death. JAF 66. From the start, Congress expected this data to be disclosed to the public. JAF 67, 81.

To implement DCRA, DOJ tasked the Bureau of Justice Statistics ("BJS") to create the Death in Custody Reporting Program, which included two programs: Mortality in Correctional Institutions ("MCI") and the Arrest Related Deaths. JAF 69, 71. Data

---

[10] OJP produced certain MCI records, subject to the same k-anonymity redaction method for Exemptions 6 and 7(c) in the related *Gannett* litigation in D.C. Although those records are not responsive to Plaintiff's requests here because they consist of state, not local data, the production in that case is available on OJP's FOIA reading room and illustrates how BJS applied k-anonymity. *See* https://www.ojp.gov/program/ojp-freedom-information-act/ojp-reading-room (last accessed April 29, 2024). The parties in the *Gannett* case are currently litigating the application of the k-anonymity method.

collected by BJS is restricted to "statistical or research purposes" and cannot be used for law enforcement, such as evidence in legal proceedings, 34 U.S.C. § 10134, and some data is subject to a confidentiality provision. *Id.* at § 10231. DCRA 2000 expired in 2006. JAF 76.

In 2014, Congress reauthorized "DCRA 2013." 34 U.S.C. § 60105. It required states receiving Edward Byrne Memorial Justice Assistance Grants ("JAG")—all fifty states and six territories—to report much of the same information required under DCRA 2000, JAF 82, 84-85, and mandated the AG issue a report analyzing the data. JAF 83. DCRA 2013 also required federal law enforcement agencies to report, resulting in BJS's Federal Law Enforcement Deaths in Custody Program ("FDCRP"). JAF 91-92. Finally, DCRA 2013 created an enforcement mechanism, allowing the AG to reduce states' JAG grants for noncompliance. JAF 86. (JAG has awarded more than $5 billion. Charlton Decl., Ex.K.) This resulted in moving state data collection from BJS to the Bureau of Justice Assistance ("BJA"), which administered the grants, effective in 2019. JAF 88. Audits revealed the data collected under DCRA 2013 is incomplete. JAF 112-113.

As of this filing, the AG has not issued its report or elected to reduce grants to any state, despite clear issues with compliance. JAF 93-94.

### B. Plaintiffs FOIA Requests and Procedural History

Plaintiff Corey, a researcher for *The Appeal*, submitted three FOIA requests seeking DCRA data. Request 1 seeks jail deaths reported by each jail facility participating in the MCI program from 2000 to 2018, including the decedents' year of death, state, facility,

and cause of death. JAF 1. DOJ withheld 182,611 pages of records under Exemption 3. JAF 22, 3-4. Request 2 seeks incident reports submitted under DCRA 2013 by federal, state and local agencies. JAF 8. DOJ withheld 25,115 records under Exemption 3. JAF 30, 12. Request 3 seeks all reports submitted under DCRA 2013 by federal law enforcement agencies from 2016 to 2020, the last full year of data available at the time. JAF 13. DOJ withheld 1,674 records under Exemption 3. JAF 35, 14. Plaintiffs timely appealed each denial. JAF 5, Corey Decl. ¶¶9, 15. OJP upheld the invocations of Exemption 3. JAF 6; Corey Decl. ¶¶10, 16. Plaintiffs sued in November 2022.ECF 1. DOJ has released fully-redacted spreadsheets under Exemption 3 and has applied redactions under Exemptions 6 and 7(C). JAF 7, 12, 15.

DOJ used "k-anonymity" to "de-identify" the dataset. *Supra,* 7-11. The algorithm works by removing "unique" data from an individual entry, such that remaining data is shared by at least one other individual. In a similar production provided to *USA Today*, the k-anonymity method resulted in complete redaction of full names and birth dates, as well as nearly all of the data related to manner of death. JAF 122-126. More than half of the facility names and locations are redacted, as well as 17% of the death months, 31% redaction of the death days, and 23% of the states where the death occurred. JAF 126.

## LEGAL STANDARD

Most FOIA cases are resolved on summary judgment. *Animal Legal Def. Fund v. U.S. FDA*, 836 F.3d 987, 989 (9th Cir. 2016). A court reviews an agency's response to a FOIA request *de novo*. 5 U.S.C. § 552(a)(4)(B). Summary judgment may be granted to an

agency on the basis of information provided in affidavits or declarations that describe "the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemptions, and show that the justifications are not controverted by contrary evidence in the record or by evidence of [agency] bad faith." *Berman v. CIA*, 501 F.3d 1136, 1140 (9th Cir. 2007). In evaluating an exemption claim, a court "must accord substantial weight to [the agency's] affidavits." *Minier*, 88 F.3d at 800 (quotation omitted).

## ADDITIONAL LEGAL STANDARDS

Under FOIA, agencies must disclose records unless disclosure is prohibited by law or the records fall within the nine exemptions in 5 U.S.C. § 552(b). *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 7–8 (2001) (citations omitted); 5 U.S.C. § 552(a)(8)(A). These exemptions are "interpreted narrowly." *Lahr v. NTSB*, 569 F.3d 964, 973 (9th Cir. 2009) (citations omitted). The agency "bears the burden of demonstrating that the exemption properly applies to the documents," *Lahr*, 569 F.3d at 973; § 552(a)(4)(B), and must articulate "tailored reasons" for their use. *Shannahan v. I.R.S.*, 672 F.3d 1142, 1148 (9th Cir. 2012). Neither boilerplate nor conclusory statements will suffice. *Id.*

Agencies "must search for documents in good faith." *Charles v. Off. Of the Armed Forces Med. Exam'r*, 730 F. Supp. 2d 205, 212 (D.D.C. 2010). And records may only be withheld if "the agency reasonably foresees that disclosure would harm an interest protected by an exemption." § 552(a)(8)(A)(i)(I); *Transgender L. Ctr. V. ICE,* 46 F.4[th]

14

771, 782 (9th Cir. 2022). The agency also bears the burden of demonstrating that "reasonably segregable portion[s] of a record" are disclosed. § 552(b). A district court "must make a specific finding that no information contained in each document or substantial portion of a document withheld is segregable." *Hamdan v. DOJ*, 797 F.3d 759, 779 (9th Cir. 2015) (citation omitted).

## ANALYSIS

### I.   Search Adequacy (Defendant's Position)

An agency can "demonstrate that it has conducted a search reasonably calculated to uncover all relevant documents . . . by reasonably detailed, nonconclusory affidavits submitted in good faith." *Lahr v. NTSB*, 569 F.3d 964, 986 (9th Cir. 2009). Here, Plaintiff's FOIA requests specified the particular data collections (and in the second request, the particular forms) of interest, and searches in response to all three requests were conducted by agency staff personally responsible for the relevant data collections. JAF 17, 26, 32. Agency staff searched all databases containing the respective data collections, and determined that no other locations were reasonably likely to contain responsive records. JAF 20, 29, 34. Defendant's searches were thus reasonably calculated to uncover all relevant documents.

