| No. | Fact | Supporting Evidence | Pl.'s Response |
|---|---|---|---|
| Plaintiff's FOIA requests | | | |
| 1. | Plaintiff submitted a FOIA request to OJP on October 10, 2019, seeking '[t]he number of jail deaths reported (and/or unique CJ-9 forms submitted) by each jail facility participating in the Mortality in Correctional Institutions reporting program (f.k.a. the Death in Custody Reporting Program) each year from 2000 to 2018, inclusive." | ECF 1-1 at 2; Carson Decl. ¶ 4. | Admitted. |
| 2. | Plaintiff specified that the request sought "the data recorded in the following columns contained in the data-file," namely, "YEAR, STATE, FACLOC, FACNAME_J, CAUSECOL, FACID, PLACE2000_2013" as well as "any other non-exempt information contained in the ICPSR 34286 data file." | ECF 1-1 at 2. | Disputed. Plaintiff's request sought "at minimum" the information listed. |
| 3. | OJP responded to Plaintiff's FOIA request by letter dated March 31, 2020. | Carson Decl. ¶ 11. | Admitted. |
| 4. | OJP's response stated that all of the records located in response to the FOIA request were exempt from disclosure under FOIA Exemption 3. | Carson Decl. ¶ 11. | Admitted. |
| 5. | On June 20, 2020, Plaintiff appealed the withholding decision to DOJ's Office of Information Policy. | Carson Decl. ¶ 12. | Admitted. |
| 6. | On November 30, 2020, OIP affirmed OJP's withholding of | Carson Decl. ¶ 13. | Admitted. |

| | | | |
|---|---|---|---|
| | records under FOIA Exemption 3. | | |
| 7. | On January 31, 2024, OJP provided the requested records to Plaintiff, with redactions pursuant to FOIA Exemptions 3, 6, and 7(C). | Carson Decl. ¶ 15. | Admitted. *See also* Charlton Decl. ¶ 16, Ex. P; Corey Decl. ¶ 17 |
| 8. | On July 27, 2020, Plaintiff submitted a second FOIA request to OJP, seeking the following records from October 1, 2019, to the date the request was fulfilled:<br><br>1. All DCR-1 quarterly summary forms submitted by federal, state, and local agencies to the Office of Justice Programs ("OJP"), the Bureau of Justice Assistance ("BJA"), or any of its contractors or agents. (Footnote reference: Form DCR-1, "Quarterly Summary." OMB No. 1121-NEW).<br><br>2. All DCR-1A incident reports submitted by federal, state, and local agencies to OJP, BJA, or any of its contractors or agents. (Footnote reference: Form DCR-1A, "Incident Report," OMB No. 1121-0365).<br><br>3. All Edward Byrne Memorial Justice Assistance Grant ("JAG") Performance Management Tool reports submitted by state and local agencies using the online portal located at https://bjapmt.ojp.gov/ that include reporting | ECF 1-1 at 25-25; Steyee Decl. ¶ 4. | Admitted. |

2

| | | | |
|---|---|---|---|
| | pursuant to the Death in Custody Reporting Act of 2013. (Footnote reference: In the Fiscal Year 2020 State Formula Solicitation for the JAG program, BJA notes, "BJA requires reporting from states pursuant to DCRA, which requires states and federal law enforcement agencies to report certain information to the Attorney General regarding the death of any person occurring during interactions with law enforcement officers or while in custody. All reporting for DCRA will be submitted via the BJA Performance Management Tool (PMT), located at https://bjapmt.ojp.gov." Bureau of Justice Assistance, Edward Byrne Memorial Justice Assistance Grant (JAG) Program Fiscal Year 2020 State Formula Solicitation, March 12, 2020, available at http://www.bja.ojp.gov/ sites/g/files/ xyckuhl186/ files/media/documents/ bja-2020-17277.pdf). | | |
| 9. | The DCR-1 and DCR-1A forms referenced in Plaintiff's request are Web-based and responses are saved in database format. | Steyee Decl. ¶ 5. | Admitted. Plaintiffs have no knowledge either way related to how the responses are saved. |

| 10. | State agencies collect the data responsive to the DCR-1 and DCR-1A forms and report it to BJA in the online Performance Management Tool, available at bjapmt.ojp.gov | Steyee Decl. ¶ 5. | Admitted. |
|---|---|---|---|
| 11. | Only States, and not local or federal jurisdictions, report to BJA the death in custody information found on the DCR-1 and DCR-1A forms. | Steyee Decl. ¶ 5. | Admitted. |
| 12. | On January 31, 2024, OJP provided the requested records to Plaintiff, with redactions pursuant to FOIA Exemptions 3, 6, and 7(C). | Steyee Decl. ¶ 16. | Admitted. *See also* Charlton Decl. ¶ 16, Ex. P; Corey Decl. ¶ 17 |
| 13. | On February 5, 2021, Plaintiff submitted a FOIA request to OJP seeking "[a]ll Death in Custody Reporting Act (DCRA) reports submitted by federal law enforcement agencies (including the Bureau of Prisons) from FY2016 to FY2020." | ECF 1-1 at 35; Scott Decl. ¶ 4. | Admitted. |
| 14. | On February 24, 2021, OJP responded by Plaintiff's FOIA request via letter, stating that all responsive records were exempt from disclosure pursuant to FOIA Exemption 3. | Scott Decl. ¶ 10. | Admitted. |
| 15. | On January 31, 2024, OJP provided the requested records to Plaintiff, with redactions pursuant to FOIA Exemptions 3, 6, and 7(C). | Scott Decl. ¶ 16. | Admitted. *See also* Charlton Decl. ¶ 16, Ex. P; Corey Decl. ¶ 17 |
| OJP's searches for responsive records | | | |
| 16. | Elizabeth Ann Carson conducted BJS's search in response to Plaintiff's October 10, 2019 FOIA request. | Carson Decl. ¶ 5. | Admitted. Plaintiffs have no knowledge either way. |
| 17. | Carson managed the MCI data collection from 2019 to 2023. | Carson Decl. ¶ 1. | Admitted. Plaintiffs have no knowledge either way. |
| 18. | In response to Plaintiff's FOIA request, on October 17, 2019, Carson searched the databases | Carson Decl. ¶ 5. | Admitted. Plaintiffs have no knowledge either way. |

