BRIAN M. BOYNTON
Principal Deputy Assistant Attorney
General
MARCIA BERMAN
Assistant Branch Director
CORMAC A. EARLY (D.C. Bar No.
1033835)
Trial Attorney, U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Telephone: (202) 616-7420
E-mail: cormac.a.early@usdoj.gov

Attorneys for Defendant
U.S. Department of Justice,
Office of Justice Programs

THOMAS R. BURKE (State Bar No.
141930)
DAVIS WRIGHT TREMAINE LLP
50 California Street, 23rd Floor
San Francisco, California 94111
Telephone:  (415) 276-6500
Facsimile:  (415) 276-6599
Email:      thomasburke@dwt.com

SARAH E. BURNS (State Bar No.
324466)
DAVIS WRIGHT TREMAINE LLP
865 South Figueroa Street, Suite 2400
Los Angeles, California 90017
Telephone:  (213) 633-6800
Facsimile:  (213) 633-6899
Email:      sarahburns@dwt.com

LEENA M. CHARLTON (*pro hac vice*)
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, New York 10020
Telephone:  (212) 489-8230
Facsimile:  (212) 489-8340
Email:      leenacharlton@dwt.com

*Attorneys for Plaintiffs*
The Appeal, Inc., and Ethan Corey

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| THE APPEAL, INC. and ETHAN COREY,<br><br>    Plaintiffs,<br><br>    v.<br><br>UNITED STATES DEPARTMENT OF JUSTICE'S OFFICE OF JUSTICE PROGRAMS,<br>    Defendant. | No. 5:22-cv-02111-JFW (AFMx)<br><br>JOINT APPENDIX OF EVIDENCE<br><br>Motion Hearing: July 12, 2024<br>Time: 11:00 a.m.<br>Courtroom: 9B<br>First Street Courthouse<br>350 W. First Street<br>Los Angeles, CA 90012<br><br>Hon. Wesley L. Hsu<br>United States District Judge |

# TABLE OF CONTENTS

Exhibit 1 – Declaration of James Steyee

Exhibit 2 – Declaration of Elizabeth Ann Carson

Exhibit 3 – Declaration of Kevin M. Scott

Exhibit 4 – Declaration of Amy Lauger

Exhibit 5 – Declaration of Leena Charlton

Exhibit 6 – Declaration of Ethan Corey

Exhibit 7 – Declaration of Michele Deitch

Exhibit 8 – Declaration of Josh Vaughn

**EXHIBIT 1 – Declaration of James Steyee**

**UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**
**EASTERN DIVISION**

THE APPEAL, INC. and ETHAN COREY,

               *Plaintiffs*,

     v.

U.S. DEPARTMENT OF JUSTICE'S
OFFICE OF JUSTICE PROGRAMS,

               *Defendant*.

Case No. 5:22-cv-02111-WLH-SK

**DECLARATION OF JAMES STEYEE**

I, James Steyee, declare the following to be true and correct:

1.   I am a Program Analyst in the Budget and Performance Division of the Bureau of Justice Assistance (BJA). I have served in this role since September 24, 2023. In this role, I oversee all aspects of BJA's Death-in-Custody Reporting Act (DCRA) Program, including oversight of state reporting, data cleaning and analysis, and state training and technical assistance.  I provide direction and guidance to states to help resolve issues related to reporting, including tools and resources that assist states with complying with DCRA.  Additionally, I provide direction on DCRA data analysis, including internal products, reports, and briefs. I also provide direction and assistance to states through our DCRA TTA Center. Prior to my current role, I served as a Program Specialist (Performance Measurement) with BJA that supported DCRA in the ways described above since September 25, 2022; and prior to that I was a Deputy Project Director under contract with BJA to provide Performance Measurement and analytical support to BJA on the DCRA program as well as others.

2.   The statements I make in this declaration are based on my personal knowledge,

information provided to me in the course of my official duties, and my review of documents and

data kept by BJA in the ordinary course of business.

3.   I am familiar with BJA's handling of the Freedom of Information Act (FOIA) request

submitted by the Plaintiffs and numbered 20-FOIA-00234.  This declaration provides information

concerning BJA's searches in response to this particular FOIA request.

