UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

THE APPEAL, INC.; ETHAN
COREY, an individual,

             Plaintiffs,

v.

UNITED STATES DEPARTMENT
OF JUSTICE'S OFFICE OF JUSTICE
PROGRAMS,

             Defendant.

Case No. 5:22-cv-02111-WLH-SK

**ORDER RE JOINT MOTION FOR
SUMMARY JUDGMENT [44]**

## I.    BACKGROUND

### A.    <u>Factual Background</u>

      This case concerns three Freedom of Information Act ("FOIA") requests for death-in-custody data submitted by Plaintiff The Appeal, Inc. and its employee, Ethan Corey (collectively "Plaintiffs"), to the Department of Justice's Office of Justice Programs ("OJP").  (Joint Brief on Summary Motion ("JB"), Docket No. 44-1 at 1). Plaintiff The Appeal, Inc., is a "national, nonprofit news agency that covers the impact of policy, politics, and the criminal-legal system on vulnerable communities." (Complaint, Docket No. 1 ¶ 11).

1     The Death in Custody Reporting Act (the "DCRA") was originally enacted in 2000 ("DCRA 2000"), requiring states to report information regarding deaths-in-custody occurring during arrest, *en route* to incarceration, or while incarcerated.  34 U.S.C. § 12104(a)(2)(2000).  The legislative history reveals that a driving purpose of the DCRA was to provide and promote transparency, openness and public confidence. (Joint Appendix of Facts ("JAF"), Docket No. 44-2 ¶ 67).  The Bureau of Justice Statistics ("BJS"), a component of Defendant OJP primarily responsible for data collection, accordingly, launched the Mortality in Correctional Institutions ("MCI") program, with the purpose of collecting data consistent with DCRA 2000.  (JB at 4). Though DCRA 2000 expired in 2006, it was later revived in 2014 ("DCRA 2014"). (*Id.* at 4-5).  From 2006 until 2015, however, BJS continued to collect such death-in-custody data, regardless of the inactive status of the DCRA.  (*Id.* at 5; JAF ¶ 77).

     The facts of this case require additional background about Defendant OJP, including its inception and its relevant components.  Congress enacted the Omnibus Crime Control and Safe Streets Act of 1968 ("CCA") to authorize additional federal funding in support of research into crime and the criminal justice system, and OJP was created within the Department of Justice to administer the programs under Title I of the CCA ("Title I").  (JB at 2).  One such Title I program, the Edward Byrne Memorial Justice Assistance Grant ("Byrne JAG") program, is the leading source of federal justice funding to states and municipalities.  (*Id.* at 2-3).  All fifty states and six territories currently receive Byrne JAG grants.  (*Id.* at 12).  The Byrne JAG program is administered by an OJP component, the Bureau of Justice Assistance ("BJA").  (JAF ¶ 87).  BJS, another OJP component under Title I, was created to "collect and analyze statistical information, concerning the operations of the criminal justice system at the Federal, State, tribal, and local levels[.]"  34 U.S.C. § 10132(c)(4).  Due to the voluntary nature of BJS' data collection, [1] BJS must "confer

---

[1] The Court, here, refers to the data collected by BJS, generally – excluding the data it collects pursuant to the DCRA.  (JB at 17).

and cooperate with State, municipal, and other local agencies" and "enter into agreements with such agencies and instrumentalities" to collect data offering visibility into the operations of the criminal justice system. *Id.* § 10132(d)(1). Congress, accordingly, enacted a privacy provision ("Privacy Provision") under Title I. *See* 34 U.S. C. § 10231(a). That provision, as amended, states:

> No officer or employee of the Federal Government, and no recipient of assistance under the provisions of this title shall use or reveal any research or statistical information furnished under this title by any person and identifiable to any specific private person for any purpose other than the purpose for which it was obtained in accordance with this title. Such information and copies thereof shall be immune from legal process, and shall not, without the consent of the person furnishing such information, be admitted as evidence or used for any purpose in any action, suit, or other judicial, legislative, or administrative proceedings.

*Id.* Given the potentially sensitive nature of the data that BJS cooperatively collects from agencies, it follows that Congress intended to prevent inappropriate disclosure.