### II.   Exemption 3 (Defendant's Position)

Exemption 3 permits an agency to withhold information that is "specifically exempted from disclosure by statute," if that statute "(i) requires that the matter be withheld from the public in such a manner as to leave no discretion on the issue; or (ii)

15

establishes particular criteria for withholding or refers to particular types of matters to be withheld." 5 U.S.C. § 552(b)(3). Exemption 3 entails a two-step inquiry. "First, a court must determine whether there is a statute within the scope of Exemption 3." *Minier*, 88 F.3d at 801. Second, "it must determine whether the requested information falls within the scope of the statute." *Id.*

At the first step, Title I's confidentiality provision "undoubtedly is" within the scope of Exemption 3. *Gannett Satellite Info. Network, LLC v. DOJ*, No. 22-cv-475 (BAH), 2023 WL 2682121, at *5 (Mar. 29, 2023). "No discretion is provided . . . on whether or not to disclose the information referred to," and the statute specifically identifies the "raw data reported by or on behalf of individuals" as the type of data "to be held confidential and not available for disclosure." *Baldridge v. Shapiro*, 455 U.S. 345, 355 (1982) (holding that a similarly worded provision in the Census Act satisfies Exemption 3).

Second, the information requested falls within the scope of the confidentiality provision. All three requests plainly seek "research or statistical information," and that information is "identifiable to specific private persons" because it particularly identifies individual decedents. 34 U.S.C. § 10231(a); *cf. Church of Scientology of Ca. v. IRS*, 484 U.S. 9, 17 (1987) ("removal of identification from [tax] return information would not deprive it of protection under" the applicable Exemption 3 withholding statute). The "dispositive question" is thus whether the information requested was "furnished under" Title I of the Crime Control Act. *Gannett*, 2023 WL 2682121, at *5.

The term "furnished under" is not defined in the statute, so the words are given their "ordinary, contemporary, common meaning." *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 433-34 (2019). "Furnished" means "provided or supplied." *Trope v. United States*, 276 F. 348, 350-51 (8th Cir. 1921); *accord Gannett*, 2023 WL 2682121, at *6. And the word "under," in the context of "under this title," means "in accordance with" or "in compliance with." *Kirtsaeng v. John Wiley & Sons, Inc.*, 568 U.S. 519, 530 (2013) (quoting 18 Oxford English Dictionary 950 (2d ed. 1989)).

Plaintiff's first request seeks data "furnished under" Title I because the data were exclusively collected on a voluntary basis pursuant to BJS's Title I statutory authority and there is no other possible statute under which the data could have been furnished. Title I authorizes BJS to collect data on all aspects of the criminal justice system on a voluntary basis, and to cooperate with state and local agencies in doing so. *See generally* 34 U.S.C. § 10132. BJS needs no additional authority to engage in voluntary data collection. For example, BJS maintains over 30 corrections-related data collections, and all data for those collections are submitted on a voluntary basis. *See* BJS, Corrections, Why Does Data Take So Long to Collect and Publish.[11]

Although Plaintiff's first request seeks data submitted to the MCI program, no responsive records were furnished under either version of the DCRA statute. The first request specifically seeks data "reported by local jails" that are "participating in the [MCI]

---

[11] Available at https://bjs.ojp.gov/topics/corrections (last accessed April 29, 2024).

reporting program," JAF 1, 2, and neither DCRA 2000 nor DCRA 2013 ever imposed any obligation on local jails to submit information to DOJ.

DCRA 2000 imposed a requirement on states to report information on deaths in custody, including deaths in "municipal or county jail[s]" and "local or State correctional facilit[ies]," but it did not impose any requirement on municipalities, counties, or localities to report information to DOJ. 42 U.S.C. § 13704(a)(2) (2000) (current version at 34 U.S.C. § 12104). Likewise, DCRA 2013 provides that "the State shall report to the Attorney General . . . information regarding the death of any person" in custody. 34 U.S.C. § 60105(a). It also specifies that the term "State" has the meaning given in Section 901(a) of Title I of the Crime Control Act, now codified at 34 U.S.C. § 10251(a). *Id.* § 60105(e). That provision, in turn, defines "State" to mean "any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, American Samoa, Guam, and the Northern Mariana Islands," *id.* § 10251(a)(2), and the immediately following provision separately defines a "unit of local government," *id.* § 10251(a)(3). When "[t]he text of the statute reveals that Congress distinguished between" two terms, "elementary principles of statutory construction" require courts to give those terms distinct meanings. *Hernandez v. Ashcroft*, 345 F.3d 824, 838 (9th Cir. 2003). Information responsive to the first request was thus furnished under Title I, and *only* under Title I.

Plaintiff's second and third requests each seek information that was required to be submitted by DCRA 2013, and Defendant does not dispute that such information was "furnished under" DCRA. But the information Plaintiff seeks was *also* "furnished under"

Title I, and is thus subject to the confidentiality provision. That provision protects information "furnished under," *i.e.*, supplied or provided in accordance with or in compliance with, Title I, regardless of whether it may also have been "furnished under" another statute as well.

The term "furnished under" does not naturally or necessarily imply exclusivity, which is why Congress and agency regulations have expressly specified when that is the intended meaning. *See, e.g.*, 38 U.S.C. § 3104(d) (prohibiting certain assistance to veterans "under this chapter" and specifying that "such assistance may be furnished only under" another section); 42 C.F.R. § 422.632(d)(1) (prohibiting cost recovery for certain Medicare services "to the extent that the services were furnished solely under the requirements of this section."). Likewise, the Ninth Circuit has recognized, for example, that proceedings to determine the validity of certain mining claims "under the General Mining Law of 1872" qualify as proceedings "under § 554" of the Administrative Procedure Act for purposes of awarding attorney's fees "under the [Equal Access to Justice Act]," even though the Mining Law "does not specifically state that § 554 applies to such proceedings." *Collord v. U.S. Dep't of Interior*, 154 F.3d 933, 935-36 (9th Cir. 1998). The same proceeding can be "under" the Mining Law, the APA, and the EAJA, because the phrase "under" is not the equivalent of "exclusively under." Similarly here, information may be (and was) "furnished under" both DCRA 2013 and Title I.

Plaintiff's second request seeks information submitted on two forms issued by BJA as part of its DCRA data collection, plus information submitted "pursuant to" DCRA 2013

on a specified BJA website. JAF 8. States are required to furnish information to BJA, a Title I entity, only by virtue of their voluntary participation in the Byrne JAG program, a Title I program, subject to enforcement via the potential loss of funds under that program. 34 U.S.C. § 60105(a), (c)(2). A state that does not participate in the Byrne JAG program has no obligation whatsoever to furnish any information under DCRA.

Plaintiff's third request seeks DCRA 2013 reports submitted by federal law enforcement agencies. JAF 13. DCRA 2013 requires all federal law enforcement agencies, starting in fiscal year 2016, to report death-in-custody data "in such form and manner specified by the Attorney General," to include, "at a minimum," the information that DCRA 2013 requires states to submit. 18 U.S.C. § 4001 note. Pursuant to the Attorney General's direction, federal DCRA information must be submitted to BJS, and federal law enforcement authorities must comply with BJS's guidance on reporting procedures and the information they are required to submit. [12]

The D.C. Circuit's decision construing a confidentiality provision in the Census Act covering, as does the Title I provision at issue here, "information furnished under the provisions of this Title" is instructive. *Seymour v. Barabba*, 559 F.2d 806, 807 (D.C. Cir. 1977). There, the plaintiff argued that the information it sought was not "furnished under the provisions of this Title" because the information may have been "acquired or supplied

---

[12] *See* The Attorney General's October 2016 Memorandum on DCRA, available as Appendix 3 to U.S. DOJ Office of the Inspector General, Review of the Department of Justice's Implementation of the Death in Custody Reporting Act of 2013, https://oig.justice.gov/reports/2018/e1901.pdf (last accessed April 29, 2024).