| | | | |
|---|---|---|---|
| | that contained information submitted to the MCI program on the CJ-9 (Death Report on Inmates Under Jail Jurisdiction) and CJ-9A (Annual Summary of Death Reports on Inmates Under Jail Jurisdiction) forms. | | |
| 19. | Carson also searched the personal folders of all MCI project managers and unit chiefs to determine whether they had retained any documents responsive to the FOIA request. | Carson Decl. ¶ 5. | Admitted. Plaintiffs have no knowledge either way. |
| 20. | Based on Carson's experience with BJS, her familiarity with the records maintained by BJS, discussions with knowledgeable staff, as well as her understanding of the scope of Plaintiff's FOIA request, Carson determined that there were no other locations reasonably likely to contain responsive records. | Carson Decl. ¶ 7. | Admitted. Plaintiffs have no knowledge either way. |
| 21. | At that time, BJS was still processing data for 2018, so 2017 data was the most recent available. | Carson Decl. ¶ 5. | Admitted. Plaintiffs have no knowledge either way. |
| 22. | Carson's 2019 search identified 182,611 pages of potentially responsive records, representing the number of pages that would be produced if BJS were required to produce PDF files of each death requested. | Carson Decl. ¶ 5. | Admitted. |
| 23. | In April 2023, Carson produced the responsive records identified in her search in database format. | Carson Decl. ¶ 12. | Admitted. Plaintiffs have no knowledge either way. |
| 24. | At that time, data for 2018 were available, and were included in Carson's search. | Carson Decl. ¶ 12. | Admitted. Plaintiffs have no knowledge either way. |
| 25. | James Steyee conducted BJA's search for records responsive to | Steyee Decl. ¶ 7. | Admitted. Plaintiffs have no knowledge either way. |

| | | | |
|---|---|---|---|
| | Plaintiff's July 27, 2020, FOIA request. | | |
| 26. | Steyee oversees all aspects of BJS's DCRA Program, including oversight of state reporting, data cleaning and analysis, and state training and technical assistance. | Steyee Decl. ¶ 1. | Admitted. Plaintiffs have no knowledge either way. |
| 27. | The forms referenced in Plaintiff's FOIA request are web-based and the information inputted into the forms by states is uploaded to a DCRA database and extracted to an Excel file by OJP's OCIO. | Steyee Decl. ¶ 7. | Admitted. Plaintiffs have no knowledge either way related to how the responses are saved. |
| 28. | Steyee searched the PMT DCRA database for records responsive to Plaintiff's request on three occasions: July 29, 2020; June 8, 2021; and January 12, 2024. | Steyee Decl. ¶¶ 7, 12, 14. | Admitted. Plaintiffs have no knowledge either way. |
| 29. | Based on Steyee's experience with BJA, his familiarity with the records maintained by BJA, discussions with knowledgeable staff, and his understanding of the scope of Plaintiff's FOIA request, he determined that no other locations were reasonably likely to contain responsive records. | Steyee Decl. ¶¶ 8, 12, 14. | Admitted. Plaintiffs have no knowledge either way. |
| 30. | Across all three searches, Steyee identified a total of 25,115 records potentially responsive to Plaintiff's FOIA request. | Steyee Decl. ¶ 14. | Admitted. |
| 31. | Kevin M. Scott conducted BJS's search for records responsive to Plaintiff's February 5, 2021, FOIA request. | Scott Decl. ¶ 6. | Admitted. Plaintiffs have no knowledge either way. |
| 32. | Scott has worked in supervisory roles at BJS since 2017, and is currently the Acting Director of BJS. | Scott Decl. ¶ 1. | Admitted. Plaintiffs have no knowledge either way. |

| 33. | In response to Plaintiff's FOIA request, Scott searched all BJS databases that contain federal DCRA information. | Scott. Decl. ¶ 6. | Admitted. Plaintiffs have no knowledge either way. |
|---|---|---|---|
| 34. | Based on Scott's experience with BJS, his familiarity with the records maintained by BJS, discussions with knowledgeable staff, and his understanding of the scope of Plaintiff's FOIA request, Scott determined that there were no other locations reasonably likely to contain responsive records. | Scott Decl. ¶ 7. | Admitted. Plaintiffs have no knowledge either way. |
| 35. | Scott's initial search, in February 2019, identified 1,674 records, consisting of 3,348 pages, of potentially responsive records. | Scott Decl. ¶ 8. | Admitted. |
| 36. | Scott identified a further 505 records, consisting of 1,010 pages, of potentially responsive records when the Bureau of Prisons provided their FY 2020 FDCRP data to BJS. | Scott Decl. ¶ 11. | Admitted. Plaintiffs have no knowledge either way. |
| 37. | In April 2023 Scott generated spreadsheets containing the requested data in tabular database format. | Scott Decl. ¶ 13. | Admitted. Plaintiffs have no knowledge either way. |
| BJS's "k-anonymity" redactions pursuant to FOIA Exemptions 6 and 7(C) | | | |
| 38. | BJS processed records responsive to all three of Plaintiff's FOIA requests to redact information pursuant to FOIA Exemptions 6 and 7(C). | Lauger Decl. ¶ 3 | Admitted. |
| 39. | BJS employed a method known as "k-anonymity" to determine which cells to redact in the records responsive to Plaintiff's FOIA requests. | Lauger Decl. ¶ 5. | Admitted. |
| 40. | "K-anonymity" is one of several statistical disclosure avoidance methods that can be used to meet confidentiality | Lauger Decl. ¶¶ 4-5. | Admitted. |