4.   On July 27, 2020, Plaintiffs submitted a FOIA request, which sought the following records

for the time period from October 1, 2019, to the date the request was fulfilled:

- All DCR-1 quarterly summary forms submitted by federal, state, and local agencies to the Office of Justice Programs ("OJP"), the Bureau of Justice Assistance ("BJA"), or any of its contractors or agents. (Footnote reference: Form DCR-1, "Quarterly Summary," OMB No. 1121-NEW).
- All DCR-1A incident reports submitted by federal, state, and local agencies to OJP, BJA, or any of its contractors or agents. (Footnote reference: Form DCR-1A, "Incident Report," OMB No. 1121-0365.)
- All Edward Byrne Memorial Justice Assistance Grant ("JAG") Performance Management Tool reports submitted by state and local agencies using the online portal located at https://bjapmt.ojp.gov/ that include reporting pursuant to the Death in Custody Act of 2013. (Footnote reference: In the Fiscal Year 2020 State Formula Solicitation for the JAG program, BJA notes, "BJA requires reporting from states pursuant to DCRA, which requires states and federal law enforcement agencies to report certain information to the Attorney General regarding the death of any person occurring during interactions with law enforcement officers or while in custody. All reporting for DCRA will be submitted via the BJA Performance Management Tool (PMT), located at https://bjapmt.ojp.gov." Bureau of Justice Assistance, Edward Byrne Memorial Justice Assistance Grant (JAG) Program Fiscal Year 2020 State Formula Solicitation, March 12, 2020, available at https://www.bja.ojp.gov/sites/g/files/xyckuh186/files/media/document/bja-2020-17277.pdf.)

5.   The DCR-1 and DCR-1A forms are Web-based and responses are saved in a database

format. State agencies collect the data and report it to BJA in the online Performance Management

Tool (PMT). The PMT website, available at bjapmt.ojp.gov, allows BJA grantees to identify,

collect, and report performance measurement data on activities funded by their awards, including

the information found on the DCR-1 and DCR-1A forms. Only States, and not local or federal

jurisdictions, report to BJA the death in custody information found on the DCR-1 and DCR-1A forms.

6.  On July 28, 2020, OJP's FOIA office acknowledged receipt of this request and numbered this request as 20-FOIA-00234.

7.  On July 29, 2020, in response to the FOIA request, I searched the Performance Measurement Tool (PMT) DCRA database extracts (in Excel) that contained information responsive to this request. The forms referenced in the FOIA request are web-based and the information inputted into the forms by states are uploaded to a DCRA database and extracted to an Excel file by OJP's OCIO.

8.  Based on my experience with BJA, my familiarity with the records maintained by BJA, discussions with knowledgeable staff, as well as my understanding of the scope of the Plaintiffs' FOIA request numbered 20-FOIA-00234, I determined that there were no other locations reasonably likely to contain responsive records.

9.  Through this search, I identified 2,058 records that were potentially responsive to the FOIA request for the DCRA portion of the request.

10. On July 29, 2020, in accordance with standard BJA practice, I responded to OJP's FOIA Office describing the search process and provided responsive records for the DCRA portion of the request.

11. On May 24, 2021, OJP's FOIA office notified the Plaintiffs that it had resubmitted FOIA request numbered 20-FOIA-00234 because the request sought requests for the time period up until the date the request was fulfilled and the Plaintiffs had yet not received responsive records.

12. On June 8, 2021, I and another BJA contractor (Lauren Duhaime) conducted another

search for responsive records. We used data the extract (Excel file) from the PMT to retrieve responsive records and transmitted them to OJP's FOIA Office. This search took approximately two hours. This search identified 6,509 records that were potentially responsive to the FOIA request for the DCRA portion of the request. This total includes records identified in the prior search. Based on my experience with BJA, my familiarity with the records maintained by BJA, discussions with knowledgeable staff, as well as my understanding of the scope of the Plaintiffs' FOIA request numbered 20-FOIA-00234, I determined that there were no other locations reasonably likely to contain responsive records.

13. On January 26, 2023, OJP's FOIA Office contacted BJA and requested a new search for records responsive to 20-FOIA-00234.  In response, I and another BJA contractor (Sam Wilcox) conducted another search on the same PMT extract and retrieved responsive records, which were provided to OJP's FOIA Office on January 30, 2023.

14. On January 4, 2024, OJP's FOIA Office contacted BJA and requested an updated search for records responsive to 20-FOIA-00234. In response, Sam Wilcox and I conducted a new search on the PMT extract for records responsive to the Plaintiffs' FOIA request numbered 20-FOIA-00234. This search identified 25,115 records that were potentially responsive to the FOIA request for the DCRA portion of the request. This total includes records that were identified in the previous two searches. On January 12, 2024, we completed the search and provided the records to OJP's FOIA Office.

15. The requested records contain private, highly sensitive, and potentially embarrassing information about the decedents. The records contain private information of the decedents, such as full name, date of birth, race, gender, and ethnicity, and information about the decedent's place of death, and manner of death (*e.g.*, homicide, suicide, accident, alcohol,

including specifically identified drugs and health issues). The records also contain information about the circumstances leading to death. Some of these records include sensitive information about alleged crimes (*e.g.,* DUIs, armed robbery, sex crimes against children, domestic abuse, sexual assault, cruelty to children), private health information (*e.g.*, types of cancer, renal failure, AIDS-related illnesses, cardiovascular disease) and information on the decedent's surgeries or other medical care. Some of the records also include other sensitive information, such as immigration status, or potentially embarrassing information (*e.g.*, erratic and disruptive behavior while under the influence of drugs).