DCRA 2014 contained some additions the initial iteration lacked; one such addition was an enforcement mechanism allowing the Attorney General to reduce states' Byrne JAG grants by no more than 10% if they failed to comply with reporting requirements. 34 U.S.C. § 60105(c)(2). Accordingly, given BJA's administration of the Byrne JAG grants, data collection under the DCRA from states was shifted from BJS to BJA starting in 2019. (JAF ¶ 88). DCRA 2014 also required federal law enforcement agencies to report death-in-custody data, which was to be collected by BJS. (*Id.* ¶ 91).

In October 2019, Plaintiffs submitted a FOIA request to Defendant OJP seeking "[t]he number of jail deaths reported (and/or unique CJ-9 forms submitted) by each

1  jail facility participating in the Mortality in Correctional Institutions reporting

2  program (f.k.a. the Death in Custody Reporting Program) each year from 2000 to

3  2018, inclusive." (*Id.* ¶ 1).  Defendant responded in March 2020, indicating that all

4  records were exempt from disclosure under Exemption 3.  (*Id.* ¶¶ 3-4).  Though

5  Plaintiffs appealed this withholding to the Office of Information Policy, the

6  withholding was affirmed.  (*Id.* ¶¶ 5-6).

7      Plaintiffs submitted a second request in July 2020, seeking three categories of

8  data.  (*Id.* ¶ 8).  In particular, Plaintiffs sought: "'All DCR-1 quarterly summary forms

9  submitted by federals, state, and local agencies' to OJP or its components; '[a]ll DCR-

10  1A incident reports submitted by federal, state, and local agencies to OJP' or its

11  components; and '[a]ll Edward Byrne Memorial Justice Assistance Grant ("JAG")

12  Performance Management Tool reports submitted by state and local agencies using

13  the online portal located at http://bjapmt.ojp.gov/ that include reporting pursuant to

14  [DCRA 2013].' JAF 8."  (JB at 6).  Defendant determined that the records were

15  exempt from disclosure.  (*Id.* at 7).

16      Plaintiffs submitted a third request in February 2021, seeking "[a]ll Death in

17  Custody Reporting Act reports submitted by federal law enforcement agencies

18  (including the Bureau of Prisons) from FY2016 to FY2020."  (JAF ¶ 13).  Defendant

19  responded stating that all responsive records were exempt from disclosure pursuant to

20  FOIA Exemption 3.  (*Id.* ¶ 14).

21      **B.   Procedural Background**

22      Plaintiffs filed this action on November 8, 2022, to challenge the withholding of

23  records as a violation of FOIA.  (Compl., Docket No. 1).  Pursuant to a 26(f)

24  conference on November 17, 2023, parties agreed that Defendant would provide the

25  responsive records, with exempt portions redacted, on or before January 31, 2024.

26  (Joint Rule 26(f) Report, Docket No. 37 at 4).

27      On January 31, 2024, Defendant ultimately provided the requested records from

28  all three requests to Plaintiffs, but with full redactions pursuant to FOIA Exemptions

4

3, 6, and 7(c). (*Id.* ¶¶ 7, 12, 15). In carrying out later redactions, Defendant removed direct identifiers from the dataset – those variables that relate to personally identifiable information. (*Id.* ¶ 47). Then, Defendant used a method known as "k-anonymity" to redact information from all three FOIA requests pursuant to FOIA Exemptions 6 and 7(c). (*Id.* ¶¶ 38-39). "K-anonymity" is a method used to de-identify the data set, aiming to prevent disclosure of confidential information. (*Id.* ¶¶ 40-42). The algorithm applied for k-anonymity "protects the privacy of person-specific, field-structured data by ensuring that the information for each person contained in the release cannot be distinguished from at least k-1 individuals whose information also appears in the release." (*Id.* ¶ 44).

## II.    DISCUSSION

### A.    <u>Legal Standard</u>

Under FOIA, federal agencies must disclose requested records within their control, unless disclosure is against the law, or the documents fall within enumerated exemptions. 5 U.S.C. § 552; *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 7 (2001). These exemptions do not "obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act." *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976). Accordingly, the exemptions are exclusive and to be narrowly construed. *Id.*; *see also*, *Env't Prot. Agency v. Mink*, 410 U.S. 73, 79 (1973); *Fed. Bureau of Intel. v. Abramson,* 456 U.S. 615, 630 (1982).