20

from sources other than the specific reporting establishments" under the Census Act. *Id.* at 809. The court rejected that argument, holding that it was sufficient for Exemption 3 that the data sought were "gathered by the Census Bureau" and "categorized and assembled for Census Bureau purposes." *Id.* at 808. The same is true here: The information Plaintiff's second and third requests seek was gathered by BJA and BJS, both Title I entities, and categorized and assembled for those offices' purposes as established by Title I, and thus qualifies as having been "furnished under" Title I.

Defendant acknowledges that the court in *Gannett*, the only decision specifically construing the provision at issue here, concluded that death-in-custody data were "furnished under" DCRA and were thus not protected from disclosure under Title I and Exemption 3. *See Gannett*, 2023 WL 2682121, at *10. Defendant's position is that that decision was erroneous for a number of reasons, including that it did not recognize that information could be "furnished under" both DCRA and Title I.[13]

## III.   Exemptions 6 and 7(C) (Defendant's Position)

Exemption 6 protects "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). Exemption 6 thus "protect[s] individuals from the injury and embarrassment that can result from the unnecessary disclosure of personal information." *Dep't of State v.*

---

[13] Defendant has sought reconsideration in *Gannett* as to MCI data that were not submitted under DCRA (because DCRA was not in force, or did not apply to local jails), which the opinion did not directly address. *See* 2023 WL 2682121, at *9 n.3. Defendant maintains its respectful disagreement with that court's holding as to data that were submitted under DCRA but has not sought reconsideration of that particular holding.

*Wash. Post Co.*, 456 U.S. 595, 599 (1982). The phrase "similar files" has a "broad, rather than a narrow meaning," and includes "[g]overnment records containing information that applies to particular individuals." *Forest Serv. Employees for Env. Ethics v. U.S. Forest Service*, 524 F.3d 1021, 1024 (9th Cir. 2008). The records at issue here contain data on the deaths of individual inmates, and thus satisfy Exemption 6's threshold requirement.

Exemption 7(C) similarly protects "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. §552(b)(7)(C). "[I]nformation initially contained in a record made for law enforcement purposes continues to meet the threshold requirements of Exemption 7" even when "that recorded information is reproduced or summarized in a new document for a non-law-enforcement purpose." *FBI v. Abramson*, 456 U.S. 615, 631-32 (1982). The phrase "law enforcement" in Exemption 7 is not "limited to federal law enforcement." *Shaw v. FBI*, 749 F.2d 58, 64 (D.C. Cir. 1984).

Departments of corrections and other state or local agencies that operate correctional facilities are law enforcement agencies. *Cf. Duffin v. Carlson*, 636 F.2d 709, 713 (D.C. Cir. 1980) (Federal Bureau of Prisons is "a criminal law enforcement authority."). And information compiled pursuant to the "law enforcement mission of protecting inmates, staff, and the community" qualifies for protection under Exemption 7's threshold inquiry. *Pinson v. DOJ*, 236 F. Supp. 3d 338, 365 (D.D.C. 2017) (applying Exemption 7 to "administrative remedy index," which "collects records pertaining to

wrongful conduct within the prison that were affirmatively created by BOP to fulfill its law enforcement responsibility of protecting inmates.").

Under both exemptions, the court "must balance the privacy interest protected by the exemptions against the public interest in government openness that would be served by disclosure." *Lahr*, 569 F.3d at 973. Although the analysis is similar for both exemptions, they "differ in the magnitude of the public interest that is required to override the respective privacy interests protected by the exemptions." *DOD v. FLRA*, 510 U.S. 485, 496 n.6 (1994). When, as here, both exemptions apply, the government "need meet only the lower threshold of Exemption 7(C). *Lahr*, 569 F.3d at 974. But "[b]ecause both exemptions require balancing of public and private interests, cases arising under Exemption 6 also inform [the court's] analysis" under Exemption 7(C). *Id.*

### A. Disclosure of the records Plaintiff seeks would constitute a clearly unwarranted invasion of personal privacy

The Supreme Court has emphasized that "the concept of personal privacy under Exemption 7(C) is not some limited or cramped notion of that idea." *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 165 (2004). Personal privacy, as protected by Exemptions 6 and 7(C), encompasses "the individual's control of information concerning his or her person" as well as an "interest in keeping personal facts away from the public eye." *DOJ v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 763 (1989). The Ninth Circuit has thus held that "[a] privacy interest is cognizable" under both exemptions if it is "nontrivial" and "more than de minimis." *Rojas v. FAA*, 941 F.3d 392, 405 (9th Cir.

2019) (internal citation and quotation marks omitted).

By definition, the records Plaintiff seeks here concern individuals who are no longer living. That fact does affect the analysis—"the deceased by definition cannot personally suffer the privacy-related injuries that may plague the living,"—but it is not dispositive, because "certain reputational interests and family-related privacy expectations survive death." *Campbell v. DOJ*, 164 F.3d 20, 33 (D.C. Cir. 1998). The Supreme Court has thus held that "FOIA recognizes surviving family members' right to personal privacy with respect to their close relative's death-scene images," and noted that its holding "ensures" that "child molesters, rapists, murderers, and other violent criminals" could not use FOIA to obtain "autopsies, photographs, and records of their deceased victims." *Favish*, 541 U.S. at 170. Likewise, the D.C. Circuit has held that "[d]eceased defendants never convicted of a crime retain a reputational interest in keeping information concerning their prosecutions out of the public eye." *ACLU v. DOJ*, 750 F.3d 927, 936 (D.C. Cir. 2014).

The records at issue here contain precisely the kind of highly sensitive and potentially embarrassing information about the subjects of the records that merits protection even post-mortem. Along with the full name, date of birth, and date of death of the deceased inmate, the records Plaintiff seeks all include information on the deceased inmate's sex and race and ethnicity, as well as a description of the circumstances surrounding the death. JAF 62-64. The data sets also includes information such as the inmate's place of death (including in a segregation unit, an on- or off-site medical center, and an on- or off-site mental health center); the cause of death (with specific variables for

causes including AIDS-related illness, accidental alcohol or drug intoxication, suicide, and homicide); and details about the inmate's medical and surgical care. *Id.* The privacy interest of the deceased and their relatives in keeping such highly intimate and sensitive details out of the public eye is plainly more than *de minimis*, and thus must be balanced against the public interest in disclosure. *Rojas*, 941 F.3d at 405.

**B.     The privacy interests at stake outweigh the public interest in disclosure**

Because "privacy concerns addressed by" Exemptions 6 and 7(C) "are present," Plaintiff bears the burden of showing "that the public interest sought to be advanced is a significant one, an interest more specific than having the information for its own sake," and that "the information is likely to advance that interest." *Favish*, 541 U.S. at 172. "[T]he *only* relevant public interest in the FOIA balancing analysis is the extent to which disclosure of the information sought would shed light on an agency's performance of its statutory duties or otherwise let citizens know what their government is up to." *Bibles v. Or. Natural Desert Ass'n*, 519 U.S. 355, 355-56 (1997). In that analysis, what matters is not public interest in the general subject matter, but instead only the "marginal additional usefulness" of the particular information withheld. *Lahr*, 569 F.3d at 978.