| | | | |
|---|---|---|---|
| | standards for statistical datasets. | | |
| 41. | The National Institute of Standards and Technology's "De-Identification of Personal Information" reference guide lists "k-anonymity" as a de-identification method. | Lauger Decl. ¶¶ 4-5. | Admitted. |
| 42. | "K-anonymity" is a "suppression" method of data de-identification, meaning that it works by suppressing (i.e., redacting) certain cells in a database, as distinct from methods such as "swapping" or "perturbation" that work by altering the record in some way. | Lauger Decl. ¶¶ 4-5. | Admitted. |
| 43. | BJS chose the k-anonymity redaction method because it is an efficient and objective optimization method that minimizes the number of redacted cells while protecting against the unwarranted invasion of privacy. | Lauger Decl. ¶ 5. | Disputed. That the k-anonymity redaction method "protect[s] against the unwarranted invasion of privacy" is a legal conclusion. |
| 44. | K-anonymity protects the privacy of person-specific, field structured data by ensuring that the information for each person contained in the release cannot be distinguished from at least k-1 individuals whose information also appears in the release. | Lauger Decl. ¶ 6. | Admitted. |
| 45. | BJS applied the k-anonymity method using RSTudio, an integrated development environment for the R programming language. | Lauger Decl. ¶ 29. | Admitted. Plaintiffs have no knowledge either way. |
| 46. | BJS used the k-anonymity algorithm contained in sdcMicro version 5.7.5, a bundled collection of functions, data, and compiled code that can be loaded into RStudio to | Lauger Decl. ¶ 29. | Admitted. Plaintiffs have no knowledge either way. |

| | | | |
|---|---|---|---|
| | enable users to apply disclosure limitation techniques. | | |
| 47. | Before applying the k-anonymity algorithm, BJS removed variables in each dataset that it determined to be "direct identifiers," meaning variables that can directly identify an individual. | Lauger Decl. ¶ 11, 29 | Admitted. Plaintiffs have no knowledge either way. |
| 48. | For records responsive to Plaintiff's October 10, 2019, request, BJS identified variables containing the decedent's name and birth date as direct identifiers. | Lauger Decl. ¶ 11. | Admitted. Plaintiffs have no knowledge either way. |
| 49. | For records responsive to Plaintiff's July 27, 2020, request, BJS identified variables containing the decedent's name and birth year, as well as variables containing the name, phone number, and email address of the point of contact for the respondent, as direct identifiers. | Lauger Decl. ¶ 13. | Admitted. Plaintiffs have no knowledge either way. |
| 50. | For records responsive to Plaintiff's February 5, 2021, request, BJS identified the variables containing the decedent's name, BOP register number, decedent ID, and birth date as direct identifiers. | Lauger Decl. ¶ 15. | Admitted. Plaintiffs have no knowledge either way. |
| 51. | BJS also identified variables for each dataset that it considered to be "quasi-identifiers," meaning variables that could be used to identify an individual when combined with other information, either on the MCI/DCRA datasets or any other available data sources. | Lauger Decl. ¶ 9. | Admitted. Plaintiffs have no knowledge either way. |
| 52. | BJS considered online search directories for individuals in custody and press releases and news articles to be the primary sources that could be used in | Lauger Decl. ¶ 9. | Admitted. Plaintiffs have no knowledge either way. |

| | | | |
|---|---|---|---|
| | conjunction with the MCI/DCRA datasets to identify individual decedents. | | |
| 53. | For records responsive to Plaintiff's October 10, 2019, request, BJS identified the following variables as quasi-identifiers: State; release/death date; facility name; race/ethnicity; admission date; offense; legal status; and cause of death. | Lauger Decl. ¶ 10. | Admitted. Plaintiffs have no knowledge either way. |
| 54. | For records responsive to Plaintiff's July 27, 2020, request, BJS identified the following variables as quasi-identifiers: gender; race; ethnicity; date of death; time of death; location of death (street address, city, state, zip code); whether the death occurred in municipal/county jail, state prison, state-run boot camp prison, contracted boot camp prison, any state or local contract facility, other state or local correctional facility (including juvenile facilities), or none of the above; name of the department or agency that detained, arrested, or was in the process of arresting the deceased; manner of death; and a brief description of the circumstances leading to the death. | Lauger Decl. ¶ 12. | Admitted. Plaintiffs have no knowledge either way. Plaintiffs dispute that quasi-identifiers are appropriate for the redaction of these records. |
| 55. | For records responsive to Plaintiff's February 5, 2021, request, BJS identified the following variables as quasi-identifiers: respondent ID (ID for the responding agency); date of death; time of death; address where event causing death occurred; city where event causing death occurred; | Lauger Decl. ¶ 14. | Admitted. Plaintiffs have no knowledge either way. Plaintiffs dispute that quasi-identifiers are appropriate for the redaction of these records. |

| | | | |
|---|---|---|---|
| | location type where event causing death occurred; location in or outside facility where incident causing death occurred; business type specified where event causing death occurred; other location specified where event causing death occurred; decedent age; decedent ethnic origin; decedent race; reason for initial contact (criminal investigation; general law enforcement response and patrol, inspection, security, warrant service, or other); where decedent did not commit any criminal acts, specify event that led to contact; offenses; whether decedent used or displayed a weapon; law enforcement weapon use; agency; cause of death; manner of death; notes (which contain narratives that have identifiers); date decedent was committed or admitted; facility name and location; decedent legal status; weapon causing death; whether law enforcement personnel used other actions to subdue decedent; source used to establish manner of death; and whether a death was attributable to COVID-19. | | |
| 56. | BJS selected a "k" value of 2, meaning that each possible combination of values for a set of quasi-identifiers will relate to at least 2 individual entries. | Lauger Decl. ¶ 16. | Admitted. Plaintiffs have no knowledge either way. |
| 57. | BJS set the "importance" parameter to null, meaning that no variables were identified as priorities not to be redacted, minimizing the overall number of redactions. | Lauger Decl. ¶ 17. | Admitted. Plaintiffs have no knowledge either way. |