16. On January 31, 2024, the Department provided the requested records to the Plaintiffs with redactions pursuant to FOIA Exemptions 3, 6, and 7(C).

17. Based on my experience with BJA, my familiarity with the records maintained by BJA, discussions with knowledgeable staff, as well as my understanding of the scope of the Plaintiffs' FOIA request numbered 20-FOIA-00234, I determined that there were no other locations reasonably likely to contain responsive records.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed this 29th day of April, 2024.

*James Steyee*
_____
James Steyee

JAMES
STEYEE

Digitally signed by
JAMES STEYEE
Date: 2024.04.29
13:56:11 -06'00'

**EXHIBIT 2 – Declaration of Elizabeth Ann Carson**

**UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**
**EASTERN DIVISION**

|  |  |
|---|---|
| THE APPEAL, INC. and ETHAN COREY,<br><br>*Plaintiffs*,<br>v.<br><br>U.S. DEPARTMENT OF JUSTICE'S OFFICE OF JUSTICE PROGRAMS,<br><br>*Defendant*. | Case No. 5:22-cv-02111-WLH-SK |

### DECLARATION OF ELIZABETH ANN CARSON

I, Elizabeth Ann Carson, declare the following to be true and correct:

1.     I am currently the branch chief of preparedness statistics at the Office of Homeland Security Statistics, U.S Department of Homeland Security. From January 30, 2011, to October 7, 2023, I was employed as a statistician at the Bureau of Justice Statistics (BJS), Office of Justice Programs (OJP), U.S. Department of Justice. In this role, I managed multiple BJS corrections statistics collections, including the Mortality in Correctional Institutions (MCI) collection from 2019 to 2023.

2.     The statements I make in this declaration are based on my personal knowledge, information provided to me in the course of my official duties, and my review of documents and data kept by BJS in the ordinary course of business.

3.     I am familiar with BJS's handling of the Freedom of Information Act (FOIA) request submitted by the Plaintiffs that sought BJS records and is numbered 20-FOIA-00016. This declaration provides information concerning BJS's searches in response to this FOIA request.

PAGE 1

4.      On October 10, 2019, Plaintiff submitted a FOIA request, which sought, in relevant part, the following records:

The number of jail deaths reported (and/or unique CJ-9 forms submitted) by each jail facility participating in the Mortality in Correctional Institutions reporting program (f.k.a. the Death in Custody Reporting Program) each year from 2000 to 2018, inclusive.

5.      On October 17, 2019, in response to the FOIA request, I consulted the CJ-9 (Death Report on Inmates Under Jail Jurisdiction) and CJ-9A (Annual Summary of Death Reports on Inmates Under Jail Jurisdiction) forms. I accessed the responses that included the data on these forms through the secure BJS data collection webtool operated by BJS's data collection agent for the MCI survey, RTI. Between 2000 and 2017, the total number of deaths overall in all U.S. jails was 18,042. If BJS had been required to provide all of the death records and annual summary forms for these individuals, the total number of pages would have been 182,611, and it would have required approximately 3,462 hours of BJS time to download these documents. For this October 2019 search, the search terms I used were "2000-2017" (because when FOIA request number 20-FOIA-00016 was originally submitted, BJS was still processing the 2018 data and the 2017 data was the most recent data available) and "death." My search was limited to databases that included data on jail deaths reported by local jails. I also searched the personal folders of all MCI project managers and unit chiefs to determine whether they had retained any documents responsive to the FOIA request.

6.      In accordance with standard BJS practice, I responded to OJP's FOIA Office describing the search process and the responsive records. I advised that, in BJS's view, because the records contain research or statistical information identifiable to specific persons, the release of these records would violate 34 U.S.C. § 10231.

7.      Based on my experience with BJS, my familiarity with the records maintained by BJS, discussions with knowledgeable staff, as well as my understanding of the scope of the

Plaintiff's FOIA request, I determined that there were no other locations reasonably likely to contain responsive records.

8.      On October 28, 2019, OJP's FOIA office acknowledged receipt of this request and numbered this request as 20-FOIA-00016.

9.      On March 31, 2020, OJP responded to the Plaintiffs' FOIA request numbered 20-FOIA-00016 via letter. The letter stated that all of the records located by BJS in response to the FOIA request were exempt from disclosure pursuant to FOIA Exemption 3, found at 5 U.S.C. § 552(b)(3).

10.     On June 20, 2020, the Plaintiffs appealed the withholding decision to the DOJ's Office of Information Policy (OIP).