Most FOIA cases are resolved on summary judgment. *Animal Legal Def. Fund. V. U.S. Food & Drug Admin.,* 836 F.3d 987, 989 (9th Cir. 2016). A court engages in *de novo* review of an agency's response to a FOIA request. *Id.* § 552(a)(4)(B).

The agency "bears the burden of demonstrating that the exemption properly applies to the documents." *Lahr v. Nat'l Transp. Safety Bd.*, 569 F.3d 964, 973 (9th Cir. 2009); *Id.* § 552(a)(4)(B). Further, the agency must articulate "tailored reasons" for an exemption's use, avoiding boilerplate and conclusory statements. *Shannahan v. Internal Revenue Serv.*, 672 F.3d 1142, 1148 (9th Cir. 2012). It is appropriate to grant

summary judgment to an agency based on information it provides in affidavits or declarations that explain "the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemptions, and show that the justifications are not controverted by contrary evidence in the record or by evidence of [agency] bad faith." *Berman v. Cent. Intel. Agency*, 501 F.3d 1136, 1140 (9th Cir. 2007). In the absence of bad faith, a court "must accord substantial weight to [the agency's] affidavits." *Minier v. Cent. Intel. Agency*, 88 F.3d 796, 800 (9th Cir. 1996).

### B.   <u>Analysis</u>

The Court is in receipt of the parties Joint Brief on Summary Judgment Motion. (JB, Docket No. 44-1), as well as the accompanying Joint Appendix of Facts (JAF, Docket No. 44-2), and Joint Appendix of Evidence Vols. I-III (Docket Nos. 44-2-5). In reviewing the information provided, the Court hereby **GRANTS**, in part, and **DENIES**, in part, Defendant's Motion for Summary Judgment, as provided below.

### 1.   <u>Defendant's Search Does Not Appear Inadequate</u>

"FOIA requires an agency responding to a request to 'demonstrate that it has conducted a search reasonably calculated to uncover all relevant documents.'" *Lahr*, 569 F.3d at 986 (quoting *Zemansky v. Env't Prot. Agency*, 767 F.2d 569, 571 (9th Cir. 1985)). Such a showing "may be made by 'reasonably detailed, nonconclusory affidavits submitted in good faith.'" *Id.*

Here, there is little evidence to indicate that Defendant failed to conduct a search reasonably calculated to uncover all relevant documents. Defendant identified the particular employees responsible for conducting the searches and described their methods of searching and locations searched. (JAF ¶¶ 16-20, 22-37). In each instance, it appears that the employees searched to the best of their abilities. Defendant provided affidavits of each employee who conducted the searches, in which they described their procedures and efforts in full. (Joint Appendix of Evidence ("JAE") Vol. I, Docket No. 44-3, Exh. 1-4). Given the level of detail and precision,

Defendant has properly demonstrated the search was reasonably calculated to uncover all relevant documents.  This is particularly true where there is no allegation of bad faith.

The Court rejects Plaintiffs' argument that Defendant failed to adequately search because it was "obligated to search for whichever forms fulfill the substance of the Requests," beyond the forms Plaintiffs named.  (JAB at 30).  Though the point is taken that there were, perhaps, additional forms containing data responsive to Plaintiffs' requests, that, alone, does not mean that Defendant failed to conduct a search reasonably calculated to uncover all relevant documents.  Accordingly, the Court concludes that Defendant's search was not inadequate.

## 2.  Exemption 3 Does Not Prevent Disclosure of the Data Collected Pursuant to the DCRA, Which Was Inactive from 2006-2015

FOIA Exemption 3 applies to matters "specifically exempted from disclosure by statute" if that statute either (1) "requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue" or (2) "establishes particular criteria for withholding or refers to particular types of matters to be withheld."  5 U.S.C. § 552(b)(3)(A)(i)-(ii).  Determining whether Exemption 3 applies is a two-step inquiry.  "First, a court must determine whether there is a statute within the scope of Exemption 3."  *Minier*, 88 F.3d at 801.  "Then it must determine whether the requested information falls within the scope of the statute."  *Id.*

Here, Defendant asserts that the Privacy Provision of Title I of the CCA is the type of statute that qualifies for withholding records under FOIA's Exemption 3.  (JB at 16).  The Court agrees.  This Privacy Provision "undoubtedly is" the type of statute that invokes FOIA's Exemption 3.  *Gannett Satellite Info. Network, LLC v. Dep't of Justice*, No. 22-cv-475 (BAH), 2023 WL 2682121, at *5 (Mar. 29, 2023).  Thus, the "dispositive question" is whether the data collected pursuant to the DCRA is technically "furnished under" Title I of the CCA, such that the Privacy Provision applies.  *Id.*