For Plaintiff's first and second requests, there is no cognizable public interest to weigh, because "FOIA is concerned only with shedding light on misconduct of the *federal* government, not *state* governments." *Rimmer v. Holder*, 700 F.3d 246, 258 (6th Cir. 2012). Thus, "just as there is no FOIA-recognized public interest in discovering evidence in federal government files of a private party's violation of the law, *see Reporters Comm.*,

489 U.S. at 774, there is no FOIA-recognized public interest in discovering wrongdoing by a *state* agency." *Landano v. U.S. Dep't of Justice*, 956 F.2d 422, 430 (3d Cir. 1992), *vacated on other grounds*, 508 U.S. 165 (1993); *accord Union Leader Corp. v. DHS*, 749 F.3d 45, 56 n.8 (1st Cir. 2014) (same, quoting *Landano*); *Rimmer*, 700 F.3d at 259 (same). The first and second requests seek only information from state and local, rather than federal, facilities. Such records are not relevant to the specific public interest that FOIA is concerned with, namely shedding light on the operations of the *federal* government.

Moreover, even Plaintiff's third request, which seeks information relating to federal law enforcement, would at best minimally advance the public interest. BJS already publishes comprehensive statistical reports derived from those data. *See* BJS, FDCP, Publications and Products.[14] Aggregate statistical information about deaths in federal custody is thus already publicly available. Releasing personally identifying information and medical details about particular individual decedents would provide minimal, if not zero, marginal additional benefit, but would impose grave privacy costs.

## C.    BJS appropriately redacted the records

An agency must disclose "any reasonably segregable" non-exempt portions of the requested records. 5 U.S.C. § 552(b). Whether information is "reasonably segregable," however, depends on the context. Thus, in a case involving a FOIA request for summaries of honors and ethics hearings at a military service academy, the Supreme Court noted that

---

[14]    *Available    at* https://bjs.ojp.gov/data-collection/federal-law-enforcement-agency-deaths-custody-reporting-program-fdcrp#2-0 (last accessed April 29, 2024).

"what constitutes identifying information regarding a subject cadet must be weighed not only from the viewpoint of the public, but also from the vantage of those who would have been familiar . . . with other aspects of his career at the Academy." *Dep't of Air Force v. Rose*, 425 U.S. 352, 380 (1976). The Supreme Court thus instructed the District Court, on remand, that "if in its opinion deletion of personal references and other identifying information is not sufficient to safeguard privacy, then the summaries should not be disclosed." *Id.* "[E]ven with names redacted, subjects of such summaries can often be identified through other, disclosed information." *Reporters Comm.*, 489 U.S. at 769.

Similarly, in a case involving Patent & Trademark Office disciplinary records, the D.C. Circuit held that the agency appropriately withheld information regarding court cases involving the subjects of the investigations, as well as their business associates and clients. *See Carter v. U.S. Dep't of Commerce*, 830 F.2d 388, 390-91 (D.C. Cir. 1987). Because court cases "are already in the public domain, release of certain portions of them, even with names redacted, could easily lead to the revelation of the documents in their entirety, including the identities of the attorneys involved." *Id.* at 391.

Likewise, in a case concerning data pertaining to certain Medicare claims submitted by physicians, the D.C. Circuit held that the records were properly withheld under Exemption 6 because, combined with information "publicly available on the internet," the data requested could reveal private financial information. *Consumers' Checkbook Ctr. for Study of Servs. v. HHS*, 554 F.3d 1046, 1049 (D.C. Cir. 2009). Specifically, the plaintiff sought "data elements includ[ing] the diagnosis, the type and place of service and the

Unique Physician Identifying Number (UPIN) of the physician who performed the services." *Id.* "A physician's name, office zip code, medical or surgical specialty and UPIN are publicly available on the internet," as are "[t]he fees a physician receives from Medicare for performing a specific service or procedure." *Id.* Putting that information together with the data requested by the plaintiff, it would be possible "to calculate the total payments Medicare made to any individually identified physician," which would compromise "a substantial privacy interest" in the physicians' finances. *Id.*

The "k-anonymity" method that BJS used to redact the records released to Plaintiff fits squarely within the logic of *Rose*, *Carter*, and *Consumers' Checkbook*. As in those cases, BJS sought to protect personal privacy by redacting certain variables in the dataset that could be combined with other, publicly available information to identify an individual (in BJS's terminology, "quasi-identifiers"). Rather than wholesale redacting all quasi-identifiers, however, as in *Carter* and *Consumers' Checkbook*, the k-anonymity method allowed BJS to redact quasi-identifiers only to the extent necessary to protect personal privacy. K-anonymity solves the problem of quasi-identifiers by making the smallest number of redactions necessary to ensure that no individual record contains a unique (and thus identifiable to the particular inmate) combination of quasi-identifiers.

The resulting pattern of redactions may appear arbitrary if viewed in isolation— OJP has, for example, redacted the "month of death" variable for some rows but not for all. But any such surface-level inconsistencies are merely an artefact of OJP's good-faith efforts to reasonably segregate information, by redacting quasi-identifiers only as

necessary. A variable may be identifying in the context of one row but not another, depending on the relationships between all of the variables in the dataset as a whole.

Requiring BJS to fully release the quasi-identifiers (or worse, the full datasets including full names and dates of birth) would produce manifest harms to privacy concerns of the most sensitive and intimate nature. In these circumstances, a "court may find the foreseeable-harm requirement" of 5 U.S.C. § 558(a)(8)(A)(i)(I) satisfied if "'the very context and purpose of' the withheld material 'make[s] the foreseeability of harm manifest.'" *Amiri v. Nat'l Sci. Found.*, 664 F. Supp. 3d 1, 21 (D.D.C. 2021) (quoting *Rep. Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 372 (D.C. Cir. 2021)). BJS properly withheld identifying and quasi-identifying information under Exemptions 6 and 7(C), and the k-anonymity method ensured that the redactions were no greater than necessary.

## PLAINTIFFS' ARGUMENT

### A. DOJ's Search Appears Inadequate

"[T]he agency must demonstrate beyond material doubt that its search was reasonably calculated to uncover all relevant documents." *Charles*, 730 F. Supp. At 205 (citations omitted). It is not clear whether DOJ unreasonably limited its searches to the specific forms in the Requests. *Supra,* 15, 19. Though the Requests cited specific forms, it appears over a dozen forms were used under DCRA since 2000. JAF 95-96. For example, Request 2 asks for information from federal agencies from DCR-1 and DCR-1A forms. However, federal agencies use forms CJ-13, CJ-13A, and CJ-13B. JAF 96. If Plaintiffs misidentified forms related to the requests or omitted a specific form, the agency

is obligated to search for whichever forms fulfill the substance of the Requests. *Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321, 326-27 (D.C. Cir. 1999) (requiring "methods which can be reasonably expected to produce" the "records…requested/additional records responsive to [his] request."). To the extent that DOJ did not reasonably include searches for other forms containing responsive data, Plaintiffs contest the adequacy of the search.