| 58. | BJS set the parameter determining the treatment of missing values to minimize the overall number of redactions. | Lauger Decl. ¶¶ 18-22. | Admitted. Plaintiffs have no knowledge either way. |
|---|---|---|---|
| 59. | Before applying the k-anonymity algorithm, BJS redacted any quasi-identifier value that was unique within its column. | Lauger Decl. ¶ 24. | Admitted. Plaintiffs have no knowledge either way. |
| 60. | After applying the k-anonymity algorithm, BJS redacted closely related variables in some records to maintain the integrity of the redactions. | Lauger Decl. ¶¶ 25-26. | Admitted. Plaintiffs have no knowledge either way. |
| 61. | After applying all redactions, BJS randomized the order of the rows in each dataset. | Lauger Decl. ¶¶ 27-28. | Admitted. Plaintiffs have no knowledge either way. |
| Information contained in the datasets requested | | | |
| 62. | The MCI dataset containing records responsive to Plaintiff's October 10, 2019, request includes sensitive information such as: the full name, date of birth, race, gender, and ethnicity of the decedent; information on the decedent's arrest charge (*e.g.*, drug trafficking, child molestation, rape, prostitution, assault with a deadly weapon, DUI/DWI, public intoxication, robbery, murder, sexual assault); health information about the decedent (*e.g.*, overnight stay in a mental health ward since jail admission, medication or other medical treatment since jail admission); and information about the decedent's manner of death (*e.g.*, homicide, suicide, accident, alcohol/drug intoxication, specific types of illnesses). | Carson Decl. ¶ 14. | Disputed. That the information is "sensitive" is a factually unsupported conclusion. |
| 63. | The BJA DCRA dataset containing records responsive to Plaintiff's July 27, 2020, | Steyee Decl. ¶ 15. | Disputed. That the information is "sensitive" is a factually unsupported conclusion. |

| | | |
|---|---|---|
| | request includes sensitive information such as: the full name, date of birth, race, gender, and ethnicity of the decedent, as well as information about the decedent' place and manner of death (*e.g.*, homicide, suicide, alcohol, including specifically identified drugs and health issues); some of the records also contain information about alleged crimes (*e.g.*, DUIs, armed robbery, sex crimes against children, domestic abuse, sexual assault, cruelty to children), health information (*e.g.*, types of cancer, renal failure, AIDS-related illnesses, cardiovascular disease) and information on the decedent's surgeries or other medical care); and other sensitive information such as immigration status, or erratic and disruptive behavior while under the influence of drugs. | | |
| 64. | The FDCRP dataset containing records responsive to Plaintiff's February 5, 2021, request includes information such as: the full name, date of birth, race, gender, and ethnicity of the decedent; information on the manner of death (*e.g.*, homicide, suicide, accident, alcohol/drug intoxication, specific types of illnesses); offenses for which the decedent was held (*e.g.*, drugs, weapons, sex offenses, fraud, robbery, disorderly conduct), and some of the decedents' immigration legal status. | Scott Decl. ¶ 15. | Admitted. |

| No. | Fact | Supporting Evidence | Def.'s Response |
|---|---|---|---|
| **Death in Custody Reporting Act 2000** | | | |
| 65. | The Death in Custody Reporting Act ("DCRA 2000") was enacted in 2000 as an amendment to the Violent Crime Control and Law Enforcement Act of 1994. | Declaration of Leena Charlton in Support of Plaintiffs' Cross Motion for Summary Judgment ("Charlton Decl.") ¶ 1, Ex. A at 2. | Undisputed |
| 66. | DCRA 2000 required states to "provide[] assurances that it will follow guidelines established by the Attorney General in reporting, on a quarterly basis:" information regarding the death of any person who is in the process of arrest, is en route to be incarcerated, or is incarcerated at a municipal or county jail, State prison, or other local or State correctional facility (including any juvenile facility) that, at a minimum, includes (A) the name, gender, race, ethnicity, and age of the deceased; (B) the date, time, and location of death; and (C) a brief description of the circumstances surrounding the death. | 34 U.S.C. § 12104(a)(2) | Undisputed that Plaintiffs have accurately quoted 34 U.S.C. § 12104(a)(2) (2000). That statute's requirements are a legal conclusion, not an issue of fact. |
| 67. | In support of DCRA 2000, Representative Asa Hutchinson stated: | Charlton Decl. ¶ 18, Ex. S | Undisputed, except that Charlton Decl. ¶ 18 does not reference Ex. S. |

| | | | |
|---|---|---|---|
| | In any other atmosphere, unnatural deaths under questionable circumstances would not only be reported but would raise serious concerns. State and local jails and lockups should be no different. This legislation will provide openness in government and will bolster public confidence and trust in our judicial system. In addition, I believe that it will serve as a deterrent to future misconduct by wrongdoers who will know that someone will be monitoring their actions. | | |
| 68. | In support of DCRA 2013, Senator Patrick Leahy stated: I have long worked to pass legislation to bring additional transparency and accountability to the government. I do so again today by calling on all Senators to support the Death in Custody Reporting Act... This is about an open and fair government. ...The Justice Department should have an opportunity to analyze the data and see what we can learn from it. And the American people deserve the same. This important opportunity for needed transparency comes at a time when many Americans are losing faith in our justice system. We are having an important conversation about the loss of human life in communities across the country. Here we have an | Charlton Decl. ¶ 19, Ex. T | Undisputed, except that Charlton Decl. ¶ 19 does not reference Ex. T. |

| | | | |
|---|---|---|---|
| | opportunity to instill some measure of accountability, and hopefully begin to restore some measure of trust in these communities. | | |
| 69. | The Attorney General designated the Bureau of Justice Statistics ("BJS") in the Office of Justice Programs to administer DCRA 2000. | Charlton Decl. ¶ 1, Ex. A at 2, n.2; Charlton Decl. ¶ 2, Ex. B; Charlton Decl. ¶ 3, Ex. C | Undisputed. |
| 70. | Data collected by [BJS] shall be used only for statistical or research purposes, and shall be gathered in a manner that precludes their use for law enforcement or any purpose relating to a private person or public agency other than statistical or research purposes. | 34 U.S.C. § 10134 | Undisputed that Plaintiffs have accurately quoted 34 U.S.C. § 10134. That statute's requirements are a legal conclusion, not an issue of fact. |
| 71. | BJS created the Deaths in Custody Reporting Program, which housed the Mortality in Correctional Institutions ("MCI") and the Arrest Related Deaths ("ARD"). | Charlton Decl. ¶ 1, Ex. A at 2, 3; Charlton Decl. ¶ 2, Ex. B; Charlton Decl. ¶ 3, Ex. C; Charlton Decl. ¶ 4, Ex. D at 6 | Disputed.