11.     On November 30, 2020, OIP affirmed OJP's withholding of records under FOIA Exemption 3, which concerns matters specifically exempted from release by a statute other than FOIA (in this case, 34 U.S.C. § 10231).

12.     In April 2023, OJP's FOIA Office contacted BJS and requested the responsive records that I had previously identified in a database format.  In response, I conducted a new search for records in April 2023 that consisted of running a SAS program (statistical coding using the SAS statistical software package that was written to select only the deaths of interest from the entire dataset) on the MCI dataset that was limited to data on jail deaths reported by local jails, which generated two Excel spreadsheets. The first spreadsheet contained records covering 2000 to 2009, for which the Census Bureau acted as the collection agent. The second spreadsheet covered 2010 to 2018, for which period RTI was the collection agent. Unlike the prior search for records in October 2019, the 2018 data was available for the April 2023 search and was included in this search. The spreadsheets contained in tabular database format all of the data collected from local jail administrators on the CJ-9 and CJ-9A forms, plus some additional metadata that was appended

PAGE 3

to the records upon their submission, including the date of submission, the number of total deaths reported for that state department of corrections or local jail during that year, and the name of the respondent. The data contained on the CJ-9 and CJ-9A forms was submitted directly by local jail administrators to BJS's collection agent.

13.     These documents were placed on a secure server drive to which only I, my unit chief, the senior statistical advisor, the acting director of BJS, and the OJP FOIA office had access.

14.     The requested records contain private, highly sensitive, and potentially embarrassing information about the decedents. The records contain private information of the decedents, such as full name, date of birth, race, gender, and ethnicity. The requested records also include sensitive information on the decedent's arrest charge (*e.g.*, drug trafficking, child molestation, rape, prostitution, assault with a deadly weapon, DUI/DWI, public intoxication, robbery, murder, sexual assault), sensitive private health information (*e.g.*, overnight stay in a mental health ward since jail admission, medication or other medical treatment since jail admission), and information about the decedent's manner of death (*e.g.*, homicide, suicide, accident, alcohol/drug intoxication, specific types of illnesses).

15.     On January 31, 2024, the Department provided the requested records to the Plaintiffs with redactions pursuant to FOIA Exemptions 3, 6, and 7(C).

I declare under the penalty of perjury that the foregoing is true and correct.

Executed this 29th day of April, 2024.

_____
Elizabeth Ann Carson

PAGE 4

**EXHIBIT 3 – Declaration of Kevin M. Scott**

**UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**
**EASTERN DIVISION**

THE APPEAL, INC. and ETHAN COREY,

         *Plaintiffs*,

     v.

U.S. DEPARTMENT OF JUSTICE'S
OFFICE OF JUSTICE PROGRAMS,

         *Defendant*.

Case No. 5:22-cv-02111-WLH-SK

## DECLARATION OF KEVIN M. SCOTT, PH.D.

I, Kevin M. Scott, declare the following to be true and correct:

1. I am the Principal Deputy Director and Acting Director of the Bureau of Justice Statistics (BJS). I have served in those roles since March 2023 and August 2023, respectively. I have worked for BJS since 2017 in a variety of supervisory roles. In those roles, I have overseen all aspects of several BJS data collections, including design of data collection, sampling, administration protocols, and analysis a nd reporting of collected data.

2. The statements I make in this declaration are based on my personal knowledge, information provided to me in the course of my official duties, and my review of documents and data kept by BJS in the ordinary course of business.

3. I am familiar with BJS's handling of the Freedom of Information Act (FOIA) request submitted by the Plaintiffs and numbered 21-FOIA-00114. This declaration provides information concerning BJS's searches in response to this particular FOIA request.

1

4.  On February 5, 2021, Plaintiffs submitted a FOIA request, which sought "[a]ll Death in Custody Reporting Act (DCRA) reports submitted by federal law enforcement agencies (including the Bureau of Prisons) from FY2016 until FY2020."

5.  On February 9, 2021, OJP's FOIA office acknowledged receipt of this request and numbered this request as 21-FOIA-00114.

6.  In response to the FOIA request, I searched all BJS databases that contained federal DCRA information (*i.e.*, information submitted under the Federal Deaths in Custody Reporting Program).

7.  Based on my experience with BJS, my familiarity with the records maintained by BJS, discussions with knowledgeable staff, as well as my understanding of the scope of the Plaintiffs' FOIA request, I determined that there were no other locations reasonably likely to contain responsive records.

8.  Through this search, I identified 1,674 records, consisting of 3,348 pages, that were potentially responsive to the FOIA request. These pages represented the records requested if BJS were required to produce PDF files of each death requested.