The Court agrees with Plaintiffs that the data collected pursuant to the DCRA is not "furnished under" Title I of the CCA. "Furnish" means to supply. *E.W. Bliss Co. v. U.S.*, 248 U.S. 37, 45 (1918). "Under" means "subject or pursuant to," "governed by," or "by reason of the authority of." *Ardestani v. Immigr. & Naturalization Serv.*, 502 U.S. 129, 135 (1991); *Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 39 (2008). BJS created MCI to collect data pursuant to DCRA 2000. (JAF ¶¶ 69, 71). Although BJS may have collected such data previously, following the enactment of DCRA 2000, this altered the "specificity of the data, the frequency of collection, and the compliance mechanisms. JAF 74." (JB at 32). Logically, then, DCRA data is being collected "by reason of the authority of" the DCRA, as well as "subject to" the requirements of the DCRA. Accordingly, DCRA data was furnished under the DCRA, rather than Title I.

The Court notes Defendant's argument that DCRA data could be furnished under *both* Title I and the DCRA. The Court disagrees, however, in this instance. The court's analysis in *Gannett* is instructive, as it addressed the very DCRA data at issue here. There, the court concluded, following a textual analysis, that because the DCRA "reporting requirements were not enacted as an amendment to the Crime Control Act, but as stand-alone legislation," then the "sought-after information is not provided pursuant to Title I. *Accord Ardestani*, 502 U.S. at 134-37 (1991)." *Gannett*, 2023 WL 2682121, at *6. Further, given that Title I does not, in any way, require reporting on the specific type of data that the DCRA mandates, it is furnished under the DCRA, alone. *Id.* Following a structural analysis, the court further highlighted that nowhere does the DCRA make explicit reference to Title I. *Id.* at *8. By contrast, with respect to the Juvenile Justice and Delinquency Prevention Act and the Justice Assistance Act – both statutes otherwise independent of Title I – Congress expressly made clear that "those statutes were subject to the statutory exemption in the Crime Control Act." *Id.* Accordingly, Congress' election to *not* make an explicit reference to Title I's Privacy Provision in either iteration of the DCRA, passed years

8

after both above-mentioned statutes, is a decisive one.  Accordingly, the Title I Privacy Provision does not bear on the data collected pursuant to the DCRA.

The Court, however, takes note that the DCRA-type data collected from 2006 until 2015 when the DCRA was revived may be a different story.  In that case, such data was collected by BJS, absent any other statutory mandate apart from BJS' authorizing statute in Title I.  The use of "forms authorized to implement DCRA" during the time when the DCRA was inactive does not lead to the logical conclusion that such data was furnished under a then-inactive statute.  (JB at 32).  The only possible statute under which such data was furnished between 2006 and 2015 is Title I.  As such, the Privacy Provision applies to the DCRA-type data collected during those years.

The Privacy Provision exempts disclosure of documents when they will be used "for any purpose other than the purpose for which [they were] obtained in accordance with this chapter."  34 U.S.C. § 10231(a).  The explicit purpose of BJS' data collection stated in Title I is for "research or statistical purpose."  *Id.* § 10134. Plaintiffs argue that, as their intent is to use the data for research or statistical analysis, their usage comports with the purpose for which the data was obtained; Plaintiffs contend that this prevents the Privacy Provision from operating to exempt the sought after data.  (JB at 36).  The Court disagrees.  Plaintiffs' reading of the Privacy Provision is too literal.  While Plaintiffs do seek to use the data for research or statistical purposes, more generally, that does not mean that the data is being used for the purpose for which it was collected.  The Court agrees with Defendant's reasoning, as articulated in its Reply Brief to this Motion.  (Docket No. 46).  The purpose for which the data was obtained, within the meaning of the Privacy Provision, is for "statistical analysis *by BJS and BJA*, not by the public at large."  (Reply Br. on Summ. J. Mot., Docket No. 46 at 5).  Accordingly, the Court concludes that Plaintiffs' intended use of the data is for a purpose other than the purpose for which it was

obtained.  As such, the DCRA-type data collected by BJS from 2005 to 2016 is exempt from disclosure by Title I's Privacy Provision.