## B. Exemption 3 Does Not Apply

To justify this alleged confidentiality, DOJ has retroactively concocted an interplay between FOIA, DCRA, and the Crime Control Act. The truth is quite simple: DCRA records were meant to be disclosed. DOJ argues the BJS confidentiality provision mandates withholding the records. *Supra,* 15-21. It states:

> No officer or employee of the Federal Government, and no recipient of assistance under the provisions of this chapter shall use or reveal any research or statistical information furnished under this chapter by any person and identifiable to any specific private person for any purpose other than the purpose for which it was obtained in accordance with this chapter.

34 U.S.C. § 10231(a).[15] Exemption 3 only applies if the statute requires nondisclosure "in such a manner as to leave no discretion on the issue" or "establishes particular criteria for withholding or refers to particular types of matters to be withheld." § 552(b)(3). Assuming Sec. 10231(a) is such a statute, it does not apply here. These records were "furnished under" DCRA, not Chapter 101; do not identify "any specific private person;" and will be

---

[15] The Crime Control Act was enacted as Pub. L. No. 90-351 and used "title," referring to Title I, rather than "chapter." In the U.S. Code, Title I is codified as Chapter 101 (34 U.S.C. §§ 10101 to 10755). DCRA 2000 was originally codified in Title 42 of the U.S. Code and is now codified in Chapter 121 at 34 U.S.C. § 12104. DCRA 2013 is codified in Chapter 601 in Sec. 60105.

used for "the purpose for which [they were] obtained." § 10231(a).

DOJ offers a tortured reading of the statute. It argues the Death in Custody records were "furnished under" Chapter 101 of the Crime Control Act—rather than the DCRA statutes—because: 1) BJS is allowed to voluntarily collect this type of information, *supra,* 17-18; 2) local jurisdictions reporting to MCI (a DCRA program) were not obligated to report by DCRA, *id.*; 3) some information was furnished under both Chapter 101 and DCRA, because "furnished under" does not require "exclusivity," *id.* 19; 4) states who were not receiving JAG grants did not furnish under DCRA, *id.* at 19-20; and 5) records responsive to Requests 2 and 3 were gathered for BJS's purposes. *Id.* at 20-21. DOJ's bizarre reading of the provision is untenable for several reasons.

### 1. The Records Were Furnished Under DCRA, Not Chapter 101

"Furnish" means "to supply." *E.W. Bliss Co. v. U.S.*, 248 U.S. 37, 45 (1918); *Decker v. U.S.*, 140 F.2d 375, 377 (4th Cir. 1944) (furnish is "not a term of art"); *supra,* 17. "Under," though it has several definitions, means "subject or pursuant to," "governed by," or "by reason of the authority of." *Ardestani v. I.N.S.*, 502 U.S. 129, 135 (1991); *Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 39 (2008). Thus, Sec. 10231 only applies to information supplied pursuant to, or by reason of the authority of, Chapter 101. DCRA is *not in* Chapter 101 and therefore not governed by this statute. Instead, under the plain reading of "furnished under,"[16] the Death in Custody records were supplied to BJS

---

[16] "If the statutory language is unambiguous and 'the statutory scheme is coherent and consistent…the inquiry ceases.'" *Kingdomware Techs., Inc. v. U.S.*, 579 U.S. 162, 171 (2016).

subject to the requirements and responsibilities outlined in DCRA, which contains no confidentiality provision.

Before DCRA, BJS collected only annual, aggregate data from states and federal agencies. JAF 73. DCRA fundamentally changed the type and quality of the data collected regarding deaths in custody—the specificity of the data, the frequency of collection, and compliance mechanisms. JAF 74. DCRA required "detailed, individual inmate death records," collected from the state prison systems, as well as over 3,000 jail jurisdictions and roughly 18,000 State and local law enforcement agencies. *Id.* In a 2000 submission to the OMB, BJS called the DCRA data a "supplement" to the aggregate data it already collected and stated that the new forms were also meant "[t]o *comply* with Pub. L. 106–297's [DCRA 2000] *new requirement* for a quarterly collection of inmate death data from local jails [and] State prisons.". JAF 72. In 2003, when BJS began collecting arrest-related deaths under DCRA, it  noted that BJS began collecting quarterly prison and jail information "in order to implement Pub. L. 106-297." *Id.* As a result, OMB authorized the use of several forms to collect this new data, including CJ-9 and CJ-10. *Id.* Between 2000 and 2006 and since 2015, this collection was de *facto* compulsory. Though the statute only applies to states receiving certain grants—upon reauthorization, JAG grants—that condition encompasses all 50 states and six territories. Reporting is only voluntary to the extent a state decides it can accept a reduction in grants from the federal government.

The collections between 2007 and 2014 were also "furnished under" DCRA, as BJS continued to use the forms authorized to implement DCRA. In other words, while

participation was not mandatory, it was subject to DCRA's guidelines and for DCRA's purposes. In its 2009 form instructions, BJS indicated that collecting certain information "was required by the Death in Custody Reporting Act of 2000." *See* JAF 78. Critically, these directions specify only that names are subject to confidentiality and do not mention the BJS confidentiality provision.

Nevertheless, DOJ specifically seeks to exclude MCI data submitted by local entities between 2000 and 2019, arguing it was not provided under DCRA. This argument ignores that DCRA requires states to report local, county, and municipal data, and those entities are "subordinate governmental instrumentalities created by the State to assist in the carrying out of state governmental functions." *Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 362 (2009) ("Political subdivisions of States—counties, cities, or whatever— never were and never have been considered as sovereign entities."). DOJ has offered no evidence that local subdivisions provided DCRA data independently of their state.

In fact, DOJ has not even shown the data it seeks to withhold was submitted by local subdivisions. For decades, California and Texas have independently required local law enforcement to report deaths in custody to the state's attorney general under state law. JAF as 79. The state authority then submitted to the DOJ. For these states—and any with similar reporting models—local data cannot reasonably be considered voluntarily or independently submitted. *See* JAF 75. Even if the Court accepts that some local entities submitted data voluntarily and separately from DCRA—which DOJ has not shown—it is DOJ's burden to also show to which states' data this theory applies, and it has failed to do

33

so.

DOJ also argues that DCRA records were furnished under *both* Chapter 101 and DCRA, because "furnished under" does not require "exclusivity." Even if this were true, it precludes application of Exemption 3, which requires "no discretion on the issue" or "criteria for withholding." § 552(b)(3). Under DOJ's theory, DCRA and Sec. 10231 apply simultaneously to the records. However, DCRA promotes transparency and anticipated disclosure of the records; and Sec. 10231, according to the DOJ, requires near total secrecy. There is no way to reconcile these two purposes and no statutory requirement to follow Sec. 10231 over DCRA.