MCI was a data collection formerly known as the "Deaths in Custody Reporting Program" ("DCRP"). ARD was a "portion of the DCRP." Charlton Decl. ¶ 2, Ex. B. |
| 72. | In submissions to the OMB, BJS stated that the DCRA data was a "supplement" to the data it already collected and requested clearance for new forms "[t]o *comply* with Pub. L. 106–297's [DCRA 2000] *new* | Charlton Decl. ¶ 13, Ex. L; Charlton Decl. ¶ 21, Ex. U | Undisputed, except that the submissions Plaintiffs quote did not contain italicized emphases. |

| | | | |
|---|---|---|---|
| | *requirement* for a quarterly collection of inmate death data from local jails, State prisons, and juvenile facilities." | | |
| 73. | Before DCRA, BJS conducted annual, aggregate counts of state prisoner deaths on a voluntary basis. | Charlton Decl. ¶ 3, Ex. C at 2 | Undisputed. |
| 74. | To comply with DCRA, BJS "replaced" "[a]ggregate counts of deaths" with "detailed, individual inmate death records, collected every 3 months from over 3,000 jail jurisdictions, 50 State prison systems, juvenile correctional authorities in all 50 States, and roughly 18,000 State and local law enforcement agencies nationwide." | Charlton Decl. ¶ 3, Ex. C at 2 | Undisputed, except to the extent the quoted language suggests that BJS collected data directly from 18,000 law enforcement agencies quarterly. As the rest of the paragraph explains, collection was done via a network of statewide law enforcement reporters. Charlton Decl. ¶ 3, Ex. C at 2. |
| 75. | BJS relied in part on "state reporting coordinators" for data collection, who used "a variety of strategies for identifying arrest-related deaths through law enforcement sources, medical examiners, and open sources, such as news reports." | Charlton Decl. ¶ 1, Ex. A at 2-3 | Undisputed as to the ARD data collection. |
| 76. | DCRA 2000 expired in 2006. | Charlton Decl. ¶ 1, Ex. A at 3; Charlton Decl. ¶ 5, Ex. E at 1 | Undisputed. |
| 77. | BJS continued to collect information using the forms authorized pursuant to DCRA until collection was transferred to the Bureau of Justice Assistance in 2019. | Charlton Decl. ¶ 2, Ex. B | Disputed. After DCRA expired in 2006, the forms were no longer "authorized pursuant to DCRA." Charlton Decl. ¶ 1, Ex. A at 3. BJS also changed and added several items to the data collection in 2007 and 2008, and allowed yearly reporting rather than on a quarterly basis in 2007. Charlton Decl. ¶ 2, Ex. B – Changes Over Time. |

| 78. | In 2009, the CJ-11A Reporting Instructions stated:<br>While BJS policy prohibits releasing the names associated with any of these death records, the collection of this item was required by the *Death in Custody Reporting Act of 2000* (DICRA) statute. Names are used to sort and identify these records internally, and when discussing them with the State reporters involved. | Charlton Decl. ¶ 8, Ex. H | Undisputed that the quoted language appears in the Form CJ-11A instructions for deaths that occurred in 2009. |
| --- | --- | --- | --- |
| 79. | For decades, California and Texas have had state laws requiring state and local law enforcement agencies to report deaths in custody to the state attorney general. Both states data <u>are</u> publicly available and includes details that Defendant argues is "highly sensitive," including names. | Cal. Gov't Code §12525; Tex. Code Crim. Proc. Ann. Art. 49.18; Charlton Decl. ¶ 6, Ex. F at 20-21; Charlton Decl. ¶ 23, Ex. V; Deitch Decl. ¶ 14 | Undisputed that Texas and California require state and local law enforcement agencies to report deaths in custody to the state attorney general. Undisputed that Texas makes the names of the deceased publicly available.<br><br>Disputed that either state makes all reported data available. Cal Gov't Code § 12525; Tex. Code Crim. Proc. Art. 49.18(b). Disputed to the extent that none of the sources cited states that California releases the names of decedents as part of death-in-custody data. Disputed that either state makes available the range of data on deaths in custody that Defendant has argued is "highly sensitive" in this case. |
| **Death in Custody Reporting Act 2013** | | | |
| 80. | In 2014, Congress reauthorized DCRA ("DCRA 2013"). | 34 U.S.C. §60105 (originally codified at 42 U.S.C. §13272(a)); Pub. L. No. 113-285 (Dec. 18, 2014). | Undisputed that Congress enacted the Death in Custody Reporting Act of 2013 in 2014. |

| 81. | "To advance DCRA's aims of transparency and evidence-based policy development," the information collected under DCRA was intended for public release, except for the names of the decedents. | Charlton Decl. ¶ 4, Ex. D at 8; Charlton Decl. ¶ 6, Ex. F at 31; Charlton Decl. ¶ 7, Ex. G at 91952 (PDF p. 5 of 5); Charlton Decl. ¶ 24, Ex. X at 18-19 | Disputed.<br><br>Charlton Decl. ¶ 4, Ex. D at 8 states that "[t]he Department will publicly release data collected pursuant to the DCRA, including State plans, the number of deaths reported for each agency and facility, and data on the circumstances surrounding those deaths. The release will exclude personally identifiable information and will be consistent with any applicable Department policies and federal laws, including federal privacy laws." It does not commit to release all data other than names.<br><br>Charlton Decl. ¶ 6, Ex. F at 31 is a report prepared by two non-governmental organizations, containing their assessment of "the spirit of the law" rather than facts about Congress's intent in enacting DCRA 2013. The cited page notes that "DCRA does not explicitly require the public release of data beyond the mandated report to Congress."<br><br>Charlton Decl. ¶ 7, Ex. G is a 60-day notice for a proposed data collection submitted by BJA to the Office of Management and Budget pursuant to the Paperwork Reduction Act of 1995. It states that "[t]o advance DCRA's aims of transparency and evidence-based policy development, DOJ will release certain information to the public each fiscal year, including the State plans, the number of deaths reported for each agency and facility, and data on the circumstances surrounding those deaths. The information released would otherwise be subject to public disclosure under the Freedom of Information Act. The release will be consistent with Department policies and any applicable federal laws, including federal privacy laws, and will not contain personally |