9.  In accordance with standard BJS practice, I responded to OJP's FOIA Office describing the search process and the responsive records. I advised that, in BJS's view, because the records contain research or statistical information identifiable to specific persons, the release of these records would violate 34 U.S.C. § 10231.

10.  On February 24, 2021, OJP responded to the Plaintiffs' FOIA request numbered 21-FOIA-00114 via letter. The letter stated that all of the records located by BJS in response to the FOIA request were exempt from disclosure pursuant to FOIA Exemption 3, found at 5 U.S.C. § 552(b)(3), citing 34 U.S.C. § 10231.

11.  On June 28, 2021, the Federal Bureau of Prisons provided BJS with their FY 2020

2

Federal Deaths in Custody Reporting Program data. Those data constituted 505 records, consisting of 1,010 pages, that were potentially responsive to the FOIA request. These pages represented the records requested if BJS were required to produce PDF files of each death requested.

12. In April 2023, OJP's FOIA Office contacted BJS and requested the responsive records that I had previously identified in a database format.

13. The search for records in April 2023 consisted of running a SPSS program (statistical coding using the SPSS statistical software package that was written to select only the deaths of interest from the entire dataset) on the federal DCRA dataset for responsive records. This process generated spreadsheets, which contained in tabular database format all of the data collected under the Federal Deaths in Custody Reporting Program from FY 2016 to FY 2020 pursuant to the Death in Custody Reporting Act of 2013.

14. The records were placed on a secure server drive to which only I, the senior statistical advisor, the acting director of BJS, and the OJP FOIA office had access.

15. The requested records contain private, highly sensitive, and potentially embarrassing information about the decedents. The records contain private information of the decedents, such as full name, date of birth, race, gender, and ethnicity. The requested records also include sensitive information on manner of death (*e.g.*, homicide, suicide, accident, alcohol/drug intoxication, specific types of illnesses), offenses for which the decedent was held (*e.g.*, drugs, weapons, sex offenses, fraud, robbery, disorderly conduct), and some of the decedents' immigration legal status.

16. On January 31, 2024, the Department provided the requested records to the Plaintiffs with redactions pursuant to FOIA Exemptions 3, 6, and 7(C).

I declare under the penalty of perjury that the foregoing is true and correct.

Executed this 29th day of April, 2024.

_____
Kevin M. Scott

**EXHIBIT 4 – Declaration of Amy Lauger**

**UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**
**EASTERN DIVISION**

THE APPEAL, INC. and ETHAN COREY,

*Plaintiffs*,

v.

U.S. DEPARTMENT OF JUSTICE'S
OFFICE OF JUSTICE PROGRAMS,

*Defendant*.

Case No. 5:22-cv-02111-WLH-SK

## <u>DECLARATION OF AMY LAUGER</u>

I, Amy Lauger, declare the following to be true and correct:

1.  I am a GS-15 senior statistician at the Bureau of Justice Statistics (BJS) with nearly 20 years of experience as a statistician within the federal government. I have worked at BJS since September 2019. In my current role as senior statistician, I am responsible for providing statistical advice and guidance on BJS's efforts to establish, maintain, and revise national justice statistical programs. I work with BJS's senior management to provide substantive and technical direction to nationwide statistical series and serve as an expert and consultant in areas of assigned responsibilities. As much of my career, including my years at the U.S. Census Bureau, has included work regarding data confidentiality and privacy, I routinely advise on such matters for BJS.

2.  The statements I make in this declaration are based on my personal knowledge, information provided to me in the course of my official duties, and my review of documents and data kept by BJS in the ordinary course of business.

1

3.   I am familiar with the Bureau of Justice Statistics' (BJS's) handling of the three Freedom

of Information Act (FOIA) requests submitted by the Plaintiffs, Ethan Corey and the Appeal

(numbered 20-FOIA-00016, 20-FOIA-00234, and 21-FOIA-00114), at issue in this matter.  This

declaration provides information concerning BJS's processing of records responsive to the

Plaintiffs' FOIA requests and redaction of information to safeguard against the clearly

unwarranted invasion of personal privacy and otherwise uphold FOIA requirements.

4.   BJS uses statistical disclosure avoidance methods to protect its datasets to meet

confidentiality standards for its statistical datasets.  Several methods may be used to limit the risk

of identification in sensitive datasets. The National Institute of Standards and Technology's "De-

Identification of Personal Information" provides an overview of de-identification methods and

issues, and is "intended for use by officials, advocacy groups, researchers, academics, and other

members of communities that are concerned with the practical and policy issues involving the

creation, use, archiving, and sharing of data containing personal information."[1] The document

identifies several widely recognized identification protection methods:

- Suppression
- Generalization
- Perturbation
- Swapping
- Sub-sampling[2]