The Court is persuaded by Defendant's reasoning behind such a reading, as articulated during the hearing on this Motion.  (Minutes, Docket No. 52).  The effect of the Privacy Provision is that it allows BJS to more effectively collect data from state and local agencies in a cooperative manner; given the voluntary nature of BJS' data collection – DCRA data, aside – agencies may be hesitant to cooperate with BJS in the future if there is reason to believe that Title I's Privacy Provision fails to protect disclosed data.  (*Id.*).

Furthermore, a reading to the contrary would leave *no* data protected by the Title I Privacy Provision, so long as the requester was purportedly seeking it for general research and statistical purposes.  It is difficult to conclude that the Privacy Provision was intended to be construed so narrowly and in such a way that might, in effect, impede BJS' data collection.  Canons of statutory interpretation indicate that such a reading would be contrary to reason, as it would run counter to the intention behind BJS' creation. *See, e.g, Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982) (emphasizing that "interpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available").  In sum, it is most appropriate to read the Privacy Provision as protecting data collected by BJS that is voluntarily provided by agencies – in other words, absent any statutory mandate such as the DCRA – which includes the death-in-custody data it collected from 2006-2015.

Accordingly, the Court concludes that Exemption 3, though inapplicable to the data furnished explicitly under the DCRA, prevents disclosure of the data collected by BJS from 2006 until 2015; during that time, the DCRA-type data was furnished under Title I and is, therefore, subject to Title I's Privacy Provision, which prevents disclosure.  As such, the Court **GRANTS,** in part, and **DENIES**, in part, Defendant's

1  Motion for Summary Judgment with respect to Defendant's invocation of FOIA's

2  Exemption 3.

### 3.  Exemption 7(c) Does Not Apply to the Requested Data, As This Data Was Not Collected for "Law Enforcement Purposes"

5       Exemption 7(c) protects "records or information complied for law enforcement

6  purposes, but only to the extent that the production of such law enforcement records

7  or information . . . could reasonably be expected to constitute an unwarranted invasion

8  of personal privacy."  5 U.S.C. § 552(b)(7)(C).  A document is properly withheld

9  under Exemption 7(c) if the public interest in disclosure is outweighed by the

10  individual privacy interests that would suffer from disclosure.  *Wiener v. Fed. Bureau*

11  *of Intel.*, 943 F.2d 972, 984 (1991).  In other words, in evaluating a withholding under

12  Exemption 7(c), a court must balance the privacy interest against the public interest in

13  disclosure.

14       Here, however, the Court is not convinced that the data was collected for "law

15  enforcement purposes."  This is particularly true where BJS' authorizing statute makes

16  clear that its data is precluded from "use for law enforcement."  32 U.S.C. § 10134.

17  Although Defendant argues that "departments of corrections and other state or local

18  agencies that operate correctional facilities are law enforcement agencies,"[2] it does not

19  track that DCRA data was collected for law enforcement *purposes*.  Data being

20  collected by agencies that could be considered law enforcement does not amount to

21  the data collection being for the *purposes* of law enforcement.  Further, the Court

22  finds Defendant's analogy to *Pinson* distinguishable.  *See Pinson v. Dep't of Justice*,

23  236 F.Supp.3d 338, 365 (D.D.C. 2017).  In that case, the records requested were

24  collected by the Bureau of Prisons ("BOP"), relating to incidents between inmates and

---

[2] Defendant cites to *Duffin v. Carlson*, 636 F.2d 709, 712 (D.C. Cir. 1980) (holding that Federal Bureau of Prisons is a "criminal law enforcement authority").  As noted, this fails to support the contention that the data is collected for law enforcement purposes.  Merely stating that the data was collected by law enforcement agencies does not go far enough.

1   other wrongful conduct within prisons.  *Id.*  Those records were collected specifically

2   to maintain order and safety within prisons, which is a much clearer example of data

3   collected for law enforcement purposes.  *Id.*  Here, by contrast, data collected pursuant

4   to the DCRA was collected expressly for research and statistical purposes.  Further, as

5   Plaintiffs note, to the extent that any law enforcement investigations ensued following

6   a death in custody, "those documents are not included" in the data collected by BJS.