Additionally, DOJ's reading of Sec. 10231 does not identify any BJS documents not subject to withholding, because documents "furnished under" Chapter 101 would encompass all documents "collected by" BJS. In Sec. 10134, Congress restricted uses of data "collected by" BJS to research and statistical purposes. "Furnished under" should necessarily mean something different, or it would render part of the statute superfluous. *Corley v. U.S.*, 556 U.S. 303, 314 (2009) ('[a] statute should be construed so that...no part will be inoperative or superfluous"). DOJ's reading is circular and would require that information provided "in accordance" or "in compliance" with Chapter 101, *see supra,* 17, be restricted in accordance with Chapter 101, as the rest of Sec. 10231 simply rehashes the allowed purposes of BJS data under Sec. 10134.

DOJ's reliance on *Seymour* is misplaced. *Supra,* 20-21. There, plaintiff sought information used by the Census Bureau, which the Bureau withheld under Exemption 3.

34

*Seymour v. Barabba*, 559 F.2d 806, 807 (D.C. Cir. 1977). The court affirmed, despite the records being "acquired or supplied from other sources," because they were "categorized and assembled *for the Census Bureau purposes*." *Id.* at 808 (emphasis added). Here, DOJ argues that the federal agencies gathered the data for BJS/BJA's purposes. But BJS/BJA are simply repositories for data gathered by federal, state, and local authorities *for the purposes of DCRA*. It was only by virtue of the DCRA statutes that this data was supplied at all.

### 2. The Records Do Not Identify "Any Specific Private Person"

When "person" is used in a statute, "there is an implied presumption that a person is alive." *Kirby v. AT&T Corp.*, 2022 WL 17184565, at *9 (S.D. Cal. Nov. 23, 2022). In *Kirby*, the court looked to the statute text to determine its application to living persons. *Id.* (pointing to phrases, such as "health or welfare" and "major life activities," that "deceased persons cannot do."). That presumption applies here as the rights Sec. 10231 protects— privacy and freedom from prosecution or government interference—do not survive death. *See* § 10134 (data collected by BJS "precludes their use for law enforcement or any purpose relating to a private person or public agency other than statistical or research purposes."); *Cordell v. Detective Publ'ns, Inc.*, 419 F.2d 989, 990–91 (6th Cir. 1969) (the tort of public disclosure of private matters "lapses with the death of the person who enjoyed it, and one cannot recover for this kind of invasion of the privacy of a relative, no matter how close the relationship."); *U.S. v. Dunne*, 173 F. 254, 257 (9th Cir. 1909) ("at common law actions on penal statutes do not survive" death); *Keller v. Finks*, 2014 WL

35

1283211, at *1 (C.D. Ill. Mar. 31, 2014) ("after death, Decedent was no longer a person within our constitutional and statutory framework and…had no rights of which she may have been deprived."); *see also* DOJ, Overview of the Privacy Act of 1974, at 23 (ed. 2020), https://www.justice.gov/Overview_2020/download ("Deceased individuals do not have any Privacy Act rights, nor do executors or next-of-kin.")

By definition, Death in Custody Records identify the deceased and thus do not identify "specific private persons." Therefore, Sec. 10231 cannot apply.

### 3. The Records Will Be Disclosed for The Purpose For Which They Were Obtained

Sec. 10231's prohibition applies only when documents will be used "for any purpose other than the purpose for which [they were] obtained in accordance with this chapter." This independently prevents application of Sec. 10231 to Plaintiffs' requests, as the documents will be used for "statistical and research purposes." *See also* § 10134 (records only to be used for statistical or research purposes).

Under BJS policy, statistical purposes exclude "any administrative, regulatory, law enforcement, adjudicatory, or other purpose that affects the rights, privileges, or benefits of a particular identifiable respondent." Section 502(9)(A) of the E-Government Act of 2002; *see also* § 10134. Further, DCRA's legislative history confirms that its broader purpose is oversight, transparency, and accountability. JAF 67 (DCRA 2000 "will provide openness in government and will bolster public confidence and trust in our judicial system."); *id.* at 68 (Congress "should have an opportunity to analyze the data and see

36

what we can learn from it. And the American people deserve the same."). Plaintiffs' intended uses accord with the purposes of BJS and DCRA. *See* Corey Decl. at ¶6; *see generally* Deitch Decl.

### 4. Federal Employees And Recipients Of Grants Have Disclosed Data, Which Would Otherwise Be Prohibited Under Sec. 10231

Section 10231 applies to "officer[s] and employee[s] of the Federal Government" and "recipient[s] of assistance under the provisions of this chapter"—all fifty states, six territories, and thousands of local law enforcement entities. JAF 84-85, Exs. J, K. Applying DOJ's logic, no federal agency, state, or unit of local government should disclose the data Plaintiffs seek. However, this does not comport with practice as both federal and state agencies have disclosed this identical data either in reports or in response to public records requests.

In 2023, DHS Office of Inspector General released a report regarding deaths in custody for ICE and CBP, citing the FDRCP. JAF 115. This report discloses details the DOJ now insists are confidential. The section, "Review of Deaths of Detainees in ICE Custody," describes ten case studies, providing the full name, country of origin, correctional facility, state, reason for detention, (detailed) discussion of medical histories, details about the day and reason of their deaths, and the date of their deaths. These are the exact details the DOJ is withholding under Sec. 10231 and through its overcomplicated redaction algorithm.

States have also disclosed this identical information. *See* JAF 79, 118-120. The

Pennsylvania Commission on Crime and Delinquency produced, *inter alia*, CJ-9, DCR-1 and DCR-1A forms, and detailed spreadsheets pursuant to a reporter's public records request. *Id.*; Vaughn Decl. at ¶¶4-10. Generally, the documents redacted only the decedent's date of birth and social security number. *Id.* In addition, the Incarceration Transparency Project has made available CJ-9 forms used in its research of deaths in custody in Louisiana. *Available at,* https://tinyurl.com/5n6ksp6v. The release of this information demonstrates the lack of clarity and consistent application of Sec. 10231 to this type of record and belies the DOJ's interpretation.

Consistent with these public disclosures, the requested records do not meet the criteria for withholding under Section 10231 and should be produced in full.

### C. Exemptions 6 and 7 are Not Properly Invoked

Exemption 6 protects "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). Exemption 7(C) protects "records or information compiled for law enforcement purposes" that "could reasonably be expected to constitute an unwarranted invasion of personal privacy." § 552(b)(7)(C). In deciding whether a record properly has been withheld pursuant to either exemption, "[the court] must balance the privacy interest protected by the exemptions against the public interest in government openness that would be served by disclosure." *Id.* For the independent reasons below, Exemptions 6 and 7(C) do not apply.

### 1. The records are not for "law enforcement purposes."

38

This threshold showing for Exemption 7 requires that records were collected either as investigatory records or because "they are akin to 'guidelines, techniques, and procedures for law enforcement investigations and prosecutions outside of the context of a specific investigation.'" *Pinson v. DOJ*, 236 F. Supp. 3d 338, 364–65 (D.D.C. 2017). Neither applies here.

First, the BJS authorizing statute precludes its data from "use for law enforcement." § 10134. BJS collected all DCRA data from 2000 to 2019 and continues to collect federal DCRA data. The transfer of state data to BJA in 2019 did not change the *purpose* of their collection. Indeed, the DOJ stated data collection was only moved to implement grant reductions—an administrative action it has yet to take. JAF 88, 93.