| | | | identifiable information." It does not commit to release all data other than names.<br><br>Charlton Decl. ¶ 24, Ex. X at 18-19 consists of the testimony and written statement of Charles Sullivan, the Executive Director of International Citizens United for Rehabilitation of Errants, before a subcommittee of the House of Representatives Committee on the Judiciary, proposing the release of "all reported details of all deaths in custody throughout the United States." DCRA 2013 did not adopt his proposed data-release requirements, or any requirement for the release of data "beyond the mandated report to Congress." Charlton Decl. ¶ Ex. F at 31. |
|---|---|---|---|
| 82. | DCRA 2013 required states to report:<br> the death of any person who is detained, under arrest, or is in the process of being arrested, is en route to be incarcerated, or is incarcerated at a municipal or county jail, State prison, State-run boot camp prison, boot camp prison that is contracted out by the State, any State or local contract facility, or other local or State correctional facility (including any juvenile facilities). The report…shall contain information that, at a minimum, includes the name, gender, race, ethnicity, and age of the deceased; the date, time, and location of death; the law enforcement agency that detained, arrested, or was in the process of arresting the deceased; and a brief | 34 U.S.C. § 60105 (a-b) | Undisputed that Plaintiffs have accurately quoted 34 U.S.C. § 60105, with subsection numbers omitted. That statute's requirements are a legal conclusion, not an issue of fact. |

| | description of the circumstances surrounding the death. | | |
|---|---|---|---|
| 83. | It also required the Attorney General study the information submitted under DCRA to "determine means by which such information can be used to reduce the number of such deaths" and "examine the relationship, if any, between the number of such deaths and the actions of management of such jails, prisons, and other specified facilities relating to such deaths;" and to issue a report of its findings by December 18, 2016. | 34 U.S.C. § 60105 (f) | Undisputed that Plaintiffs have accurately quoted 34 U.S.C. § 60105(f). That statute's requirements are a legal conclusion, not an issue of fact. |
| 84. | States receiving grants administered under the Edward Byrne Memorial Justice Assistance Grant Program ("JAG") must comply with DCRA 2013. | 34 U.S.C. § 60105 (c)(2) | Undisputed, except that the requirements of 34 U.S.C. § 60105 are an issue of law not fact. |
| 85. | The Edward Byrne Memorial Justice Assistance Grant (JAG) Program "allocates funds to the 50 states, the District of Columbia, Puerto Rico, Guam, the Virgin Islands, America Samoa, and the Northern Mariana Islands." | Charlton Decl. ¶ 9, Ex. I; Charlton Decl. ¶ 10, Ex. J; Charlton Decl. ¶ 11, Ex. K | Undisputed. |
| 86. | DCRA 2013 includes an enforcement mechanism that allowed the Attorney General to reduce states' JAG grants by 10% if they failed to comply with the reporting requirements. | 34 U.S.C. § 60105 (c)(2) | Undisputed, except that the penalty is "not more than" 10%, and the requirements of 34 U.S.C. § 60105 are an issue of law not fact. |
| 87. | The JAG Program is administered by the BJA. | Charlton Decl. ¶ 9, Ex. I; 34 U.S.C. §§ 10141- | Undisputed. |

| | | 10203 *et seq.* | |
|---|---|---|---|
| 88. | The Attorney General transferred implementation of DCRA 2013 from BJS to BJA, due to the grant administration aspect of the statute and to avoid triggering § 10134, which excluded data use for law enforcement purposes. | Charlton Decl. ¶ 2, Ex. B; Charlton Decl. ¶ 4, Ex. D t 8, n. 17; Charlton Decl. ¶ 5, Ex. E at 5 | Undisputed that DOJ transferred implementation of DCRA 2013 from BJS to BJA. |
| 89. | MCI was discontinued after collecting data for the year 2019. | Charlton Decl. ¶ 2, Ex. B | Undisputed. |
| 90. | ARD was discontinued in 2014 "due to concerns about data quality." | Charlton Decl. ¶ 1, Ex. A at 16 | Undisputed. |
| 91. | DCRA 2013 also required federal entities to report deaths in custody. | 34 U.S.C. § 60105 | Undisputed, except that the requirements of DCRA 2013 are an issue of law not fact. The federal reporting requirement is codified at 18 U.S.C. § 4001 note. |
| 92. | In 2016, The Office of Justice Programs created the Federal Law Enforcement Agency Deaths in Custody Reporting Program ("FDCRP"), administered by BJS, for federal data collection | 18 U.S.C. §4001 note; Charlton Decl. ¶ 1, Ex. A at 6; Charlton Decl. ¶ 13, Ex. M | Undisputed. |
| 93. | DOJ has not implemented the grant penalty yet. | Charlton Decl. ¶ 1, Ex. A at 11; Charlton Decl. ¶ 6, Ex. F | Undisputed. |
| 94. | DOJ has not yet issued the report mandated under Section f. | Charlton Decl. ¶ 1, Ex. A at 7-8 | Disputed. DOJ submitted the first report required by DCRA 2013 to Congress. See https://www.ojp.gov/pdffiles1/nij/30580 2.pdf |
| **Data Collection Methods** | | | |

| 95. | From 2000 to 2019, BJS collected DCRA data on forms authorized pursuant to DCRA 2000. | Charlton Decl. ¶ 1, Ex. A at 4, 16; Charlton Decl. ¶ 2, Ex. B | Disputed. After DCRA expired in 2006, the forms were no longer "authorized pursuant to DCRA." Charlton Decl. ¶ 1, Ex. A at 3. BJS also changed and added several items to the data collection in 2007 and 2008, and allowed yearly reporting rather than on a quarterly basis in 2007. Charlton Decl. ¶ 2, Ex. B – Changes Over Time. |
|---|---|---|---|
| 96. | BJS has received authority from OMB to collect information under the following forms:<br>CJ-9 – Death Report on Inmates under Jail Jurisdiction [2004-2019]<br>CJ-9A – Annual summary on Inmates under Jail Jurisdiction [2003-2019]<br>CJ-10 – Death Report on Inmates in Private and Multi-Jurisdictional Jails [2003-2019]<br>CJ-10A – Annual Summary on Inmates in Private and Multi-Jurisdictional Jails [2003-2019]<br>CJ-11 – Quarterly Summary Arrest-Related Deaths [2003-2011]<br>CJ-11A – Arrest Related Deaths [2003-2011]<br>NPS-4 – Annual Summary of Inmate Deaths in State Prisons [2004-2019]<br>NPS-4A – State Prison Inmate Death Report [2004-2019]<br>NPS-5 – Quarterly Summary of Deaths in State Juvenile Residential Facilities [2004-2007]<br>NPS-5A – State Juvenile Residential Death Report [2003-2007]<br>DCR-1 – Quarterly Summary [2019-present] | Charlton Decl. ¶ 2, Ex. B; Charlton Decl. ¶ 7, Ex. G; Charlton Decl. ¶ 13, Ex. M; Charlton Decl. ¶ 14, Ex. N | Undisputed, except that BJA, rather than BJS, received approval for forms DCR-1, DCR-1A, DCR-1B, and DCR-2. Charlton Decl. ¶ 7, Ex. G. Defendant also notes that there were separate forms for different years and the forms are not entirely identical from year to year. In addition, Forms CJ-13 (Federal Deaths in Custody Annual Summary), CJ-13A (Federal Arrest-Related Death Report), and CJ-13B (Federal Detention/Incarceration Death Report) were not OMB-cleared because OMB approval is not required for collection from other federal agencies. |