5.   Most of these types of de-identification methods alter the record in some way or exclude

certain records and, therefore, are not suitable for a response to a FOIA request, as in the case of

the Mortality in Correctional Institutions (MCI) and Death in Custody Reporting Act (DCRA)

data. Therefore, BJS only considered suppression methods. Suppression methods do not alter or

---

[1] Garfinkel, S. (2015), De-identification of personal information, National Institute of Standards and Technology, Gaithersburg, MD. https://doi.org/10.6028/NIST.IR.8053, 1.
[2] Garfinkel, 20.

exclude records that would be responsive to a FOIA request. BJS decided to employ the suppression method known as k-anonymity as the main approach for determining which cells to redact in the records that were responsive to the Plaintiffs' FOIA requests. This approach allows for a quantitative classification of the risk of re-identification and uses an efficient and objective optimization method that minimizes the number of redacted cells while protecting against the unwarranted invasion of personal privacy.

6.   Dr. Latanya Sweeney, currently a professor of computer science at Harvard, developed the k-anonymity method more than twenty years ago.[3] Sweeney describes the problem and solution as:

> "Consider a data holder, such as a hospital or a bank, that has a privately held collection of person-specific, field structured data. Suppose the data holder wants to share a version of the data with researchers. How can a data holder release a version of its private data with scientific guarantees that the individuals who are the subjects of the data cannot be re-identified while the data remain practically useful? The solution provided in this paper includes a formal protection model named k-anonymity and a set of accompanying policies for deployment. A release provides k-anonymity protection if the information for each person contained in the release cannot be distinguished from at least k-1 individuals whose information also appears in the release."[4]

7.   In her paper, Sweeney used an example with medical information combined with voter registration lists to illustrate the problem. She used three variables common to the datasets – age, sex, and ZIP code – to identify the then-governor of Massachusetts in the medical dataset. The identification allowed her to read through the governor's medical records, which included nearly 100 attributes of data including diagnosis, medications, procedures, and many other attributes.[5]

---

[3] Sweeney, L.  (2002), k-anonymity: a model for protecting privacy. International Journal on Uncertainty, Fuzziness and Knowledge-based Systems, 10 (5); 557-570. https://doi.org/10.1142/S0218488502001648. (Also available at https://epic.org/wp-content/uploads/privacy/reidentification/Sweeney_Article.pdf.)

[4] Sweeney, L., 557.

[5] Sweeney, L., 558-559.

This knowledge could reasonably be expected to constitute an unwarranted invasion of personal privacy. This sort of data linkage is also possible with records or information compiled for law enforcement or corrections purposes, including the MCI and DCRA data, which contain several attributes that can be linked to other available datasets and many attributes with sensitive and specific data about the decedent's legal information, medical history, and cause and manner of death.

**KEY DECISIONS FOR PROTECTING THE MCI AND DCRA DATASETS**

8.   The primary method used to protect the MCI and DCRA datasets was k-anonymity. This algorithm allows for the specification of several parameters. The section below describes parameters that were chosen for this analysis.

9.   "Quasi-identifiers" are variables in a dataset that could be used to identify an individual when combined with other information, either on the MCI/DCRA datasets or any other available data sources. BJS considered two primary sources that could be used in conjunction with the MCI and DCRA datasets:

> a.   Online search directories: many jurisdictions have online databases of persons in their custody or released from their custody. The access and scope of the directories vary by jurisdiction.

> b.   Press releases and news articles: when a person in custody dies, especially due to atypical circumstances, press releases and news articles often come out, and often include identifying information about the decedent and circumstances surrounding the fatality.

10. For the data responsive to 20-FOIA-00016, BJS treated that variables containing the following information as quasi-identifiers, in that unique combinations of values could be used to

4

identify someone and information about them: State, release/death date, facility name, race/ethnicity, admission date, offense, legal status, and cause of death.

11. For the data responsive to 20-FOIA-00016, BJS treated that the columns concerning the decedent's name (lname, fname, mname) and birth date (dobmon, dobday, dobyr) as direct identifiers (*i.e.*, would directly identify someone).

12. For the data responsive to 20-FOIA-00234, BJS treated  the following categories of information as quasi-identifiers, in that unique combinations of values could be used to identify someone and information about them: gender; race; ethnicity; date of death; time of death; location of death (street address, city, state, zip code); whether the death occurred in municipal/county jail, state prison, state-run boot camp prison, contracted boot camp prison, any state or local contract facility, other state or local correctional facility (including juvenile facilities), or none of the above; name of the department or agency that detained, arrested, or was in the process of arresting the deceased; manner of death; and a brief description of the circumstances leading to the death.

13. For the data responsive to 20-FOIA-00234, BJS treated the columns concerning the decedent's name (last, first, and middle) and birth year as direct identifiers (*i.e.*, would directly identify someone), along with the name, phone number, and email address of the point of contact for the respondent.