7   (JB at 40).  Any such investigatory records for purposes of law enforcement would be

8   separate and apart from DCRA data collected by BJS.  As such, it does not follow that

9   data collected pursuant to the DCRA was collected for law enforcement purposes.

10         Accordingly, the Court finds that Exemption 7(c) is inapplicable to the

11   requested data and **DENIES** Defendant's Motion for Summary Judgment with respect

12   to Defendant's invocation of FOIA's Exemption 7(c).

13         **4.  <u>Though Exemption 6 Does Apply to the Requested Data, the</u>**

14             **<u>Public Interest in Disclosure Is High</u>**

15         Exemption 6 protects "personnel and medical files and similar files the

16   disclosure of which would constitute a clearly unwarranted invasion of privacy."  5

17   U.S.C. § 552(b)(6).  The phrase "similar files" has a "broad, rather than a narrow

18   meaning," and also includes "[g]overnment records containing information that

19   applies to particular individuals."  *Forest Serv. Employees for Env. Ethics v. U.S.*

20   *Forest Serv.*, 524 F.3d 1021, 1024 (9th Cir. 2008).  At its heart, Exemption 6

21   "protect[s] individuals from the injury and embarrassment that can result from the

22   unnecessary disclosure of personal information."  *Dep't of State v. Wash. Post. Co.,*

23   456 U.S. 595, 599 (1982).

24         To invoke Exemption 6, the agency must demonstrate a privacy interest that is

25   "nontrivial" and "more than *de minimis*."  *Rojas v. Fed. Aviation Agency*, 941 F.3d

26   392, 405 (9th Cir. 2019).  "The scope of a privacy interest under Exemption 6 will

27   always be dependent on the context in which it has been asserted."  *Armstrong v.*

28   *Exec. Office of the President*, 97 F.3d 575, 581 (D.C. Cir. 1996).  In deciding whether

1  records have been properly withheld pursuant to Exemption 6, the court "must balance
2  the privacy interest protected by the exemptions against the public interest in
3  government openness that would be served by disclosure." *Id.* § 552(b)(6).

4      First, the Court is convinced that the files sought in the request fall within the
5  type of files protected by Exemption 6.  Where the decedents' causes of death may
6  relate to medical conditions, and the files certainly contain information that "applies to
7  particular individuals," it appears death-in-custody records fall within the "broad"
8  scope of files encompassed by Exemption 6.  *Forest Serv. Employees for Env. Ethics*,
9  524 F.3d at 1024.  Thus, the Court turns to whether Defendant has demonstrated a
10 privacy concern or potential "unwarranted invasion of privacy." *Id.* § 552(b)(6).

11     Plaintiffs argue that Defendant has not demonstrated "some nontrivial privacy
12 interest in nondisclosure." *Dep't of Def. v. Fed. Labor Relations Auth.*, 510 U.S. 487,
13 501 (1994).  The Court disagrees.  Plaintiffs are correct that the deceased have a
14 diminished privacy interest.  (JB at 40); *see Campbell v. Dep't of Justice*, 164 F.3d 20,
15 33 (D.C. Cir. 1998).  Further, Plaintiffs are correct that family members do not retain
16 the same privacy interest as the deceased individual.  (JB at 41); *see Nat'l Archives &*
17 *Recs. Admin. V. Favish*, 51 U.S. 157, 167 (2004).  That, however, does not mean that
18 the family of a deceased person has *no* privacy interest regarding the information
19 released about the decedent; Defendant has demonstrated that releasing the requested
20 information, which includes cause of death, certainly implicates privacy concerns.
21 (JB at 24-25).  Not all deaths-in-custody are the same, and not all deaths are, for
22 example, at the hands of law enforcement.  Some records would potentially reveal
23 deaths stemming from "AIDS-related illness, accidental alcohol or drug intoxication,
24 [or] suicide[.]"  (*Id.* at 25).  Given Defendant's demonstration that the privacy concern
25 is "plainly more than *de minimis,*" that interest must be balanced against the public
26 interest in disclosure.  *Rojas,* 941 F.3d at 405.