Though courts defer to law enforcement agencies regarding the purpose of their records, that deference is not "vacuous." *Pinson*, 236 F. Supp. 3d at 364. Here, DOJ established neither a "rational nexus" between *any* "individual or...incident as the object of its investigation" and "one of [DOJ's] law enforcement duties," nor a "connection between an 'individual or incident and a possible security risk or violation of federal law.'" *Pratt v. Webster*, 673 F.2d 408, 420 (D.C. Cir. 1982).

DOJ argues "prisons perform law enforcement functions" when they "impose discipline for violation of the criminal laws and prison regulations by convicted prisoners" through "investigat[ion] and maint[enance of] sources of intelligence," *Duffin v. Carlson*,

636 F.2d 709, 713 (D.C. Cir. 1980); *supra,* 22, but that does not apply here. [17] DCRA records are summary accounts of the *fact* of an inmate's death, more akin to death certificates or autopsy reports. *Cf. Mingo v. DOJ*, 793 F. Supp. 2d 447, 453 (D.D.C. 2011) (applying Exemption 7 to records "pertain[ing] to an altercation involving over 50 inmates"); *Holt v. DOJ*, 734 F. Supp. 2d 28, 41 (D.D.C. 2010) (regarding "investigation of an inmate-on-inmate assault"). To the extent a death triggered an investigation— perhaps in the case of a homicide—those documents are not included in these records. DOJ's comparison to the "administrative remedy index" in *Pinson*, which "collects complaints by inmates about the conditions of their confinement," is inapt. *See supra*, 22; *Pinson*, 236 F. Supp. 3d at 365 (rejecting Exemption 7 to litigation settlement documents). If DOJ believes these records were created for law enforcement purposes, "it must say much more about the particular incident and threat involved." *Id.* at 366. It has failed to do so and cannot justify its wholesale withholdings.

### 2. DOJ did not properly invoke Exemption 6.

DOJ has not and cannot show that disclosure "would constitute a clearly unwarranted invasion of personal privacy." § 552(b)(6).

### a. The Deceased Have Diminished Privacy Interests

DOJ must demonstrate "some nontrivial privacy interest in nondisclosure. *DOD v.*

---

[17] DOJ argues that "law enforcement" includes *state* agencies, drawing on *Shaw v. FBI*. 749 F.2d 58, 64 (D.C. Cir. 1984). *Shaw* noted that a federal investigation of a state crime or a collaboration between federal and state agencies could establish law enforcement purposes, but did not conclude that state law enforcement action alone is sufficient. DOJ must still identify an investigation and federal involvement, *id.,* and has not done so.

*Fed. Labor Relations Auth.*, 510 U.S. 487, 501 (1994). Privacy is implicated if disclosure "affects…the individual's control of information concerning his or her person," "constitutes a public intrusion long deemed impermissible under the common law;" or results in "possible embarrassment, harassment, or the risk of mistreatment." *Cameranesi v. DOD*, 856 F.3d 626, 638 (9th Cir. 2017) (citations omitted).  However, "death clearly matters, as the deceased by definition cannot personally suffer the privacy-related injuries that may plague the living." *Campbell v. DOJ*, 164 F.3d 20, 33 (D.C. Cir. 1998). Family members retain some privacy interests, but "[t]his does not mean that the family is in the same position as the individual who is the subject of the disclosure." *Nat'l Archives & Recs. Admin. v. Favish*, 541 U.S. 157, 167 (2004).[18] Here, DOJ has not articulated any nontrivial privacy interest in light of the death of the subjects and the varying information that may be disclosed. Instead, DOJ applies one generic privacy interest to withhold information about the thousands of decedents in the DCRA records.

Further, DOJ has not specified what information warrants consideration of privacy interests. *Supra*, 24. Citing no legal authority, DOJ notes sex, race, and ethnicity, which are not private details, as well as the "circumstances surrounding the death"—presumably information such as cause of death—as "highly sensitive and potentially embarrassing." *Id.* Such details are precisely what the DCRA records are meant to capture for analysis.

---

[18] *Favish* and *NASA* involved highly personal records, which are not sought here. *Favish*, 541 U.S. at 170–71 (recognizing "surviving family members' right to personal privacy with respect to their close relative's death-scene images."); *New York Times Co. v. NASA*, 920 F.2d 1002, 1004 (D.C. Cir. 1990) (plaintiff sought "a tape of the voices of the Challenger crew").

Whatever interests exist in the plain facts surrounding these biographical and factual details are *de minimis*. In *U.S. v. Schlette*, the court found that "disclosure of a defendant's previous criminal record, early life and developmental history, school and employment record, mental and physical condition, religion, habits, attitudes, associates and other pertinent factors" *may* "militate against disclosure." 842 F.2d 1574, 1580-81 (9th Cir. 1988). "But when the defendant is dead…this ground for nondisclosure is foreclosed. Privacy interests are personal to the defendant and do not survive his death." *Id.* at 1581. Even in *Favish*, where the court withheld gruesome death scene photos, the "circumstances surrounding the death" were public knowledge. *See* 541 U.S. at 167.

*Even if* some privacy interest existed in these records, they vary across the thousands of decedents and their families. And the court must deny DOJ's motion as it makes no distinction between these interests. In *Pinson*, the court found that the "BOP's categorical approach provided insufficient explanation of the disparate privacy rights involved." *See Pinson*, 236 F. Supp. 3d at 363-64 (rejecting application of Exemption 6). The court noted that the method was "insufficiently precise" because the "range of circumstances included in the category must 'characteristically support an inference that the statutory requirements for exemption are satisfied.'" *Id.* at 363. DOJ's motion suffers from the same shortcomings.

For example, courts have found privacy interests in criminal records, *Landano v. DOJ*, 956 F.2d 422, 426 (3d Cir. 1992) (recognizing privacy protections depending on individual circumstances); *ACLU v. DOJ*, 750 F.3d 927, 931 (D.C. Cir. 2014) (criminal

records of a convicted defendant "would compromise more than a de minimis privacy interest, [but] it would not compromise much more." (citations omitted)). There is further differentiation depending on the outcome of the matter, *Id.* at 931-33, and even based on charge. *Pinson*, 236 F. Supp. 3d at 364 ("'the privacy interest of tort claimants will be different when they are claiming injury from a slip and fall as compared to a sexual assault.'" (citations omitted)).

Here, the majority of decedents died in prison after conviction and thus have de minimis, if any, privacy interests in these records. And their families' interests are reduced further still. But DCRA also collects information for arrest-related deaths and deaths in jails, where the status of the individual or their charges cannot reliably be assumed. A decedent who had been awaiting trial on murder charges has lesser interests than a person who died during a traffic stop. *ACLU*, 750 F.3d at 931-33. Because the DOJ has offered, at best, only a categorical privacy interest for the thousands of potentially responsive records, the court must deny summary judgment in its favor.

### b. Public interest outweighs private interests that may exist

Releasing the records serves the public interest by "shed[ding] light on [DOJ's] performance of its statutory duties," under DCRA, to collect and study the deaths in custody for federal, state, and local entities. *Bibles v. Or. Natural Desert Ass'n*, 519 U.S. 355, 355–56 (1997). Full compliance would allow Congress and the public to evaluate whether federal funding to state and local law enforcement is being properly allocated and what other tools are needed to reduce the harms to people in custody. Deitch Decl. ¶9.