|  | DCR-1A – Incident Report Law Enforcement [2019-present]<br>DCR-1B – Incident Report Corrections<br>DCR-2 – Open Source Summary<br>CJ-13 – Federal Deaths in Custody Annual Summary [2016-2019]<br>CJ-13A – Federal Arrest-Related Death Report [2016-2021]<br>CJ-13B – Federal Detention/Incarceration Death Report [2016-2021] |  |  |
|---|---|---|---|
| 97. | Collection methods have changed several times since DCRA 2013 was enacted. | Charlton Decl. ¶ 1, Ex. A; Charlton Decl. ¶ 6, Ex. F | Disputed. Plaintiffs do not specify the collection methods or the changes they refer to, and fail to specify any particular section of the 17- and 52-page documents they cite. |
| 98. | BJA collects the required data (state, local, county, and municipal facilities) only from the state. | Charlton Decl. ¶ 1, Ex. A at 5-8; Charlton Decl. ¶ 6, Ex. F at 20; Charlton Decl. ¶ 7, Ex. G | Undisputed. |
| 99. | DOJ has not implemented a consistent collection plan under DCRA 2013. For example, use of "open source review"—to check the accuracy of the data submitted by the states—has been added and removed from the DOJ implementation plans. | Charlton Decl. ¶ 1, Ex. A at 3-6, 9; Charlton Decl. ¶ 6, Ex. F at 12-17; Charlton Decl. ¶ 7, Ex. G | Undisputed that BJA's 2016 DCRA data-collection plan contemplated an "open-source review process" and BJA's 2018 plan "excluded . . . open-source data confirmation." Charlton Decl. ¶ 1, Ex. A at 5.<br><br>Disputed that BJA has not consistently implemented a data-collection plan under DCRA. The 2016 plan was never implemented. *Id.* |
| 100. | States must submit their own data collection plan to the DOJ. | Charlton Decl. ¶ 1, | Undisputed that as of September 16, 2022, DOJ planned to require FY 2022 |

| | | Ex. A at 12 | JAG award recipients to submit state data collection plans under DCRA. Charlton Decl. ¶ 1, Ex. A at 12. |
|---|---|---|---|
| **Public Interest and Public Disclosure** | | | |
| 101. | On July 7, 2020, in the wake of the murders of George Floyd, Breonna Taylor, and many more, several senators released a public letter to Attorney General William Barr regarding the unsatisfactory implementation of the Death in Custody Reporting Act ("Senate Letter"). | Charlton Decl. ¶ 17, Ex. Q | Undisputed. |
| 102. | The Senate Letter requested that the Department of Justice "take immediate action to implement and enforce the Death in Custody Reporting Act of 2013." | Charlton Decl. ¶ 17, Ex. Q | Undisputed. |
| 103. | The Senate Letter stated, "one stark, staggering fact is that there exists no reliable metric on the number of law enforcement-related deaths that occur each year because DOJ has failed to implement and enforce the DCRA." | Charlton Decl. ¶ 17, Ex. Q | Undisputed. |
| 104. | The Senate Letter noted that the "tragic law enforcement-related deaths of two Black men—Michael Brown in Ferguson, Missouri and Eric Garner in New York City, New York" prompted the reauthorization of DCRA. | Charlton Decl. ¶ 17, Ex. Q | Undisputed. |
| 105. | The Senate Letter stated, "in passing DCRA, Congress had a singular purpose—that state and federal law enforcement agencies must report to the Attorney General when a person dies in their custody." | Charlton Decl. ¶ 17, Ex. Q | Undisputed. |
| 106. | The Senate Letter stated, "That data, in turn, would help us, as policymakers, and the Attorney | Charlton Decl. ¶ 17, Ex. Q | Undisputed. |

| | | | |
|---|---|---|---|
| | General, as the nation's chief law enforcement officer, make critical decisions to reduce the number of these preventable deaths." | | |
| 107. | The Senate Letter stated that DCRA is a "a critical step" in the direction of "justice" and "accountability." | Charlton Decl. ¶ 13, Ex. M | Undisputed. |
| 108. | On May 25, 2022, President Biden issued Executive Order 14074 – Advancing Effective, Accountable Policing and Criminal Justice Practices To Enhance Public Trust and Public Safety. | Charlton Decl. ¶ 23, Ex. W | Undisputed. |
| 109. | The Executive Order called for "Sharing of Federal Best Practices with State, Tribal, Local, and Territorial Law Enforcement Agencies to Enhance Accountability" by mandating the Attorney General to "instruct" law enforcement agencies to "preserve the information required to complete timely administrative investigations as required by the Death in Custody Reporting Act of 2013." | Charlton Decl. ¶ 23, Ex. W at 3 | Undisputed, except that the mandate to the Attorney General to "instruct" was limited to federal law-enforcement agencies. Charlton Decl. ¶ 23, Ex. W at 3. |
| 110. | The Project on Government Oversight and the Leadership Conference Education Fund stated that when local law enforcement agencies fail to keep those in their custody alive and healthy, "the government must be able to identify and mandate changes to prevent future deaths. That requires accurate, reliable, and consistently reported data. DCRA requires the Justice Department to collect the data | Charlton Decl. ¶ 6, Ex. F at 8 | Undisputed. |