14. For the data responsive to 21-FOIA-00114, BJS treated the following categories of information as quasi-identifiers, in that unique combinations of values could be used to identify someone and information about them: respondent ID (ID for the responding agency); date of death; time of death; address where event causing death occurred; city where event causing death occurred; location type where event causing death occurred; location in or outside facility where

5

incident causing death occurred; business type specified where event causing death occurred; other location specified where event causing death occurred; decedent age; decedent ethnic origin; decedent race; reason for initial contact (criminal investigation, general law enforcement response and patrol, inspection, security, warrant service, or other); where decedent did not commit any criminal acts, specify event that led to contact; offenses; whether decedent used or displayed a weapon; law enforcement weapon use;  agency; cause of death; manner of death; notes (which contain narratives that have identifiers); date decedent was committed or admitted; facility name and location; decedent legal status;; weapon causing death; whether law enforcement personnel used other actions to subdue decedent; source used to establish manner of death; and whether a death was attributable to COVID-19.

15. For the data responsive to 21-FOIA-00114, BJS treated columns concerning the decedent's name (last, first, middle, and suffix), BOP register number, decedent ID, and birth date as direct identifiers (*i.e.*, would directly identify someone).

16. For *k*, BJS used k=2, which means that each possible combination of values for the set of quasi-identifiers will relate to at least 2 individual records.

17. BJS set the parameter "importance" to null. This setting means that no variables are identified as priorities to not be redacted. As such, the algorithm will minimize the number of cell suppressions, agnostic to any importance of a particular column.

18. BJS set the parameter "alpha" to 1. Alpha determines how missing values are accounted for in the set of quasi-identifiers. As an illustration, consider this small dataset with three quasi-identifiers.

19. In Table 1 below, Person 1's record violates k-anonymity with k=2 because only one record contains the values 2015, State = 1, and Race = 2. However, Person 2 and Person 3's

records satisfy k-anonymity because there are two records with 2015, State = 1, and Race =1. If, however, the dataset included a Person 4 with no information provided for their Race, alpha determines how to account for that record.

Table 1.

|  | Year | State | Race | Number of records with same combination |
|---|---|---|---|---|
| Person 1 | 2015 | 1 | 2 | 1 |
| Person 2 | 2015 | 1 | 1 | 2 |
| Person 3 | 2015 | 1 | 1 | 2 |

20. Table 2 below illustrates how records are counted when alpha is set to 1. In this case, Person 4's race is treated as a wildcard which could represent any value. So, it is considered a match with all cases, and all cases are considered a match with it. Thus, all records, including Person 1's are now deemed as satisfying k-anonymity with k=2.

Table 2.

| alpha = 1 | Year | State | Race | Number of records with same combination |
|---|---|---|---|---|
| Person 1 | 2015 | 1 | 2 | 2 |
| Person 2 | 2015 | 1 | 1 | 3 |
| Person 3 | 2015 | 1 | 1 | 3 |
| Person 4 | 2015 | 1 | [Blank] | 4 |

21. Table 3 below illustrates how records are counted when alpha is set to 0. In this case, Person 4's record is similarly counted as matching 4 records. However, it is not treated as a match for the Person 1, Person 2, and Person 3 records. Thus, Person 1 is deemed as NOT satisfying k-anonymity with k=2.

Table 3.

| alpha = 0 | Year | State | Race | Number of records with same combination |
|-----------|------|-------|------|------------------------------------------|
| Person 1 | 2015 | 1 | 2 | 1 |
| Person 2 | 2015 | 1 | 1 | 2 |
| Person 3 | 2015 | 1 | 1 | 2 |
| Person 4 | 2015 | 1 | [Blank] | 4 |

22. BJS set alpha to 1, which results in fewer redactions than other values of alpha.

## OTHER DECISIONS

23. A few other techniques were employed either before or after the k-anonymity algorithm was applied (see below).

24. *Redacting Unique Values*: BJS needed to determine how to provide adequate protection against identification of an individual given that several columns had a relatively high proportion of unique values. If a value is unique within a column, the row will necessarily violate k-anonymity where k=2 (*i.e.*, the row is not indistinguishable from at least 1 other record). To limit the effect of these rare values on the overall redaction results, BJS added a step before applying the k-anonymity approach. In this step, BJS redacted any value that was unique within its column.

25. *Redacting Values in Related Columns*: Several columns in the MCI and DCRA datasets are strongly related to each other. In some cases, a redaction of one column can be rendered meaningless if another related column is not redacted. For instance, consider this illustrative partial record in Table 4 below.