27     Here, the public interest in disclosure is undoubtedly high.  Disclosure of this
28 data would bring more than "marginal additional usefulness[.]" *Lahr*, 569 F.3d at

13

978.  This is particularly so where much of the data requested has, evidently, not always been made publicly available in other ways.  (JB at 45); (JAF ¶ 83).  The public interest, however, is not merely in the information contained in the data itself.  As Plaintiffs noted, disclosing the records "serves public interest by 'shed[ding] light on [the Department of Justice's] performance of its statutory duties,' under DCRA[.]"  (JB at 43); *see Bibles v. Or. Natural Desert Ass'n*, 519 U.S. 355, 355-56 (1997).  If the Department of Justice ("DOJ") is collecting this data, as mandated by Congress, but there is no appreciable effort to do anything with this data – including making it publicly available – that is something the public deserves to know.  *See, e.g., U.S. Dep't of Justice v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 773 (emphasizing that FOIA "focuses on the citizens' right to be informed about 'what their government is up to'").

More broadly, disclosing this data serves the public interest in understanding "who is dying in custody, how, and why[.]"  (JB at 45).  Defendants argue that FOIA is not intended to shed light on "'wrongdoing by a *state* agency.' *Landano v. U.S. Dep't of Justice,* 945 F.2d 422, 430 (3d Cir. 1992), *vacated on other grouns*[.]"  (JB at 26).  Noting that much of the data involves deaths in state and local facilities, Defendants argue that, accordingly, "[s]uch records are not relevant to the specific public interest that FOIA is concerned with[.]"  (JB at 27).  The Court disagrees.  Disclosing DCRA data in this instance is less about shedding light on state agency wrongdoing and more about the DOJ's response, or lack thereof, to address it.  Finally, where the purpose for collecting this death-in-custody data was to increase accountability and transparency, it follows that disclosing this data serves public interest, as intended.

Accordingly, the Court finds that, though Exemption 6 does apply to the requested data, the public interest outweighs the privacy interest in non-disclosure.  Thus, the Court turns to whether the data disclosed properly balances the privacy and public interests by providing reasonably segregable, non-exempt portions.

1
2

### a. *Defendant's Redactions Do Not Provide Plaintiffs with Reasonably Segregable, Non-Exempt Portions*

3    An agency must disclose "any reasonably segregable," non-exempt portions of

4    the requested records.  5 U.S.C. § 552(b).  The agency bears the burden of

5    demonstrating such reasonably segregable portions have been disclosed.  *Id.*  An

6    agency may justify its withholdings or redactions on a categorical basis "'so long as

7    its definitions of relevant categories are sufficiently distinct to allow a court to

8    determine whether specific claimed exemptions are properly applied.'"  *Prison Legal*

9    *News v. Samuels*, 787 F.3d 1142, 1149-50 (D.C. Cir. 2015) (quoting *Citizens for*

10   *Responsibility & Ethics in Washington v. U.S. Dep't of Justice,* 746 F.3d 1082, 1088

11   (D.C. Cir. 2014)).

12   Here, Defendant attempted to provide segregable, non-exempt portions of the

13   data set by applying an algorithm called "k-anonymity," with the goal of protecting all

14   individuals from being identifiable in the data.  (JAF ¶¶ 38-40).  K-anonymity

15   "protects the privacy of person-specific, field-structured data," ensuring that the

16   identity of individuals who appear in a released data set cannot be determined in

17   combination with other, publicly available information.  (*Id.* ¶ 44).  It is a de-

18   identification method recognized by the National Institute of Standards and

19   Technology.  (*Id.* ¶ 41).  Given the size of the data set, Defendant argues that BJS

20   chose to rely on k-anonymity as "'an efficient and objective optimization method that

21   minimizes the number of redacted cells while protecting against the unwarranted

22   invasion of privacy.' JAF 43."  (JB at 8).  While the Court recognizes that the privacy

23   concerns are not *de minimis*, and that some form of redaction is necessary to protect

24   these privacy concerns, the Court is not convinced that this method "ensured that the

25   redactions were no greater than necessary."  (*Id.* at 29).