43

Multiple audits of DCRA data show significant noncompliance by the states and unclear or evolving "form and manner" of collection from the AG.[19] JAF 97, 112-113. Since 2015, the AG used inconsistent methods for data collection; for example, implementing then abandoning "open source review" to cross-check state data. JAF 99. The AG also has failed to impose any JAG grant reductions, the most persuasive tool at its disposal, despite noncompliance. JAF 93.

Disclosure also "let[s] citizens know 'what their government is up to'" more generally. *Bibles*, 519 U.S. at 355–56 (citations omitted). Congress delegated an oversight role to the Executive branch in response to nationwide concerns about people dying in custody, *i.e.*, when the state "has virtually complete control." *Illinois v. Perkins*, 496 U.S. 292, 303 (1990) (concurring); Deitch Decl. ¶11. This oversight responsibility is intended to result in accountability and transparency through evaluating the breadth of this problem, providing insight and recommendations, and ultimately *preventing* deaths in custody. For example, if deaths are trending upward, analysis can spark federal investigation, guidance, or policy to address it, and determine whether it was effective. The data can be tracked against the past 24 years of social events, administration changes, political considerations, and funding to determine the effect and extent of—and motivation for—this oversight duty.

---

[19] *Wessler*, 381 F. Supp. 3d 253, 260 (S.D.N.Y. 2019) ("significant" public interest where "audits from DOJ's Inspector General have already identified serious deficiencies with respect to the very topic Wessler is investigating—the monitoring and oversight of state, local, and private facilities by USMS).

Indisputably, the public interest is furthered by understanding who is dying in custody, how, and why, as well as whether the federal government is pulling available levers in order to prevent these deaths, especially when there is intentional misconduct at the state level. *Wessler v. DOJ*, 381 F. Supp. 3d at 260 ("The public has a right to know the circumstances under which people die while detained.")(releasing medical records of deceased U.S. Marshall detainees). These layers of oversight and power are the basis of Federalism.

Because DOJ has completely withheld these documents and has yet to conduct and release its mandated report under DCRA, disclosure has more than a "marginal additional usefulness" to exposing the government's failure to comply with DCRA. *Lahr*, 569 F.3d at 978 (regarding witness and agent names in otherwise unredacted records); *cf. Favish*, 541 U.S. at 162 ("Any purported public interest in disclosure, moreover, 'is lessened because of the exhaustive investigation that has already occurred regarding Foster's death.'").

The public interests outweigh the de minimis privacy interests that may be present, and DOJ has not and cannot demonstrate a "clearly unwarranted" invasion of personal privacy.[20]

### 3. DOJ Has Not Identified a Foreseeable Harm

DOJ has an "independent and meaningful burden" to "articulate both the nature of

---

[20] *ACLU*, 750 F.3d at 930 (D.C. Cir. 2014) ("public interest in 'what the government is up to' outweighs the privacy interests of persons who have been convicted of crimes or have entered public guilty pleas").

the harm [from disclosure] and the link between the specified harm and specific information contained in the material withheld." *Reporters Comm. For Freedom of the Press v. FBI*, 3 F.4th 350, 369 (D.C. Cir. 2021) (citations omitted).  It "cannot rely on "mere 'speculative or abstract fears,' or fear of embarrassment." *Id.* By providing only "generalized assertions," *id.,* that the release of "quasi-identifiers" would "produce manifest harms to privacy concerns of the most sensitive and intimate nature," the DOJ has not met this burden. *Supra,* 28-29; *Dep't of the Air Force v. Rose,* 425 U.S. 352, 380 n.19 ("Exemption 6 was directed at threats to privacy more palpable than mere possibilities.").

DOJ relies on *Amiri v. Nat'l Sci. Found.*, 664 F. Supp. 3d 1, 21 (D.D.C. 2021). This case is inapposite. In *Amiri*, the court weighed a disgruntled researcher's unmoored theories of misconduct against the release of PII of students and individual government employees involved in awarding grant proposals. In *Favish*, the decedent's family was able to show that prior investigations had resulted in harassment and profiteering from the public, resulting in "nightmares and heart-pounding insomnia." 541 U.S. at 167. Here, to support its speculation, the DOJ expects the Court to extrapolate "foreseeable harm" to decedents from the mere disclosure of "quasi-identifiers," which include details such as gender and facility name. *See supra,* 28-29; *see Schlette*, 842 F.3d at 1580 (noting "harm from violation of privacy interests" from disclosure of presentencing reports was "speculative.") (citing *Berry v. DOJ*, 733 F.2d 1343, 1352 n.14 (9th Cir. 1984) (when in the public record, "no significant intrusion on the privacy of the individual criminal").

Consistently, identical DCRA submissions have been released by other government agencies, and no harms have been identified. *See infra* 37-38; Vaughn Decl. at ¶ 11, Ex. A.

Because of decedents' *de minimis* privacy rights, DOJ must do more than nod to these "manifest harms."

### D.   DOJ Has Failed to Reasonably Segregate Data

Without legal authority, DOJ insists the DCRA records must be entirely "de-identified," citing the out-of-context identification of a governor in a 1990s research dataset. *Supra,* 7-11. Such stringent redaction is not mandated (or warranted) here. The DCRA dataset was created to promote transparency and accountability. Even assuming *any* redaction is warranted, there is no evidence that anything more than PII (*i.e.*, full names and birth dates, and social security numbers) is appropriate. JAF 118-121. Indeed, the AG has only indicated that disclosure "will exclude personally identifiable information"—nothing more. Charlton Decl., Ex. D at 8. This directive acknowledges that the remaining data is essential to the utility of the dataset. In contrast, DOJ's algorithm strips the data to nothing, removing entire columns of information at the core of any meaningful analysis—how inmates die, where, and why. JAF 47-60, 126.

DOJ's redaction algorithm is also inappropriate for the same reasons it cannot articulate privacy interests: it treats the dataset as a singular, monolithic unit, rather than unique incidents. Redacting more than PII requires individualized analysis of each decedent's privacy interests, which the DOJ has not done. *See Rose*, 425 U.S. 352, 381 (1976) (remanding for in camera review, as "what constitutes identifying information

regarding a subject cadet must be weighed not only from the viewpoint of the public, but also from the vantage of those who would have been familiar").

## PLAINTIFFS' CONCLUSION

For the foregoing reasons, the Court should grant summary judgment in favor of Plaintiffs and order the disclosure of the records subject to Plaintiffs' request.

## DEFENDANT'S CONCLUSION

For the foregoing reasons, the Court should grant summary judgment in favor of Defendant on all of Plaintiff's claims. Should the Court determine that Exemption 3 does not apply to any portion of Plaintiff's requests, it should nevertheless grant summary judgment in favor of Defendant on Exemptions 6 and 7(C).

Dated: May 31, 2024                    DAVIS WRIGHT TREMAINE LLP

_____

Leena Charlton
*Attorneys for Plaintiffs*

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

MARCIA BERMAN
Assistant Branch Director

*/s/ Cormac A. Early*
CORMAC A. EARLY
D.C. Bar. No. 1033835
Trial Attorney, U.S. Department of Justice

48

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Tel.: (202) 616-7420
cormac.a.early@usdoj.gov

*Counsel for Defendants*