| | | | |
|---|---|---|---|
| | necessary to craft policy that will reduce in-custody deaths." | | |
| 111. | In 2019, "there were more deaths in local jails than ever recorded, an increase of 5 percent from the previous year. The number of unique jurisdictions reporting one or more deaths was the highest in history. The reported mortality rate for people incarcerated but not convicted hit an all-time high, as did reports of in-custody deaths from drugs and alcohol. State prisons reported the most homicides in reporting history." | Charlton Decl. ¶ 6, Ex. F at 9 | Undisputed. |
| 112. | Audits have revealed that the data being collected is incomplete. | Charlton Decl. ¶ 1, Ex. A at 9; Charlton Decl. ¶ 4, Ex. D; Charlton Decl. ¶ 5, Ex. E at 7; Charlton Decl. ¶ 25, Ex. Y | Undisputed. |
| 113. | For example, these audits have found that "[d]uring the three-month-overlap period [where BJS and BJA collected data], BJA received reports for 744 deaths in local jails and state prisons, which was approximately 60% of the 1,246 deaths identified by BJS." | Charlton Decl. ¶ 1, Ex. A at 8-11; Charlton Decl. ¶ 6, Ex. F at 25; Charlton Decl. ¶ 25, Ex. Y | Undisputed. |
| 114. | The Justice Department found its data matched the publicly-available Mapping Police Violence Project between 29 and 36 percent of the time. | Charlton Decl. ¶ 1, Ex. A at 9-10 | Undisputed as to FY 2020 and 2021. |

| 115. | On February 1, 2023, Office of the Inspector General of the Department of Homeland Security issued a report titled, "ICE and CBP Deaths in Custody during FY 2021" | Charlton Decl. ¶ 18, Ex. R | Undisputed. |
|---|---|---|---|
| 116. | The report stated, "[u]nder the Federal Deaths in Custody Reporting Program, Federal law enforcement agencies must report deaths that occurred under their jurisdiction to the Department of Justice on an annual basis." | Charlton Decl. ¶ 18, Ex. R at 1, n. 1 | Undisputed. |
| 117. | The report provided summaries of the ten deaths it found to fall under the Federal Deaths in Custody purview. These summaries included the decedents' names, gender, dates of death, facility where the death occurred, reason for detention, city and state, medical conditions, and other circumstances surrounding their deaths, including efforts to revive the deceased. | Charlton Decl. ¶ 18, Ex. R at 4-10 | Undisputed, except that not every summary included every detail listed by Plaintiffs. |
| 118. | Beginning in 2020, a reporter for *PennLive* made multiple requests under the Pennsylvania Right-to-Know Law to the Pennsylvania Commission on Crime and Delinquency for spreadsheets for all deaths in custody and all DCR-1A forms submitted. | Declaration of Josh Vaughn in Support of Plaintiffs' Cross-Motion for Summary Judgment ("Vaughn Decl.") ¶¶ 3-4 | Undisputed. |
| 119. | In response to his requests, the reporter received information identical to the information requested by Plaintiffs and withheld by Defendants, including CJ-9 and DCR-1A | Vaughn Decl. ¶¶ 6-9 | Disputed. The forms received were redacted to remove some of the information requested by Plaintiffs, including "certain identifying information like social security numbers and dates of birth," and in some cases "the address where the death occurred |

| | | | |
|---|---|---|---|
| | forms and spreadsheets of the data. | | and the decedents' dates of death." Vaughn Decl. ¶¶ 6-7. |
| 120. | The forms were only minimally redacted. | Vaughn Decl. ¶¶ 6-9 | Disputed. That the forms were "only minimally" redacted is Plaintiffs' opinion, not a statement of fact. |
| 121. | Social Security Numbers and dates of birth were redacted as well as some addresses of the institution where a death occurred. | Vaughn Decl. ¶¶ 3-4 | Undisputed. |
| **Application of K-Anonymity** | | | |
| 122. | A dataset including similar records to the ones requested by Plaintiffs was released to *USA Today* pursuant to FOIA litigation, *Gannett v. Satellite Information Network, LLC v. U.S. Department of Justice*, Case No. 1:22-cv-00475-BAH. | Charlton Decl. ¶ 15, Ex. O; Declaration of Ethan Corey in Support of Plaintiffs' Cross-Motion for Summary Judgment ("Corey Decl.") ¶ 18 | Undisputed. |
| 123. | These records were not subject to Exemption 3, pursuant to a summary judgment ruling in *Gannett*. | *Gannett Satellite Info. Network, LLC v. U.S. Dep't of Just.*, 2023 WL 2682121 (D.D.C. Mar. 29, 2023); Corey Decl. ¶ 18 | Undisputed that the records were not withheld under Exemption 3 pursuant to a summary judgment ruling. |
| 124. | That data has been redacted using the k-anonymity redaction method used in this case. | Charlton Decl. ¶ 15, Ex. O | Undisputed. |

| 125. | Plaintiff Corey reviewed these records. | Corey Decl. ¶ 18-20 | Undisputed. |
|---|---|---|---|
| 126. | Based on his analysis, k-anonymity has resulted in the following redactions to the *Gannett* data,<br><br>Last name: 100%<br>First name: 100%<br>Middle name: 100%<br>DOB month: 100%<br>DOB day: 100%<br>DOB year: 100%<br>Force specification: 100%<br>Self-injury specification: 98%<br>Homicide specification: 89%<br>Illness specification: 83%<br>Drug specification: 82%<br>Offense of incarceration: 78%<br>Suicide specification: 62%<br>Facility name: 58%<br>Facility location: 58%<br>Admission year: 38%<br>Admission day: 35%<br>Death day: 31%<br>State: 23%<br>Admission month: 20%<br>Death month: 17% | Corey Decl. ¶¶ 20 | Undisputed Plaintiffs have accurately reported Corey's conclusions. Disputed to the extent that Corey's analysis does not account for records that were already blank before any redactions were applied. For example, the suicide specification variable was blank for anyone who did not die by suicide. Blanks do not mean that the data was redacted with the k-anonymity method. Lauger Decl. ¶ 29. |