Table 4.

| State | Facility Name | Facility Location | Race | Race Indicator - White |
|-------|---------------|-------------------|------|------------------------|
| **Redacted** | San Quentin State Prison | San Quentin | Redacted | 1 |

26. In this case, the unredacted information reveals that State = California and Race Indicator - White = 1. Due to relationships like these, BJS redacted related variables for some records, as applicable, after the main set of redactions to achieve k-anonymity.

27. *Randomizing Row Order*: The MCI and DCRA source files contained data sorted by column values, so after redactions the dataset could look like the illustration in Table 5 below.

Table 5.

|  | State | Year | Death Month | Death Day |
|--|-------|------|-------------|-----------|
| **Person 1** | 1 | 2018 | 1 | 5 |
| **Person 2** | 1 | Redacted | 1 | 7 |
| **Person 3** | 1 | 2018 | 1 | 12 |
| **Person 4** | Redacted | 2018 | Redacted | 18 |
| **Person 5** | 1 | 2018 | 1 | 30 |

28. If the sort order is maintained in Table 5, because Person 4 is situated between Person 3 and Person 5 and each of them are from State 1, it is known that Person 4 is from State 1 even though that cell had been redacted. Similarly, purely due to the sort order, one can deduce, despite redactions, that Person 2 died in 2018 and Person 4 had Death Month = 1. To prevent this, BJS randomized the order of rows after all redactions were applied.

## SUMMARY OF STEPS EMPLOYED

29. All steps taken to assess and redact the dataset were done in RStudio, an integrated development environment for the R programming language. The R programing language is designed for statistical computing, data analysis, statistical modeling, and data visualization. The

9

k-anonymity algorithm used is part of sdcMicro[6] version 5.7.5. sdcMicro is a bundled collection of functions, data, and compiled code that can be loaded into RStudio to enable users to apply disclosure limitation techniques.[7]

    a.   The following list contains the steps taken to prepare the data files containing potentially responsive records:

(1) Load the Excel file containing MCI and DCRA data into an R session using RStudio.

(2) Subset the data to contain records from the applicable years and months.

(3) Replace any cells with missing data to "Blank", to prepare for processing.

(4) Subset the data to keep columns that are part of the FOIA request, except for the direct identifiers.

(5) For each of the quasi-identifiers, redact any cell that is unique within its column.

(6) Enforce K-anonymity, with the following parameters specified:

    a.   Quasi-identifiers: as listed above.

    b.   k=2

    c.   a=1

    d.   Importance = NULL

(7) Apply redactions on associated columns, as described above.

(8) Add the fully redacted direct identifiers and a column called FOIA_note that indicates "FOIA Exemptions (b)(3), (b)(6), (b)(7)(c)" for each row.

(9) Replace cells that were blanked during the redaction process with "Redacted."

(10)    Replace cells that contain "Blank" to their original, empty, contents.

---

[6] See https://cran.r-project.org/web/packages/sdcMicro/index.html and https://sdcpractice.readthedocs.io/en/latest/sdcMicro.html.
[7] See https://sdctools.github.io/sdcMicro/articles/sdcMicro.html.

(11)   Randomize the order of the rows.

(12)   Fully redact the requested data pursuant to Exemption 3 of the FOIA.

(13)   Output the data to an Excel file.

30. Exemption 6 of the FOIA concerns "personnel and medical files and similar files" when the disclosure of such information "would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). Because the information contained in the requested MCI and DCRA data plainly constitutes personnel and medical files and similar files, Exemption 6 applies to records in the requested information that would constitute a clearly unwarranted invasion of personal privacy.

31. Exemption 7(C) of the FOIA protects information compiled for law enforcement purposes and exempts the disclosure personal information when disclosure "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). Because the information contained in the requested MCI and DCRA data concerns information compiled for law enforcement purposes (correctional institutions), Exemption 7(C) applies to records in the requested information that could reasonably be expected to constitute an unwarranted invasion of personal privacy.

32. Exemption 3 of the FOIA allows the withholding of information prohibited from disclosure by certain other federal statutes. In this instance, 34 U.S.C. § 10231 protects from disclosure research or statistical information identifiable to any specific private person for any purpose other than the purpose for which it was obtained. Because the information requested by the Plaintiffs was research or statistical information protected from disclosure by statute (34 U.S.C. § 10231), Exemption 3 of the FOIA applied and the information was withheld in full.

33. The requested MCI and DCRA information includes sensitive personal information about an individual's medical history, cause and manner of death, and criminal history. When this information can be linked to a particular individual, the disclosure of this information would constitute an unwarranted invasion of personal privacy. The personal information contained in the requested MCI and DCRA records is not available in the public domain or otherwise easily accessible by the public. In applying the k-anonymity method to the requested MCI and DCRA records, BJS endeavored to minimize the number of redactions necessary to protect against unwarranted invasions of personal privacy.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed this __26th__ day of April, 2024.

_____
Amy Lauger

12