26   The Court takes issue with the use of k-anonymity for two main reasons.  First,

27   though a privacy interest may exist in these records, Plaintiffs highlight that this

28   interest varies in type and magnitude across the decedents and their families.  (JB at

42).  Applying a technique that renders every single individual unidentifiable is heavy-handed where it very well be that many of these individuals have little to no actual privacy interest.  In *Prison Legal News v. Samuels*, the plaintiff Prison Legal News ("PLN"), a legal journal, sought documents showing money the Federal Bureau of Prisons had spent in relation to lawsuits and claims brought against it from 1996 to 2003.  787 F.3d at 357.  The defendant initially produced no records in response, but, after PLN brought suit in 2005, ultimately provided records with redactions pursuant to Exemption 6.  *Id.*  The district court eventually granted the defendant's motion for summary judgment, finding the "categorical explanation for the redactions" sufficient.  *Id. at 358.*  The redacted information included individuals' names and personal identifying information, which would have the practical effect of revealing the identity of a person related to a claim against the Bureau.  *Id.* at 360.  The court of appeals, however, disagreed with this approach.  *Id.* at 1150.  The court of appeals highlighted that "Exemption 6 'does not categorically exempt individuals' identities.'"  *Id.* at 1147 (quoting *Judicial Watch, Inc. v. Food & Drug Admin.,* 449 F.3d 141, 153 (D.C. Cir. 2006).  The court of appeals determined the redaction improper where it lumped together "a wide range of claims covering various degrees of privacy interests."  *Id.* at 1150.  In essence, because the individuals' privacy interest varied widely depending on the type of claim and whether they were victim or perpetrator, the court found the approach not tailored enough.  *Id.* The court was clear that it was not "foreclosing use of a categorical approach," as in some instances this may be appropriate.  *Id.* at 1152.  The necessary inquiry is whether "the range of circumstances included in the category 'characteristically support[s] an inference' that the statutory requirements for exemption are satisfied[.]"  *Nation Magazine, Washington Bureau v. U.S. Customs Service*, 71 F.3d 885, 893 (D.C. Cir. 1995).  In sum, an approach to redaction that over-simplifies varying degrees of privacy interests does not satisfy FOIA's mandate to provide reasonably segregable, non-exempt portions.  K-anonymity treats all

1  decedents as a single category and fails to provide the reasonably segregable, non-
2  exempt portions of the data.

3        Second, the Court takes issue with the practical result of the redaction by k-
4  anonymity.  Plaintiffs point out that the algorithm "strips the data to nothing[.]"  (JB at
5  47).  The result is that the data is so redacted that it forecloses any "meaningful
6  analysis – how inmates die, where, and why." (*Id.*).  To be sure, Plaintiffs recognize
7  that basic redaction by category of information – including name, birth date, and
8  social security number – is appropriate.  (*Id.*).  To the extent that Defendant can point
9  to additional categories to be redacted, supported by a specific and articulable privacy
10 concern, the Court is willing entertain expanding the categories beyond personally
11 identifiable information.  The Court, however, agrees that, with respect to the use of k-
12 anonymity, such "stringent redaction is not mandated (or warranted) here." (*Id.* at
13 47).

14       Though the Court agrees that Exemption 6 applies to the records requested,
15 Defendant has failed to provide reasonably segregable, non-exempt portions of the
16 requested records.  Accordingly, the Court **GRANTS**, in part, and **DENIES**, in part,
17 Defendant's Motion for Summary Judgment with respect to its invocation of FOIA's
18 Exemption 6.

19 **III.    CONCLUSION**

20       For the foregoing reasons, the Court hereby **GRANTS**, in part, Defendant's
21 Motion for Summary Judgment as follows:

22       -    Exemption 3 applies to Plaintiffs' first FOIA request, but only with respect
23            to the data collected by BJS from 2006-2015;

24       -    Exemption 6 applies to all three of Plaintiffs' FOIA requests.

25       The Court hereby **DENIES**, in part, Defendant's Motion for Summary
26 Judgment as follows:

27       -    Exemption 3 does not bar disclosure of data furnished under the DCRA;

28       -    Exemption 7(c) does not apply to Plaintiffs' three FOIA requests;

17

- Though Exemption 6 applies to all three of Plaintiffs' FOIA requests, Defendant failed to provide reasonably segregable, non-exempt data.

Accordingly, the Court hereby **ORDERS** parties to meet and confer and, within 21 days of this Order, Defendant shall lodge the desired categories to be redacted. Defendant shall point to specific privacy issues with respect to each category, and Plaintiffs may subsequently lodge its opposition to categories proposed by Defendant. The Court will rule category by category as to which data must be redacted in compliance with FOIA's Exemption 6.

**IT IS SO ORDERED.**

Dated:  October 15, 2024

HON. WESLEY L. HSU
UNITED STATES DISTRICT JUDGE

18