1        UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA

3     HONORABLE WESLEY L. HSU, JUDGE PRESIDING

4   THE APPEAL, INC.,                    )
                                         )
5                                        )
                                         )
6                   Plaintiff,           )
                                         )
7                                        )
                                         )
8        Vs.                             )   No. CV22-02111-WLH
                                         )
9                                        )
                                         )
10  UNITED STATES DEPARTMENT OF          )
    JUSTICE'S OFFICE OF JUSTICE          )
11  PROGRAMS,                            )
                                         )
12                                       )
                                         )
13                  Defendant.           )

14  _____

15

16

17        REPORTER'S TRANSCRIPT OF PROCEEDINGS

18              LOS ANGELES, CALIFORNIA

19            FRIDAY, OCTOBER 4, 2024

20

21

22

23        MIRIAM V. BAIRD, CSR 11893, CCRA
       OFFICIAL U.S. DISTRICT COURT REPORTER
24            411 WEST FOURTH STREET
                  SUITE 1-053
25         SANTA ANA, CALIFORNIA 97201
           VELIZBAIRDMIRIAM@GMAIL.COM

1                       **A P P E A R A N C E S**

2

3     **ON BEHALF OF THE PLAINTIFF,**          LEENA M. CHARLTON
      **THE APPEAL:**                          DAVIS WRIGHT TREMAINE, LLP
4                                              1251 AVENUE OF THE AMERICAS
                                               21ST FLOOR
5                                              NEW YORK, NEW YORK 10020

6

7

8

9

10    **ON BEHALF OF THE DEFENDANT,**          CORMAC EARLY
      **UNITED STATES DEPARTMENT OF**          UNITED STATES DEPARTMENT OF
11    **JUSTICE'S OFFICE OF JUSTICE**          JUSTICE
      **PROGRAMS:**                            1100 L STREET NW
12                                             WASHINGTON, DC 20005

13

14

15

16

17

18

19

20

21

22

23

24

25

1    LOS ANGELES, CALIFORNIA; FRIDAY, OCTOBER 4, 2024; 10:59 A.M.

2                                  ---

3

4

5              THE CLERK:  Calling CV22-02111-WLH, The Appeal,

6    Inc., et al. v. United States Department of Justices, Office

7    of Justice Programs.

8              Counsel.

9              MS. CHARLTON:  Leena Charlton for the plaintiffs.

10             MR. EARLY:  Good morning, Your Honor.  Cormac Early

11   for defendant.

12             THE COURT:  All right.  Good morning to both of

13   you.

14             Matter is on calendar for the motion for summary

15   judgment as to all counts.

16             I last night posted a tentative.  Have both sides

17   had an opportunity to review it?

18             MS. CHARLTON:  Yes, Your Honor.

19             MR. EARLY:  Yes, Your Honor.

20             THE COURT:  Mr. Early, are you going to rest on the

21   tentative?

22             MR. EARLY:  We have a few concerns to raise,

23   Your Honor.

24             THE COURT:  Okay.  All right.  Why don't I start

25   with Ms. Charlton.

1          MS. CHARLTON:  Great.  We have one issue that we'd

2     like to discuss with you.

3          THE COURT:  Sure.

4          MS. CHARLTON:  We were very happy to see your

5     tentative ruling this morning.

6          THE COURT:  Most of it.

7          MS. CHARLTON:  Having ten minutes, it was going to

8     be a lot to try to discuss in that time period.

9          The one issue that we would have left is about the

10    Exemption 6 application of the K-anonymity application to the

11    data.

12         So we believe you are correct that the public

13    interest does outweigh the private interest here, as it has

14    been articulated in this case.

15         However, when the public interest does outweigh the

16    private interest, Exemption 6 actually should not apply.  And

17    therefore, we should be able to receive the documents without

18    any redactions.

19         If it is -- if the case is that you -- if you

20    believe that there should be some redactions, if there are

21    some other privacy interests that do outweigh the public

22    interest in this case, they should be much more limited than

23    they would be with the K-anonymity redaction method.

24         Basically what the K-anonymity redaction method

25    does is it -- they've identified three direct identifiers and

1    a series of quasi-identifiers which actually result in the

2    data being completely useless.  There's holes in it

3    everywhere.  It takes out the names of the decedents, and

4    many times where they died, when they died, how they died,

5    the dates of their deaths, when they were admitted into the

6    facility.  All this information is actually essential to the

7    data that we're seeking.

8            If you look at other Exemption 6 cases, it's also

9    not this kind of data that's being redacted.  The kind of

10   data that's being redacted is home addresses of federal

11   employees or their personal e-mail addresses.  It's not any

12   information, so far as I've seen, that's related to

13   information about the decedents.

14           The exceptions that we have are two cases, very

15   different factual -- factual situations.  For Favish, we

16   actually know the name of the decedent, how he died, when he

17   died, all the circumstances of his death.  What they refused

18   to disclose were the pictures, the death scene images of this

19   man, Mr. Foster.

20           For the NASA case it's the same.  We know who died,

21   we know how they died, when they died.  And what the Court

22   redacted, what the Court withheld was simply -- well,

23   actually, not simply, was the last words -- the audio of the

24   last words of the astronauts.

25           THE COURT:  Did the government oppose the

1    information that you're talking about being disclosed then?

2          MS. CHARLTON:  To my knowledge, no.  But I think

3    that's because there's no rationale to withhold it.

4          THE COURT:  See, I just don't agree with that

5    fundamental principle.  Because here's the thing.  I don't

6    think that it's an all-or-nothing with 6.

7          So what I'm saying -- I think what I'm trying to

8    say is, and maybe I didn't articulate it well, is that the

9    public interest outweighs the privacy interest so long as the

10   privacy interest is properly addressed through some type of

11   redaction.

12         And so we -- I think -- I am open to disputing

13   whether K-anonymity is appropriate.  I'm not open to saying

14   that because the public interest outweighs the privacy

15   interest, therefore, I'm ordering, you know, blank slate

16   disclosure of the information.

17         But more fundamental than that, I guess, the

18   hypothetical that -- frankly, that my clerks and I discussed

19   is:  What if there was an inmate that died of AIDS, and that

20   he had never told his family, and/or anyone else that he was

21   gay or had AIDS or something like that?

22         That does seem to me, even with the person being

23   deceased, as something that there is a significant privacy

24   interest in -- in keeping confidential.

25         So how do I distinguish that from the information,

1    which I think you are really interested in, which is:  Did

2    they die in custody because of, you know, failure of medical

3    treatment or -- or some other condition where the BOP is at

4    fault, or a contributor, at least?

5            How do I distinguish those situations in terms of

6    what I order the government to disclose or not?

7            MS. CHARLTON:  So in that situation, I would say --

8    I would have to agree, obviously, having to have your

9    sensitive medical history disclosed in that way would be

10   shocking pre-mortem.  Post-mortem -- the decedent, I would

11   say, has very few -- almost no interest in it at that point.

12           The family may have their own privacy interests,

13   but they haven't been raised here actually.

14           In Favish and in NASA -- well, in Favish in

15   particular.  I'll speak to Favish.  The family -- their

16   interests were asserted by the family.  They had specific

17   reasons why they didn't want the information released, and

18   that included that they had already been harassed by the

19   public; had been having, you know, bouts of insomnia and

20   nightmares.  There was a concrete showing that they had a

21   privacy interest at issue.

22           Whereas here it's hypothetical.  And we actually

23   don't know how many of these cases where AIDS is -- for

24   example, something that sensitive is the reason for the death

25   of the decedent.  And for that reason, K-anonymity can't

1    address that specific instance.

2              If there were a different situation, for example,

3    my client has been looking at trying to put together pieces

4    of other datasets to kind of get at this information, which

5    is hard to do because so far we have access -- minimal access

6    to two states.  And California and Texas have this

7    information public.

8              But using K-anonymity and the dataset that was

9    released in Gannett -- we actually haven't received our

10    dataset yet unredacted so we don't know what this will look

11    like applied to our dataset.

12              But using the Gannett dataset, he found that he

13    could go -- one had to find a specific person he was looking

14    for first.  He couldn't just look down the list and identify

15    people individually.  But he found someone from the

16    California dataset who had enough information that was

17    essentially randomly redacted or not from the DOJ dataset,

18    and was able to actually find the illness in the DOJ dataset

19    that was just specified as illness in the California dataset.

20    It's not actually doing the work that you would like it to

21    do.

22              For that reason, we would say that we would need to

23    see the redactions first before we make a decision on this

24    issue.  We would love to do more briefing, if that's helpful

25    for you.

1          THE COURT:  I'm not sure about the briefing.  I'm

2     trying to think -- and maybe, Mr. Early, you can opine on

3     this.

4          I guess what I have in mind is maybe -- because

5     ideally -- I feel like there must be some mechanism to get

6     your client -- well, for clarity of the record, the

7     plaintiff, the data that they need while balancing against

8     that the privacy interest that I'm concerned about.

9          Whether or not the family has asserted their

10    privacy rights, I still think that the diminished privacy

11    right in the decedent still carries some weight with me.

12         MS. CHARLTON:  Uh-huh.

13         THE COURT:  I, of course, picked the most glaring

14    example.  But there could be others that are persuasive to

15    me.

16         So I am wondering if there is some mechanism where

17    we can either -- you know, you -- the government submits it

18    in camera to me, or we have a -- an attorneys-only viewing of

19    the unredacted documents so that we can -- so that you two

20    can fight about it.  It can be done here so that I'm

21    available to resolve disputes as to what I consider to be

22    privacy protected and what is not.

23         Then I could order the redactions based on that

24    lawyer-only review.  And then the documents could be

25    produced.

1          I don't know if that would be satisfactory to

2     either side.  But it seems to me that is one way to resolve

3     it.  Because I do think -- to be clear, I do think that your

4     client is entitled to data.

5          MS. CHARLTON:  Uh-huh.

6          THE COURT:  I just want to be --

7          MS. CHARLTON:  Cognizant --

8          THE COURT:  -- cognizant of the -- I don't even

9     know -- I mean, there may be no cases where my privacy

10    concern is sort of heightened.  But maybe there are.  And I

11    would want to -- I would want to know that before I ordered

12    the wholesale disclosure of the information.

13         MS. CHARLTON:  I think that's the right state of

14    mind.  We want to see what we're actually having redacted

15    before it's redacted.

16         I will note that when there is such a sensitive

17    health record, since we're using the AIDS example, there

18    still is often fault by the state agency.  There's the

19    example of the trans -- LGTB -- the Transgender Legal

20    Center -- I'm totally butchering the name of that case, I

21    apologize -- where the immigrant who came for asylum because

22    they were transgender did have AIDS and their condition was

23    neglected completely.  That is still a fault of the agency

24    and not necessarily something that was held secret.  That

25    information is public.  We know that from the cases.

1           And the DHS also does disclose the details of the

2   medical histories of people who have died in their custody --

3   at least in this recent report that they released.

4           I will also say that our client pointed out to us

5   -- great client, by the way.  He's very thorough.

6           But for the CDC, he couldn't find any examples

7   where K-anonymity was used for this type of sensitive data.

8   So even the CDC and the census and the National Practitioner

9   Data Bank, which is about doctor's malpractice suits, they

10  will redact specific columns of sensitive information.  Or,

11  for example, in The National Practitioners Data Bank, they'll

12  round up the settlement amount so you can't go back and find

13  the exact case based on the settlement amount.  Or they'll

14  find some other way to round out the edges of the data rather

15  than completely redact it.

16          Because essentially what we do want is that

17  sensitive information that helps illuminate what happened

18  behind these closed doors.

19          And we do, of course, want to be aware that this is

20  still sensitive information in some instances.  That, you

21  know -- I think the AIDS example's a great one.  I think

22  there's also examples of -- that were raised by the

23  government of alcohol and drug use.  But that also raises the

24  question of how you get alcohol and substances behind -- in

25  the facility.

1           THE COURT:  That's true.  I agree with that.

2   There's public interest in that.

3           MS. CHARLTON:  Right.  So I think that these

4   redactions need to be very minimal, if at all.

5           I think we definitely need to see what's being

6   redacted before we make a final decision on what those

7   redactions will look like.  Again, because what we have now

8   as the example from Gannett is, you know, all of the names

9   redacted; all of the birth dates, years, months redacted,

10  which could be rounded up to an age instead of a date of

11  birth.  The self-interest specification is gone almost

12  completely.  The drug specification.  Facility names.  That

13  is one thing our client was interested in was the facility

14  names to see who was creating -- who was contributing the

15  most to this problem.

16          THE COURT:  That makes sense.

17          MS. CHARLTON:  Yes.  So I think that's kind of

18  where our concerns are.

19          We do have a couple studies that are helpful about

20  K-anonymity if that is something that you would be interested

21  in reading.  One is called Protecting Privacy Using

22  K-Anonymity.  That word is hard to say when you're trying to

23  speak quickly.  Sorry.  I will slow down.

24          That's from the Journal of the American Medical

25  Informatics Association.

1          There's another study called the Re-Identifications

2    of Governor William Weld Medical Information, a critical

3    reexamination of the health data identification risks and

4    privacy protections then and now.

5          And that's a 2015 paper by Daniel Barth Jones at

6    Columbia examining how K-anonymity results in over

7    anonymization and, therefore, like ruining the dataset.

8          So, again, I feel like I'm throwing a lot at you

9    because I feel like we don't have that much time and we

10   can -- you know, I'm happy to talk more or, you know, I did

11   offer briefing, which I'm happy to do as well.  Those are our

12   main concerns from the tentative ruling.

13          THE COURT:  Okay.  Thank you very much.

14          MS. CHARLTON:  Thank you.

15          THE COURT:  Mr. Early.

16          MR. EARLY:  So I'm happy to start with the

17   Exemption 6 analysis, if that would be helpful.

18          THE COURT:  Sure.

19          MR. EARLY:  Pick up where my friend left off.  So I

20   guess, Your Honor, you suggested potentially in camera or

21   attorneys' eyes review of this data.

22          Our position is that K-anonymity, it is admittedly

23   imperfect in several ways.  So my friend raised the CDC and

24   census and how they protect data in their publications.  And

25   they -- as I understand it, they will essentially fudge the

1    data.  They will go into the datasets and round up or round

2    down or create dummy data that makes individuals not

3    identifiable.  That is a great approach when it's available.

4    But it's not an option to an agency under FOIA.

5                THE COURT:  Right.

6                MR. EARLY:  We're obliged to turn over, you know,

7    the records that we have if they're disclosable.

8                So that is the difficulty that BJS was facing in

9    terms of finding -- and the other part of this, of course, is

10   the reason that we went with an algorithmic approach is that

11   this is just a huge amount of data.  This is tens of

12   thousands of deaths and, you know, hundreds of thousands, at

13   least, of cells of information that would need to be

14   reviewed.

15               THE COURT:  Well -- okay.  But I think some of

16   those things can be addressed.  I -- you know, so we redact

17   the month and day of their birthday, leaving the year.  I

18   mean, that is not -- it's not rounding.  But it's -- it's --

19   it provides more information than K-anonymity would.

20               I guess, Mr. Early, my concern is that while I do

21   think that there is some privacy implicated here, I do think

22   that they are entitled to the information that they need for

23   the purpose -- and enough of the information to satisfy the

24   purposes of a FOIA request at all.

25               MR. EARLY:  Certainly understood, Your Honor.

1          When we're dealing with a dataset of this size, as

2    I said, BJS's view is that an algorithmic approach is what

3    makes sense.  Because a line-by-line, cell-by-cell review of

4    this would be -- and there is case law supporting this in the

5    FOIA context where that kind of review becomes so burdensome

6    that the agency is not obliged to produce.

7          So what we were trying to do was, in the spirit of

8    the Rose case, the consumer checkbook case we cite -- and

9    those cases were essentially a much more blunt force.  Those

10   cases allowed wholesale redaction of all of the data.

11         And in our view, what K-anonymity does, it's

12   essentially a more sophisticated, more tailored approach to

13   that concern.  It's still -- I understand the plaintiffs are

14   not happy with, you know, at least what it looks like based

15   on the Gannett data they would receive.  It does -- there are

16   still substantial redactions.

17         I'm sorry.  Where was I?

18         THE COURT:  You were providing some data rather

19   than --

20         MR. EARLY:  Right.  Yes.

21         So the cases that we rely on, they support a much

22   more blunderbuss approach, and we didn't want to do that

23   here.  We wanted to have tailoring that protects the privacy

24   interest to, you know, the greatest extent reasonably

25   feasible with a dataset of this size but still giving --

1          THE COURT:  You don't dispute, though, that the

2      privacy interest is diminished somewhat because these are all

3      decedents.

4          MR. EARLY:  Absolutely.  No doubt about that.  And

5      obviously everyone in this dataset by construction is

6      deceased.

7          THE COURT:  Yes.  I think -- I don't think that you

8      would dispute that there is public interest in the

9      information that the plaintiff is seeking and the reason that

10     the plaintiff is seeking it?

11         MR. EARLY:  So I want to be very careful about my

12     choice of words here, Your Honor.  Because, of course, in

13     colloquial use of the phrase "public interest," there is, of

14     course, a great deal of public interest.  We don't dispute at

15     all that the public at large is interested in deaths in

16     custody.

17         That said, as DEPTRINAL matter, there is the point

18     that we raised in our briefs that the public interest that is

19     cognizable under FOIA is more limited.  And it's limited to

20     understanding how the federal government is working.

21         So for -- the third request deals with federal

22     data.  So that doesn't even apply to the third request but

23     for the first two.

24         There is, of course -- you know, plaintiffs point

25     out that there's an interest in understanding how the federal

1    government is doling out grant money; how the federal

2    government is interacting with the state criminal justice

3    system.

4         But that is a more attenuated interest than the

5    kind of direct public interest in understanding how these

6    facilities themselves are operating, which, while it is

7    obviously in many senses of the word a very compelling

8    interest; it's just not a compelling interest --

9         THE COURT:  Of the federal government?

10        MR. EARLY:  -- that's recognized under FOIA.

11   States, of course, have their own Freedom of Information laws

12   that shed light on the operations of states and local

13   governments.  But the public interest that FOIA is concerned

14   with is understanding how the federal government is

15   operating.

16        So, you know, our overarching point is that on the

17   public interest part of the analysis, you know, we've gotten

18   -- I think everyone agrees that there is more than a de

19   minimis privacy interest, however vague it may be here.  So

20   we're at the stage where we're looking at the public interest

21   and then weighing.

22        And on the public interest part in particular,

23   that's where plaintiffs do bear the burden here, you know, in

24   FOIA cases.  Generally the government bears the burden.  But

25   on this prong of the analysis, the burden's on plaintiffs to

```
1    show the marginal improvement in public interest from the

2    specific data they're seeking.

3          So where the dots don't connect for us is to say:

4    Knowing that, you know, John Doe died of X and Y cause in ABC

5    state on whatever date, we don't see how that informs the

6    public understanding of how DOJ is administering DCRA.

7    Sorry, DCRA, that's the -- D-C-R-A is the statute that some

8    but not all of this data is furnished under.

9          THE COURT:  Isn't that a little bit of a narrow

10   construction?  I mean, just hypothetically speaking, would

11   there be interest in -- what is the public interest in the

12   federal government continuing to provide grant money or to do

13   other things, like, for example, contracting with the state

14   facilities to hold federal defendants when they are awaiting

15   trial or even post-trial, as has been known to occur in the

16   past when the -- that facility is reporting, you know,

17   hundreds of -- in custody deaths every year under DCRA.

18         That seems to me to be something where the public

19   interest is in how the federal government is functioning.

20         MR. EARLY:  Certainly, Your Honor.  And I take the

21   point.  But that does -- there is a -- what I think is a

22   subtle but extremely important point here about the way the

23   public interest prong of FOIA analysis works.  And it's --

24   it's -- the Reporter's Committee case in the Supreme Court is

25   what we're relying on primarily here, which is to say, the
```

1      federal government has vast amounts of information about all

2      kinds of things.  And that information can be sliced and

3      diced statistically.  And in particularly in the age of big

4      data and machine learning and so on.

5              I'm sorry.  In the age of machine learning and big

6      data.  I might have said it there other way around.

7              There is just an enormous amount that could be

8      gleaned from information in the federal government's

9      possession.

10             THE COURT:  Yes.

11             MR. EARLY:  That, again, with some colloquial

12     understandings of the word "interest" would be of interest to

13     a lot of people for a lot purposes.

14             The Supreme Court addresses this with FBI rap

15     sheets.  Of courses it's of interest in some sense.  But it's

16     not of interest in specifically illustrating how the federal

17     government is functioning.

18             That's the line that we want to suggest the Court

19     stick to, which is to say -- so, for grant money, for

20     example, the federal government is quite transparent.  So

21     BJA, which is the part of OJP that doles out the grants,

22     there are transparent criteria for --

23             (Court requests clarification.)

24             MR. EARLY:  Sorry.  OJP.  There's a lot of

25     acronyms.  Office of Justice Programs.  I apologize, Your

```
 1    Honor.  There's a lot acronyms flying around in this case.

 2              They're transparent about the criteria that are

 3    used for doling out grant money.  And similarly with federal

 4    contracting, in Your Honor's example.

 5              If you look at those criteria, what you will find

 6    is that no one is looking at --

 7              THE COURT:  DCR data.

 8              MR. EARLY:  They're not looking at analyses that

 9    BJS has conducted but not made public.  Those analyses just

10    don't exist.  To the extent that BJS has done the analysis,

11    it's published it.

12              So maybe you could make the argument and the public

13    might be interested in making the argument that maybe GJA

14    should be looking at that data.  But the fact that they are

15    not is already public.

16              So in terms of contributing to public understanding

17    of what the government actually is doing, our position is

18    that this kind of granular individual decedent level data

19    isn't actually advancing that interest substantially.

20              THE COURT:  I see.  Okay.

21              MR. EARLY:  I would -- while we're sticking to the

22    substance.  There was one particular concern I wanted to

23    raise with the Exemption 3 part of the opinion.

24              THE COURT:  Okay.

25              MR. EARLY:  Which is for the years in which neither
```

1    version of DCRA was in effect.  So that's 2006 to -- and the

2    DCRA 2013 effective date is phrased in an incredibly

3    confusing way, but it cashes out to -- October 1st, 2015 is

4    when it took effect.

5            THE COURT:  Okay.

6            MR. EARLY:  So for those years in between, our

7    position -- and I don't understand plaintiffs to be

8    disputing -- is that DCRA was not in effect.

9            THE COURT:  Correct.

10           MR. EARLY:  So the concern for BJS here is that

11   treating that information as not subject to Title I's

12   confidentiality provision would be -- and I don't mean to be,

13   you know, an alarmist or anything, but BJS views that as an

14   existential threat to their ability to carry out their

15   function.  The reason being, that practically everything that

16   BJS does depends on voluntary cooperation, voluntary data

17   collection.  No one is forced to turn over their data to BJS.

18   And BJS through extensive history of building up trust of

19   being a reliable custodian of data makes representations that

20   it is covered by the confidentiality provision that data

21   that's turned over to BJS will be used strictly for

22   statistical purposes by BJS, not by the public at large.

23           The upshot of saying if a FOIA requester has a

24   statistical purpose, which, you know, of course we accept

25   plaintiffs' intent to carry out statistical analyses of this

1  data, the problem for BJS with that is that once information

2  is disclosable under FOIA, it's disclosable to anyone for any

3  purpose.

4          And so --

5          THE COURT:  I guess -- I mean, I sympathize with

6  the agency.  I do.  I'm not dismissing the concern.

7          But I still need some actual statutory basis for

8  exempting that time period.  It's not in DCRA.

9          MR. EARLY:  Well, so I -- our statutory argument,

10  to be clear, it is confidentiality provision which says that

11  the data can't be turned over except for the purpose for

12  which it was provided.

13          THE COURT:  I understand.  But that -- it's pretty

14  clear to me that the DCRA didn't reference that

15  confidentiality provision.  They had their own.

16          MR. EARLY:  I think there might be a little bit of

17  misunderstanding, Your Honor.  I'm only, for the purposes of

18  this argument, focused on the data for the time period when

19  DCRA was not in effect.

20          THE COURT:  No, no.  I understand.  I guess I'm not

21  being clear.

22          So DCRA 1 says, this data is subject to FOIA

23  exemptions, right?  Something to that effect.

24          No.  I'm sorry.  There's DCRA 1.  You collect --

25  you, BJS, collect this data.  Okay?

```
 1                MR. EARLY:  Right.

 2                THE COURT:  There's DCRA 2.

 3                MR. EARLY:  Yes.

 4                THE COURT:  You collect this data.

 5                MR. EARLY:  Yes.

 6                THE COURT:  Neither DCRA 1 nor DCRA 2 refers to

 7      Title 1.

 8                MR. EARLY:  Yes.

 9                THE COURT:  Right?  Correct?

10                MR. EARLY:  Correct.

11                THE COURT:  So it seems to me that the fact that

12      BJS was collecting stuff in between DCRA 1 and DCRA 2 doesn't

13      necessarily mean that it's covered by Title 1.

14                MR. EARLY:  Right.  Okay.  So our -- to take a step

15      back.  Our argument for that is that BJS has authority under

16      Title 1 to collect statistical data about the operation of

17      the criminal justice system.  And we can provide you with

18      citations.  But it's in BJS's organic statute.

19                THE COURT:  Yes.

20                MR. EARLY:  BJS relies on that all the time, you

21      know, that -- outside the context of DCRA, the voluntary data

22      collections I was referring to.  Those are all under BJS's

23      Title 1 authority.  And what goes with that is the

24      confidentiality provision in Title 1.

25                THE COURT:  I see.  Okay.  So let me rephrase.
```

1        In the period in between the two DCRA acts, BJS was

2    only collecting that data pursuant to its power under

3    Title 1?

4            MR. EARLY:  And power is even putting it a bit

5    strongly.

6            THE COURT:  Okay.  The authorization --

7            MR. EARLY:  Mandate, I suppose.

8            THE COURT:  Yes.  The authorization under Title 1.

9            MR. EARLY:  Right.  Because it was voluntary, no

10   one had to turn over anything.

11           THE COURT:  Right.  Okay.  I see.

12       So if not for Title 1, in other words, BJS would

13   not have collected any of this data?

14           MR. EARLY:  Right.  BJS wouldn't -- BJS is a

15   Title 1 entity.  It exists by virtue of Title 1.  Everything

16   is -- it's Title 1 all the way down for BJS.

17           THE COURT:  I see.

18           MR. EARLY:  DCRA is a slightly unusual situation

19   because there's a separate source of statutory authority for

20   collecting data.

21       In the main, what BJS does is it asks people to

22   give it data and then it analyzes that.

23           THE COURT:  I see.

24           MR. EARLY:  And it's that data that BJS is

25   particularly concerned about when DCRA laws went into effect.

1          You know, of course, we respectfully disagree with

2     the Gannett Court and Your Honor's inclination about the

3     interaction, when DCRA clearly is in effect, how that

4     interacts with Title I confidentiality provision.

5          But it's the part where it's just Title I all by

6     itself that BJS is particularly concerned about.

7          There was just one other relatively more minor

8     detail there, which is, there was a dispute in the briefing

9     about what exactly in the request was covered by DCRA and

10    what was not.

11         So our position is that because DCRA says the

12    states must report this data about states and local entities,

13    that the -- the part of the dataset that is subject to the

14    DCRA mandate and in the logic of the tentative opinion does

15    not subject to the confidentiality provision, is only the

16    data that was actually turned over by the states.

17         THE COURT:  Okay.  I guess I'm -- at the moment I'm

18    blanking on what that means as a practical matter.

19         MR. EARLY:  So the first request specifically asks

20    for data that was turned over by local jails participating

21    in --

22         THE COURT:  Oh, I see.

23         MR. EARLY:  And so local jails did, in fact,

24    participate in MCI.

25         But our position was that was BJS doing what it

```
1    normally does, which is, you know, going hat in hand to

2    entities that have data and saying, Please give us some.

3              THE COURT:  I see.

4              MR. EARLY:  And so DCRA did say, states must report

5    this data.  And to be fair to plaintiffs, states must report

6    this data about local --

7              THE COURT:  Themselves.

8              MR. EARLY:  -- jurisdictions and states.  You know,

9    everyone under the state.

10             THE COURT:  But there were local institutions that

11   reported directly?

12             MR. EARLY:  They reported directly, yes.

13             THE COURT:  I see.

14             MR. EARLY?  Our position was that was not --

15             THE COURT:  Not covered.

16             MR. EARLY:  -- required to be done under DCRA --

17   sorry.  That was not required to be done.

18             For it to be DCRA data, it would be the local jail

19   or whatever facility reports it to the state, and then the

20   state reports to BJS.

21             THE COURT:  Okay.  I understand that distinction.

22             MR. EARLY:  I'm happy to expand on that more if

23   Your Honor wants, but it's in the briefing as well.

24             THE COURT:  Okay.

25             MR. EARLY:  And then -- okay.  Moving on from the
```

1    merits, just a couple of procedural points.  My friend

2    mentioned that -- as she said, we haven't actually turned

3    over the non Exemption 3 part of the dataset yet.  So what

4    they received was a lot of pages of the word redacted over

5    and over again.

6                  THE COURT:  Yes.

7                  MR. EARLY:  And what they would receive without

8    Exemption 3 would be at least fewer redactions.

9                  So, you know, following the logic of what the

10   tentative is doing subject to the caveats that we raised, our

11   understanding is that that would be granting in part and

12   denying in part summary judgment to each party.

13                 THE COURT:  Yes.

14                 MR. EARLY:  And then related to that is that we

15   would ask the Court for a 60-day stay of the effective date

16   of a production order to allow us time to determine whether

17   to appeal.

18                 THE COURT:  Sure.  I understand.

19                 MR. EARLY:  So that, you know -- once it's turned

20   over, it's mooted out.

21                 THE COURT:  Of course.  Okay.  All right.  Thank

22   you very much.

23                 Ms. Charlton, was there anything you wanted to add?

24                 MS. CHARLTON:  Yes.  If I may.

25                 I'm going to start with the Exemption 3 points

```
 1    because I didn't get to that before.  In particular, the time
 2    period 2006 to 2015.  Again, of course, we don't contend that
 3    DCRA was in effect during this time period.  But we still
 4    believe that it was furnished to BJS under the DCRA.
 5              I know in your tentative you mentioned that the
 6    forms themselves are not dispositive of whether or not this
 7    is furnished under the DCRA, which I understand.  I think it
 8    is illustrative of what was required from the states, which
 9    was the same as was required under the DCRA.
10              I was trying to think of a good example of this
11    that's not as complicated, so I have a cake metaphor, if I
12    may; that if you have a cake recipe that you know by heart
13    and you use it and you look at it and you write from it, you
14    make your cake from it.
15              You throw away the recipe, but you continue to make
16    your cake the same way.  You're still making your cake under
17    the mandates of that recipe.
18              This is essentially what's happening here, is that
19    even though the legal requirement was lapsed, it wasn't
20    necessarily that the BJS had created another program, it was
21    reinventing how they --
22              THE COURT:  No.  I don't think Mr. Early would
23    suggest that.
24              But I do think that there is -- there is import in
25    the fact that the statutory authorization lapsed for nine
```

1    years.

2         And I realize they were all, you know, government

3    entities.  They just kind of bounced along in the way that

4    they always had.

5         That doesn't mean that it's legally insignificant

6    that the DCRA lapsed.  I mean, there -- it does motivate me

7    some -- persuade me some, Mr. Early's argument, that -- but

8    for -- in that in between period, but for Title I, BJS has no

9    authority or mandate or authorization to be collecting that

10   information at all.

11        MS. CHARLTON:  I'm not sure that that's completely

12   accurate.  I think that that's something that is obscured by

13   the complicated legal authorities in this matter.

14        So the DCRA actually gave authorization directly to

15   the DOJ which then pushed it off to BJS.

16        The DOJ does not have this confidentiality

17   provision writ large.  This is specific to BJS.

18        If the DCRA is allowed to -- if the DOJ is allowed

19   to essentially skirt what was intended to be public data by

20   putting it under a subcomponent that does have this

21   provision, it's -- it's doing end-run around the attention of

22   the DCRA data, which was to be public and promote

23   transparency.  That's clear from the legislative history.

24   It's clear because the DCRA did not include any sort of

25   confidentiality provision at all.

1          THE COURT:  Well, I guess, then, let's assume that

2     they hadn't outsourced the data collection.  Even if it was

3     housed within DOJ, what authority would they have been

4     collecting that -- accepting that information from the states

5     and local institutions under?

6          MS. CHARLTON:  I guess that's -- that's a question

7     that's more difficult to answer.

8          The mandate for BHS is huge, actually.  Some of it

9     relates to just the -- researching the victimization --

10    criminal victimization and juvenile delinquency, for lack of

11    a better word.

12         I think that it's not so much that without this

13    authority, a specific authority is probably needed for them

14    to collect certain data.  They could have received statistics

15    from another subcomponent or not.  But, for example, they

16    also collect data for -- to my understanding from -- for the

17    census.  And that collection is from the census act.

18         I don't know that they would not be able to collect

19    specific data -- I guess what I'm trying to say, it's a

20    factual question that is not clear from the information that

21    we have that that -- that there would be no -- no ability to

22    collect simply because DCRA was not in effect.

23         The next point I'd like to make is that actually

24    the local and state differentiation that Mr. Early tries to

25    make I think is kind of a non-point to a certain extent.

1   There hasn't been a showing by the DOJ that if the

2   information coming directly from the local jails is, in fact,

3   independently provided by the local jails.  As in, there's no

4   mandate from the state to provide it on their behalf.

5           The DCRA clearly says that the state is responsible

6   for what is -- for the local county municipal jails and

7   entities.  I think it's clear in that case that if the local

8   jail is providing information to the proper component at the

9   proper time on the proper forms, that that information is

10  done under DCRA and should be assumed to be under the state

11  mandate, unless it's shown otherwise, which it has not been

12  in this case.

13          I think those are my major points for the Exemption

14  3 issues.  I think it is, as we've noted, kind of a

15  complicated legal authority.  It's kind of hard to decide in

16  25 pages exactly how that should plan out.

17          I do believe that your tentative ruling noted the

18  important distinctions.  And did disagree with me in certain

19  points.  I take those disagreements.  But also ended up

20  coming to the right conclusion.

21          For the points related to Exemption 6, I think

22  Mr. Early's points actually show that how -- the importance

23  of this information.

24          For example, he knows that there are tens of

25  thousands of deaths that are being -- that are reflected in

1    this data.  DCRA has only been enacted since 2000s.  If

2    there's tens of thousands of deaths occurring across the

3    state, that is, to my knowledge, more than the people who are

4    dying on death row.  And people should not be dying in

5    prisons without -- especially without a death penalty ruling.

6          Just the sheer number of these decedents is

7    important.  It doesn't require a line-by-line review.  There

8    are options for categorical reviews.  For example, if there

9    is an illness, one of your concerns, you know, you can

10   control F for certain words.  And those things can be

11   redacted and whatnot, if that's necessary.

12         I think I want to make the point that while there

13   are some concessions that plaintiffs are prepared to make, we

14   do believe that the decedent's privacy interests are greatly

15   diminished here.

16         We should be very careful about what is redacted,

17   even if it is not necessarily positive information.

18   Obviously, these are people who died in state custody.  These

19   aren't, you know, glowing recommendations or medals they'd

20   like to show off if they were living.  They are important

21   nonetheless.  The use of redactions should be quite limited

22   in that case.

23         Exactly the point that K-anonymity is not tailored

24   even to do a categorical review.  It is much more random in

25   how it applies its redactions.

1           THE COURT:  Actually, can I stop you for a second?

2           Mr. Early, you didn't respond to my suggestion that

3   we have some sort of in camera review or some sort of

4   lawyer-only review.  Because if what BJS's concern is my --

5   well -- anyway, I'll leave it at that.

6           MR. EARLY:  I'm happy to address that.  I'll let

7   Ms. Charlton finish, or I can address that right now.

8           THE COURT:  Why don't you address it now.  Because

9   it might moot.

10          MR. EARLY:  Sure.  So -- sorry.  I thought I had

11  answered a little more clearly, Your Honor.

12          But to be clear, the reason that I was raising the

13  size of the dataset is to say that -- whether it's doing it

14  in camera or in a, you know, attorneys' eyes only with the

15  Court's assistance, it's still an unmanageably large amount

16  of data to do line-by-line analysis on.  So there's going to

17  be -- need to be some kind of -- I may take plaintiff's

18  counsel's suggestion, but there's -- you know, some kind of

19  categorical approach is going to be needed.  So --

20          THE COURT:  I see.

21          MR. EARLY:  You know --

22          THE COURT:  We may as well decide that ahead of

23  time.

24          MR. EARLY:  Right.  For the reasons that I think

25  Your Honor, I think, already appreciates.  We think

 1    K-anonymity is a good balance of that.  I will say because

 2    plaintiffs haven't received the data yet, it is possible

 3    there are ways -- and this was in the declaration explaining

 4    how the K-anonymity algorithm works.  There are parameters

 5    that you can fine-tune within K-anonymity.

 6         What we did was we fine-tuned everything to have

 7    the lowest number of redactions.  But there are different

 8    approaches you can take.

 9         So, for example, if a facility name is really

10    important, the algorithm can be told to treat that as more

11    important and to suppress other cells in preference to that.

12         That would have a greater total number of

13    redactions.  But it would result in more of the,

14    quote-unquote, higher priority data being revealed.

15         The reason I bring up the plaintiffs haven't seen

16    this dataset yet is that there is a little bit of a one-shot

17    quality to this in the sense that once they receive the data,

18    at that point, going back and changing the algorithm and

19    saying, Actually, no, let's do -- you know, whatever it may

20    be --

21              THE COURT:  It will reveal data.

22              MR. EARLY:  Yeah.  If you combine those.  And then

23    suddenly things are redacted in one version and not in

24    another, and then it loses its effectiveness.

25              THE COURT:  I see.

1          MR. EARLY:  So, you know, we are not necessarily

2     adverse to, you know, fine-tuning the application of

3     K-anonymity in consultation with the plaintiffs and with the

4     Court.  But we do think it is on balance the best approach

5     and the one that is most consistent with the case law.

6          THE COURT:  Okay.

7          MS. CHARLTON:  Responding directly to that, I have

8     to disagree that K-anonymity should be off the table.  It is

9     not possible to get the limited redactions that are required

10     from this data from K-anonymity.

11          If we are talking about getting -- picking and

12     choosing which cells are most important, and that resulted in

13     more redactions on the other end, then that's just

14     exacerbating a problem.

15          It really -- again, these are decedents.  This is

16     not information that is normally kept from the public.  If

17     these people had died in a hospital or elsewhere, there would

18     be death certificates.  There would be autopsy report, things

19     that would be available for the public if they requested it

20     from their state governments.

21          This is only in the hands of the federal government

22     because the federal government -- the Congress gave DOJ a

23     statutory duty to collect this information.  It's not private

24     information because DOJ has it.  It's public information in

25     the hands of DOJ.  They have the most comprehensive set of

1    data.  That's why we're coming to DOJ for it.  They have the

2    most comprehensive set of data because they were mandated by

3    Congress to have it.

4        So if we're trying to parse between whether or not

5    we should know the facility that they died in or their names

6    or their condition with which -- when they died, we're asking

7    the wrong questions here.  Because this isn't private data.

8    We know that there are extreme examples.

9        But like, for example, Jeffrey Epstein died in

10   custody.  We have the logs of what happened with everyone who

11   was involved, what happened, what was redacted there, the

12   names of the agents who were involved.  It's not as though we

13   keep these details private on a regular basis.

14       So I and the plaintiff -- we don't concede that

15   K-anonymity is appropriate here at all.  If redactions are

16   necessary, they need to be constructed to a tailored interest

17   that needs to be articulated clearly and applied minimally.

18       Exemption 6, again, tends to redact specific

19   personal identifiable information that is not relevant to the

20   rest of the -- the document.

21       So a home address, there's a case -- and I'm

22   blanking on the cases.  I'm sorry.  But there is a case where

23   the union members are requested from the federal government.

24   They gave the names of union members.  They did not give

25   their home addresses, because they didn't think it was

1    reasonable to have the plaintiffs -- the requesters basically

2    harass them at home.

3            Similarly, there's a case, Amiri, where the

4    requester was a disgruntled grant applicant who was looking

5    for the names of the interns and the employees who had denied

6    his grant proposal.

7            Obviously, that is a case where eventually Amiri

8    would be able to harass these people.  There's no reason to

9    know who denied your grant if you know why.

10           So for that reason, those -- the Exemption 6 logic

11   doesn't apply to this data unless you're looking at a nurse's

12   name or someone who would come up in this dataset, which is

13   not clear even really exists.

14           A lot of these responses are very brief.  There's

15   not as much information as I think the public would actually

16   like.  Sometimes the cause of death simply says, "Suicide" or

17   "illness" or "unknown."  And these are things that don't need

18   to be redacted.

19           So if we are going to concede, which -- I'm not

20   going to concede actually that there is a descendant interest

21   that we need to redact this information for in any -- using

22   K-anonymity.  But if there are redactions that need to be

23   made, they need to be very specific.  And K-anonymity cannot

24   accomplish that.

25           Another thing I did want to mention was the public

1    interest.  Because I think that it's kind of being -- and I

2    mentioned this a little bit, that it's kind of being

3    construed that we only want this information to see -- to

4    basically see like which facilities are the bad guys.

5           What we're really looking at is -- as I mentioned,

6    Congress has given a statutory duty to the DOJ.  It's clear

7    from BJS, BJA, and their OIG audits that they're not living

8    up to the mandates of the statutory duty.

9           In that case, it is for us to know -- the public to

10   know, what information isn't being analyzed in their limited

11   releases of data.

12          These limited releases often just say 53 percent

13   were men.  That seems low actually.  47 percent were women.

14   Or there's been 800 deaths in custody and a hundred deaths

15   during an arrest.

16          That's not really the data that should be

17   encompassed in the level of data that you can get from this

18   dataset if it were properly maintained.  If it were -- if the

19   levers of power to reduce grants were actually being used,

20   this information would be complete, and we would be able to

21   get down to a facility, what types of things are being

22   neglected; if the federal government is able to enact a

23   policy about drugs getting into a certain facility or about

24   medical requirements, especially if they're contracting with

25   the federal government.

1          There's a lot that the federal government could do

2     if this data were properly being analyzed.

3          I think it's clear that this data is not being

4     properly analyzed.  And in fact it's being hidden.  And the

5     fact that it's being hidden is just as concerning as if it

6     weren't being collected at all.

7          So, again, I will say that K-anonymity is not the

8     solution here.  I think that what we need to do is -- I would

9     advocate for getting this information unredacted.

10          But if you do believe that there are sensitive

11     specific privacy interests that we should be addressing that

12     we need to -- even if we do it before redactions, we need to

13     have them be very minimal and we need to decide how they're

14     redacted before we come to a conclusion about how this will

15     work.

16          THE COURT:  Okay.  Thank you.

17          Mr. Early, anything else?

18          MR. EARLY:  Sure.  If I could, just four brief

19     points, Your Honor.  I try to avoid repeating ground we've

20     already covered.

21          Briefly, my friend was suggesting -- sorry, let

22     me -- was referencing Exemption 6 cases where there was a

23     showing of potential harassment.  That isn't the standard

24     under Exemption 6.  FOIA is -- as I have already mentioned,

25     it's a facially neutral data released to any requester is

1    releasable to all.  So what the Exemption 6 cases look at is

2    the nature of the information itself, whether it is private

3    or not.

4            Second, Ms. Charlton mentioned in her opinion the

5    data they're seeking would be public data if these decedents

6    had not died in prison.  That certainly is not in the record

7    here in this case.  My understanding is that would be a

8    matter of each state's individual law, which gets back to the

9    point that this is, in fact, state data by and large.  The

10   third request is for federal data.

11           But putting that aside, this is for state data.

12   And the federal government has it for purposes of DOJ, and

13   BJS on behalf of DOJ, analyzing this information and

14   publishing reports.

15           But to the extent that it's public state data,

16   there are state freedom of information laws in every state.

17   And plaintiffs, of course, can pursue those avenues to the

18   extent they believe this is public information under state

19   law.

20           Third, my friend mentioned the Epstein example.

21   That goes to what I think is a -- a larger point that may be

22   a bit of a misunderstanding about the point of the

23   K-anonymity method.  Which is to say, yes, there are

24   high-profile deaths.  There are not high-profile deaths where

25   there are news reports or press releases or whatever it may

1    be that provide some of details.

2         Our concern and the reason that the applied

3    K-anonymity is that, it's exactly those details, the things

4    that are most likely to already be public.  So name, age,

5    crime of conviction, things like that.  That you can use

6    those data if they're revealed in our dataset to then link to

7    the other parts of our dataset.

8         So for example, was the death in an in-prison

9    mental health unit?  Was the death in an off-site mental

10   health unit?  Had the -- had the decedent received certain

11   medical, surgical, psychiatric care while in prison?

12        It's those details that when you combine with

13   what's publicly known, and then you look at our dataset, if

14   it's unredacted, you get a lot more information.  That's the

15   concern.  We're trying to protect that sensitive information.

16        So, yes, we are redacting parts of the record; but

17   it's to protect the record as a whole by making it not

18   identifiable to a particular person.

19        Then just very briefly, to return to the point

20   about the public interest that Ms. Charlton mentioned in DOJ

21   statutory duty.  You can take different views on how DOJ is

22   doing implementing DCRA.  She referenced OIG reports.  She

23   referenced, I believe, letters from senators that different

24   people have different perspectives.

25        But what's not in dispute is that it's actually

1    publicly known what DOJ is doing with this data.  The

2    analyses they publish are the analyses that DOJ is doing.

3    And what they don't do is not done.

4         So what those additional, potential extra analyses

5    may show may again be of kind of general public interest.

6    But it's not a FOIA public interest, because the fact of what

7    the agency is and is not doing, that's already public.

8         So contributing to the public understanding of, you

9    can make the argument now that DOJ should be doing more or

10   should be doing less, but you don't need to know the details

11   of an individual decedent -- excuse me -- to advance that

12   argument.

13             THE COURT:  Okay.

14             MR. EARLY:  Thank you, Your Honor.

15             THE COURT:  All right.  Thank you both.

16             The matter is taken under submission.  We'll issue

17   an order as soon as we can.

18             (Proceedings concluded at 11:56 a.m.)

19                       CERTIFICATE

20   I HEREBY CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT

21   TRANSCRIPT OF THE STENOGRAPHICALLY RECORDED PROCEEDINGS IN

22   THE ABOVE MATTER.

23   FEES CHARGED FOR THIS TRANSCRIPT, LESS ANY CIRCUIT FEE

24   REDUCTION AND/OR DEPOSIT, ARE IN CONFORMANCE WITH THE

25   REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

1

2    /s/ Miriam V. Baird                11/19/2024

3    MIRIAM V. BAIRD                          DATE
     OFFICIAL REPORTER

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

| / | A | 42:4 |
|---|---|---|

**/**

/s [1] - 43:2

**1**

1 [15] - 22:22, 22:24, 23:6, 23:7, 23:12, 23:13, 23:16, 23:23, 23:24, 24:3, 24:8, 24:12, 24:15, 24:16
1-053 [1] - 1:24
10020 [1] - 2:5
10:59 [1] - 3:1
11/19/2024 [1] - 43:2
1100 [1] - 2:11
11893 [1] - 1:23
11:56 [1] - 42:18
1251 [1] - 2:4
1st [1] - 21:3

**2**

2 [3] - 23:2, 23:6, 23:12
20005 [1] - 2:12
2000s [1] - 32:1
2006 [2] - 21:1, 28:2
2013 [1] - 21:2
2015 [3] - 13:5, 21:3, 28:2
2024 [2] - 1:19, 3:1
21ST [1] - 2:4
25 [1] - 31:16

**3**

3 [5] - 20:23, 27:3, 27:8, 27:25, 31:14

**4**

4 [2] - 1:19, 3:1
411 [1] - 1:24
47 [1] - 38:13

**5**

53 [1] - 38:12

**6**

6 [11] - 4:10, 4:16, 5:8, 6:6, 13:17, 31:21, 36:18, 37:10, 39:22, 39:24, 40:1
60-day [1] - 27:15

**8**

800 [1] - 38:14

**9**

97201 [1] - 1:25

**A**

A.M [1] - 3:1
a.m [1] - 42:18
ABC [1] - 18:4
ability [2] - 21:14, 30:21
able [6] - 4:17, 8:18, 30:18, 37:8, 38:20, 38:22
ABOVE [1] - 42:22
absolutely [1] - 16:4
accept [1] - 21:24
accepting [1] - 30:4
access [2] - 8:5
accomplish [1] - 37:24
accurate [1] - 29:12
acronyms [2] - 19:25, 20:1
act [1] - 30:17
acts [1] - 24:1
actual [1] - 22:7
add [1] - 27:23
additional [1] - 42:4
address [5] - 8:1, 33:6, 33:7, 33:8, 36:21
addressed [2] - 6:10, 14:16
addresses [4] - 5:10, 5:11, 19:14, 36:25
addressing [1] - 39:11
administering [1] - 18:6
admitted [1] - 5:5
admittedly [1] - 13:22
advance [1] - 42:11
advancing [1] - 20:19
adverse [1] - 35:2
advocate [1] - 39:9
age [4] - 12:10, 19:3, 19:5, 41:4
agency [6] - 10:18, 10:23, 14:4, 15:6, 22:6, 42:7
agents [1] - 36:12
agree [3] - 6:4, 7:8, 12:1
agrees [1] - 17:18
ahead [1] - 33:22
AIDS [6] - 6:19, 6:21, 7:23, 10:17, 10:22, 11:21
al [1] - 3:6
alarmist [1] - 21:13
alcohol [2] - 11:23, 11:24
algorithm [3] - 34:4, 34:10, 34:18
algorithmic [2] - 14:10, 15:2
all-or-nothing [1] - 6:6
allow [1] - 27:16
allowed [3] - 15:10, 29:18
almost [2] - 7:11, 12:11
American [1] - 12:24
AMERICAS [1] - 2:4
Amiri [2] - 37:3, 37:7
amount [5] - 11:12, 11:13, 14:11, 19:7, 33:15
amounts [1] - 19:1
ANA [1] - 1:25
analyses [6] - 20:8, 20:9, 21:25, 42:2,

42:4
analysis [6] - 13:17, 17:17, 17:25, 18:23, 20:10, 33:16
analyzed [2] - 38:10, 39:2, 39:4
analyzes [1] - 24:22
analyzing [1] - 40:13
AND [1] - 42:20
AND/OR [1] - 42:24
ANGELES [2] - 1:18, 3:1
anonymity [25] - 4:10, 4:23, 4:24, 6:13, 7:25, 8:8, 11:7, 12:20, 13:6, 13:22, 14:19, 15:11, 32:23, 34:1, 34:4, 34:5, 35:3, 35:8, 35:10, 36:15, 37:22, 37:23, 39:7, 40:23, 41:3
Anonymity [1] - 12:22
anonymization [1] - 13:7
answer [1] - 30:7
answered [1] - 33:11
ANY [1] - 42:23
anyway [1] - 33:5
apologize [2] - 10:21, 19:25
appeal [1] - 27:17
Appeal [1] - 3:5
APPEAL [1] - 1:4, 2:3
applicant [1] - 37:4
application [3] - 4:10, 35:2
applied [2] - 8:11, 36:17, 41:2
applies [1] - 32:25
apply [4] - 4:16, 16:22, 37:11
appreciates [1] - 33:25
approach [7] - 14:3, 14:10, 15:2, 15:12, 15:22, 33:19, 35:4
approaches [1] - 34:8
appropriate [2] - 6:13, 36:15
ARE [1] - 42:24
argument [8] - 20:12, 20:13, 22:9, 22:18, 23:15, 29:7, 42:9, 42:12
arrest [1] - 38:15
articulate [1] - 6:8
articulated [2] - 4:14, 36:17
aside [1] - 40:11
asserted [2] - 7:16, 9:9
assistance [1] - 33:15
Association [1] - 12:25
assume [1] - 30:1
assumed [1] - 31:10
astronauts [1] - 5:24
asylum [1] - 10:21
attention [1] - 29:21
attenuated [1] - 17:4
attorneys [1] - 9:18
attorneys' [2] - 13:21, 33:14
attorneys-only [1] - 9:18
audio [1] - 5:23
audits [1] - 38:7
authorities [1] - 29:13
authority [8] - 23:15, 23:23, 24:19, 29:9, 30:3, 30:13, 31:15
authorization [5] - 24:6, 24:8, 28:25,

29:9, 29:14
**autopsy** [1] - 35:18
**available** [3] - 9:21, 14:3, 35:19
**AVENUE** [1] - 2:4
**avenues** [1] - 40:17
**avoid** [1] - 39:19
**awaiting** [1] - 18:14
**aware** [1] - 11:19

## B

**bad** [1] - 38:4
**BAIRD** [2] - 1:23, 43:3
**Baird** [1] - 43:2
**balance** [2] - 34:1, 35:4
**balancing** [1] - 9:7
**Bank** [2] - 11:9, 11:11
**Barth** [1] - 13:5
**based** [3] - 9:23, 11:13, 15:14
**basis** [2] - 22:7, 36:13
**bear** [1] - 17:23
**bears** [1] - 17:24
**becomes** [1] - 15:5
**BEHALF** [2] - 2:3, 2:10
**behalf** [2] - 31:4, 40:13
**behind** [2] - 11:18, 11:24
**best** [1] - 35:4
**better** [1] - 30:11
**between** [5] - 21:6, 23:12, 24:1, 29:8, 36:4
**BHS** [1] - 30:8
**big** [2] - 19:3, 19:5
**birth** [2] - 12:9, 12:11
**birthday** [1] - 14:17
**bit** [6] - 18:9, 22:16, 24:4, 34:16, 38:2, 40:22
**BJA** [2] - 19:21, 38:7
**BJS** [32] - 14:8, 20:9, 20:10, 21:10, 21:13, 21:16, 21:17, 21:18, 21:21, 21:22, 22:1, 22:25, 23:12, 23:15, 23:20, 24:1, 24:12, 24:14, 24:16, 24:21, 24:24, 25:6, 25:25, 26:20, 28:4, 28:20, 29:8, 29:15, 29:17, 38:7, 40:13
**BJS's** [4] - 15:2, 23:18, 23:22, 33:4
**blank** [1] - 6:15
**blanking** [2] - 25:18, 36:22
**blunderbuss** [1] - 15:22
**blunt** [1] - 15:9
**BOP** [1] - 7:3
**bounced** [1] - 29:3
**bouts** [1] - 7:19
**brief** [2] - 37:14, 39:18
**briefing** [5] - 8:24, 9:1, 13:11, 25:8, 26:23
**briefly** [2] - 39:21, 41:19
**briefs** [1] - 16:18
**bring** [1] - 34:15
**building** [1] - 21:18
**burden** [2] - 17:23, 17:24

**burden's** [1] - 17:25
**burdensome** [1] - 15:5
**butchering** [1] - 10:20

## C

**cake** [5] - 28:11, 28:12, 28:14, 28:16
**calendar** [1] - 3:14
**California** [3] - 8:6, 8:16, 8:19
**CALIFORNIA** [4] - 1:2, 1:18, 1:25, 3:1
**camera** [4] - 9:18, 13:20, 33:3, 33:14
**cannot** [1] - 37:23
**care** [1] - 41:11
**careful** [2] - 16:11, 32:16
**carries** [1] - 9:11
**carry** [2] - 21:14, 21:25
**case** [21] - 4:14, 4:19, 4:22, 5:20, 10:20, 11:13, 15:4, 15:8, 18:24, 20:1, 31:7, 31:12, 32:22, 33:5, 36:21, 36:22, 37:3, 37:7, 38:9, 40:7
**cases** [12] - 5:8, 5:14, 7:23, 10:9, 10:25, 15:9, 15:10, 15:21, 17:24, 36:22, 39:22, 40:1
**cashes** [1] - 21:3
**categorical** [3] - 32:8, 32:24, 33:19
**caveats** [1] - 27:10
**CCRA** [1] - 1:23
**CDC** [3] - 11:6, 11:8, 13:23
**cell** [2] - 15:3
**cell-by-cell** [1] - 15:3
**cells** [2] - 14:13, 34:11, 35:12
**census** [4] - 11:8, 13:24, 30:17
**Center** [1] - 10:20
**CENTRAL** [1] - 1:2
**certain** [6] - 30:14, 30:25, 31:18, 32:10, 38:23, 41:10
**certainly** [1] - 14:25, 18:20, 40:6
**CERTIFICATE** [1] - 42:19
**certificates** [1] - 35:18
**CERTIFY** [1] - 42:20
**changing** [1] - 34:18
**CHARGED** [1] - 42:23
**Charlton** [6] - 3:9, 3:25, 27:23, 33:7, 40:4, 41:20
**CHARLTON** [19] - 2:3, 3:9, 3:18, 4:1, 4:4, 4:7, 6:2, 7:7, 9:12, 10:5, 10:7, 10:13, 12:3, 12:17, 13:14, 27:24, 29:11, 30:6, 35:7
**checkbook** [1] - 15:8
**choice** [1] - 16:12
**choosing** [1] - 35:12
**CIRCUIT** [1] - 42:23
**circumstances** [1] - 5:17
**citations** [1] - 23:18
**cite** [1] - 15:8
**clarification** [1] - 19:23
**clarity** [1] - 9:6
**clear** [12] - 10:3, 22:10, 22:14, 22:21, 29:23, 29:24, 30:20, 31:7, 33:12,

37:13, 38:6, 39:3
**clearly** [4] - 25:3, 31:5, 33:11, 36:17
**CLERK** [1] - 3:5
**clerks** [1] - 6:18
**client** [6] - 8:3, 9:6, 10:4, 11:4, 11:5, 12:15
**closed** [1] - 11:18
**cognizable** [1] - 16:19
**cognizant** [2] - 10:7, 10:8
**collect** [9] - 22:24, 22:25, 23:4, 23:16, 30:14, 30:16, 30:18, 30:22, 35:23
**collected** [2] - 24:13, 39:6
**collecting** [5] - 23:12, 24:2, 24:20, 29:9, 30:4
**collection** [3] - 21:17, 30:2, 30:17
**collections** [1] - 23:22
**colloquial** [2] - 16:13, 19:11
**Columbia** [1] - 13:6
**columns** [1] - 11:10
**combine** [2] - 34:22, 41:12
**coming** [3] - 31:2, 31:20, 36:1
**Committee** [1] - 18:24
**compelling** [2] - 17:7, 17:8
**complete** [1] - 38:20
**completely** [5] - 5:2, 10:23, 11:15, 12:12, 29:11
**complicated** [3] - 28:11, 29:13, 31:15
**component** [1] - 31:8
**comprehensive** [2] - 35:25, 36:2
**concede** [3] - 36:14, 37:19, 37:20
**concern** [9] - 10:10, 14:20, 15:13, 20:22, 21:10, 22:6, 33:4, 41:2, 41:15
**concerned** [4] - 9:8, 17:13, 24:25, 25:6
**concerning** [1] - 39:5
**concerns** [4] - 3:22, 12:18, 13:12, 32:9
**concessions** [1] - 32:13
**concluded** [1] - 42:18
**conclusion** [2] - 31:20, 39:14
**concrete** [1] - 7:20
**condition** [3] - 7:3, 10:22, 36:6
**conducted** [1] - 20:9
**CONFERENCE** [1] - 42:25
**confidential** [1] - 6:24
**confidentiality** [9] - 21:12, 21:20, 22:10, 22:15, 23:24, 25:4, 25:15, 29:16, 29:25
**CONFORMANCE** [1] - 42:24
**confusing** [1] - 21:3
**Congress** [3] - 35:22, 36:3, 38:6
**connect** [1] - 18:3
**consider** [1] - 9:21
**consistent** [1] - 35:5
**constructed** [1] - 36:16
**construction** [2] - 16:5, 18:10
**construed** [1] - 38:3
**consultation** [1] - 35:3
**consumer** [1] - 15:8
**contend** [1] - 28:2
**context** [2] - 15:5, 23:21

continue [1] - 28:15
continuing [1] - 18:12
contracting [3] - 18:13, 20:4, 38:24
contributing [3] - 12:14, 20:16, 42:8
contributor [1] - 7:4
control [1] - 32:10
conviction [1] - 41:5
cooperation [1] - 21:16
CORMAC [1] - 2:10
Cormac [1] - 3:10
correct [4] - 4:12, 21:9, 23:9, 23:10
CORRECT [1] - 42:20
counsel [1] - 3:8
counsel's [1] - 33:18
counts [1] - 3:15
county [1] - 31:6
couple [2] - 12:19, 27:1
course [12] - 9:13, 11:19, 14:9, 16:12, 16:14, 16:24, 17:11, 21:24, 25:1, 27:21, 28:2, 40:17
courses [1] - 19:15
COURT [71] - 1:1, 1:23, 3:12, 3:20, 3:24, 4:3, 4:6, 5:25, 6:4, 9:1, 9:13, 10:6, 10:8, 12:1, 12:16, 13:13, 13:15, 13:18, 14:5, 14:15, 15:18, 16:1, 16:7, 17:9, 18:9, 19:10, 20:7, 20:20, 20:24, 21:5, 21:9, 22:5, 22:13, 22:20, 23:2, 23:4, 23:6, 23:9, 23:11, 23:19, 23:25, 24:6, 24:8, 24:11, 24:17, 24:23, 25:17, 25:22, 26:3, 26:7, 26:10, 26:13, 26:15, 26:21, 26:24, 27:6, 27:13, 27:18, 27:21, 28:22, 30:1, 33:1, 33:8, 33:20, 33:22, 34:21, 34:25, 35:6, 39:16, 42:13, 42:15
Court [9] - 5:21, 5:22, 18:24, 19:14, 19:18, 19:23, 25:2, 27:15, 35:4
Court's [1] - 33:15
covered [5] - 21:20, 23:13, 25:9, 26:15, 39:20
create [1] - 14:2
created [1] - 28:20
creating [1] - 12:14
crime [1] - 41:5
criminal [3] - 17:2, 23:17, 30:10
criteria [3] - 19:22, 20:2, 20:5
critical [1] - 13:2
CSR [1] - 1:23
custodian [1] - 21:19
custody [7] - 7:2, 11:2, 16:16, 18:17, 32:18, 36:10, 38:14
CV22-02111-WLH [2] - 1:8, 3:5


D

Daniel [1] - 13:5
Data [2] - 11:9, 11:11
data [81] - 4:11, 5:2, 5:7, 5:9, 5:10, 9:7, 10:4, 11:7, 11:14, 13:3, 13:21, 13:24, 14:1, 14:2, 14:11, 15:10, 15:15, 15:18, 16:22, 18:2, 18:8, 19:4, 19:6, 20:7,

20:14, 20:18, 21:16, 21:17, 21:19, 21:20, 22:1, 22:11, 22:18, 22:22, 22:25, 23:4, 23:16, 23:21, 24:2, 24:13, 24:20, 24:22, 24:24, 25:12, 25:16, 25:20, 26:2, 26:5, 26:6, 26:18, 29:19, 29:22, 30:2, 30:14, 30:16, 30:19, 32:1, 33:16, 34:2, 34:14, 34:17, 34:21, 35:10, 36:1, 36:2, 36:7, 37:11, 38:11, 38:16, 38:17, 39:2, 39:3, 39:25, 40:5, 40:9, 40:10, 40:11, 40:15, 41:6, 42:1
dataset [21] - 8:8, 8:10, 8:11, 8:12, 8:16, 8:17, 8:18, 8:19, 13:7, 15:1, 15:25, 16:5, 25:13, 27:3, 33:13, 34:16, 37:12, 38:18, 41:6, 41:7, 41:13
datasets [2] - 8:4, 14:1
DATE [1] - 43:3
date [4] - 12:10, 18:5, 21:2, 27:15
dates [2] - 5:5, 12:9
DAVIS [1] - 2:3
DC [1] - 2:12
DCR [1] - 20:7
DCRA [42] - 18:6, 18:7, 18:17, 21:1, 21:2, 21:8, 22:8, 22:14, 22:19, 22:22, 22:24, 23:2, 23:6, 23:12, 23:21, 24:1, 24:18, 24:25, 25:3, 25:9, 25:11, 25:14, 26:4, 26:16, 26:18, 28:3, 28:4, 28:7, 28:9, 29:6, 29:14, 29:18, 29:22, 29:24, 30:22, 31:5, 31:10, 32:1, 41:22
de [1] - 17:18
deal [1] - 16:14
dealing [1] - 15:1
deals [1] - 16:21
death [9] - 5:17, 5:18, 7:24, 32:4, 32:5, 35:18, 37:16, 41:8, 41:9
deaths [10] - 5:5, 14:12, 16:15, 18:17, 31:25, 32:2, 38:14, 40:24
deceased [2] - 6:23, 16:6
decedent [7] - 5:16, 7:10, 7:25, 9:11, 20:18, 41:10, 42:11
decedent's [1] - 32:14
decedents [6] - 5:3, 5:13, 16:3, 32:6, 35:15, 40:5
decide [3] - 31:15, 33:22, 39:13
decision [2] - 8:23, 12:6
declaration [1] - 34:3
DEFENDANT [1] - 2:10
Defendant [1] - 1:13
defendant [1] - 3:11
defendants [1] - 18:14
definitely [1] - 12:5
delinquency [1] - 30:10
denied [2] - 37:5, 37:9
denying [1] - 27:12
DEPARTMENT [3] - 1:10, 2:10
Department [1] - 3:6
DEPOSIT [1] - 42:24
DEPTRINAL [1] - 16:17
descendant [1] - 37:20
detail [1] - 25:8
details [6] - 11:1, 36:13, 41:1, 41:3,

41:12, 42:10
determine [1] - 27:16
DHS [1] - 11:1
diced [1] - 19:3
die [1] - 7:2
died [17] - 5:4, 5:16, 5:17, 5:20, 5:21, 6:19, 11:2, 18:4, 32:18, 35:17, 36:5, 36:6, 36:9, 40:6
different [6] - 5:15, 8:2, 34:7, 41:21, 41:23, 41:24
differentiation [1] - 30:24
difficult [1] - 30:7
difficulty [1] - 14:8
diminished [3] - 9:10, 16:2, 32:15
direct [2] - 4:25, 17:5
directly [5] - 26:11, 26:12, 29:14, 31:2, 35:7
disagree [3] - 25:1, 31:18, 35:8
disagreements [1] - 31:19
disclosable [3] - 14:7, 22:2
disclose [3] - 5:18, 7:6, 11:1
disclosed [2] - 6:1, 7:9
disclosure [2] - 6:16, 10:12
discuss [2] - 4:2, 4:8
discussed [1] - 6:18
disgruntled [1] - 37:4
dismissing [1] - 22:6
dispositive [1] - 28:6
dispute [5] - 16:1, 16:8, 16:14, 25:8, 41:25
disputes [1] - 9:21
disputing [2] - 6:12, 21:8
distinction [1] - 26:21
distinctions [1] - 31:18
distinguish [2] - 6:25, 7:5
DISTRICT [3] - 1:1, 1:2, 1:23
doctor's [1] - 11:9
document [1] - 36:20
documents [3] - 4:17, 9:19, 9:24
Doe [1] - 18:4
DOJ [20] - 8:17, 8:18, 18:6, 29:15, 29:16, 29:18, 30:3, 31:1, 35:22, 35:24, 35:25, 36:1, 38:6, 40:12, 40:13, 41:20, 41:21, 42:1, 42:2, 42:9
doles [1] - 19:21
doling [2] - 17:1, 20:3
done [6] - 9:20, 20:10, 26:16, 26:17, 31:10, 42:3
doors [1] - 11:18
dots [1] - 18:3
doubt [1] - 16:4
down [5] - 8:14, 12:23, 14:2, 24:16, 38:21
drug [2] - 11:23, 12:12
drugs [1] - 38:23
dummy [1] - 14:2
during [2] - 28:3, 38:15
duty [4] - 35:23, 38:6, 38:8, 41:21
dying [1] - 32:4

## E

**e-mail** [1] - 5:11
**EARLY** [55] - 2:10, 3:10, 3:19, 3:22, 13:16, 13:19, 14:6, 14:25, 15:20, 16:4, 16:11, 17:10, 18:20, 19:11, 19:24, 20:8, 20:21, 20:25, 21:6, 21:10, 22:9, 22:16, 23:1, 23:3, 23:5, 23:8, 23:10, 23:14, 23:20, 24:4, 24:7, 24:9, 24:14, 24:18, 24:24, 25:19, 25:23, 26:4, 26:8, 26:12, 26:14, 26:16, 26:22, 26:25, 27:7, 27:14, 27:19, 33:6, 33:10, 33:21, 33:24, 34:22, 35:1, 39:18, 42:14
**Early** [2] - 3:10, 14:20
**early** [7] - 3:20, 9:2, 13:15, 28:22, 30:24, 33:2, 39:17
**early's** [2] - 29:7, 31:22
**edges** [1] - 11:14
**effect** [9] - 21:1, 21:4, 21:8, 22:19, 22:23, 24:25, 25:3, 28:3, 30:22
**effective** [2] - 21:2, 27:15
**effectiveness** [1] - 34:24
**either** [2] - 9:17, 10:2
**elsewhere** [1] - 35:17
**employees** [2] - 5:11, 37:5
**enact** [1] - 38:22
**enacted** [1] - 32:1
**encompassed** [1] - 38:17
**end** [2] - 29:21, 35:13
**end-run** [1] - 29:21
**ended** [1] - 31:19
**enormous** [1] - 19:7
**entities** [4] - 25:12, 26:2, 29:3, 31:7
**entitled** [2] - 10:4, 14:22
**entity** [1] - 24:15
**Epstein** [2] - 36:9, 40:20
**especially** [2] - 32:5, 38:24
**essential** [1] - 5:6
**essentially** [7] - 8:17, 11:16, 13:25, 15:9, 15:12, 28:18, 29:19
**et** [1] - 3:6
**eventually** [1] - 37:7
**everywhere** [1] - 5:3
**exacerbating** [1] - 35:14
**exact** [1] - 11:13
**exactly** [4] - 25:9, 31:16, 32:23, 41:3
**examining** [1] - 13:6
**example** [18] - 7:24, 8:2, 9:14, 10:17, 10:19, 11:11, 12:8, 18:13, 19:20, 20:4, 28:10, 30:15, 31:24, 32:8, 34:9, 36:9, 40:20, 41:8
**example's** [1] - 11:21
**examples** [3] - 11:6, 11:22, 36:8
**except** [1] - 22:11
**exceptions** [1] - 5:14
**excuse** [1] - 42:11
**exempting** [1] - 22:8
**Exemption** [15] - 4:10, 4:16, 5:8, 13:17, 20:23, 27:3, 27:8, 27:25, 31:13, 31:21,

36:18, 37:10, 39:22, 39:24, 40:1
**exemptions** [1] - 22:23
**exist** [1] - 20:10
**existential** [1] - 21:14
**exists** [2] - 24:15, 37:13
**expand** [1] - 26:22
**explaining** [1] - 34:3
**extensive** [1] - 21:18
**extent** [5] - 15:24, 20:10, 30:25, 40:15, 40:18
**extra** [1] - 42:4
**extreme** [1] - 36:8
**extremely** [1] - 18:22
**eyes** [2] - 13:21, 33:14

## F

**facially** [1] - 39:25
**facilities** [3] - 17:6, 18:14, 38:4
**facility** [10] - 5:6, 11:25, 12:12, 12:13, 18:16, 26:19, 34:9, 36:5, 38:21, 38:23
**facing** [1] - 14:8
**fact** [9] - 20:14, 23:11, 25:23, 28:25, 31:2, 39:4, 39:5, 40:9, 42:6
**factual** [3] - 5:15, 30:20
**failure** [1] - 7:2
**fair** [1] - 26:5
**family** [5] - 6:20, 7:12, 7:15, 7:16, 9:9
**far** [2] - 5:12, 8:5
**fault** [3] - 7:4, 10:18, 10:23
**Favish** [4] - 5:15, 7:14, 7:15
**FBI** [1] - 19:14
**feasible** [1] - 15:25
**federal** [23] - 5:10, 16:20, 16:21, 16:25, 17:1, 17:9, 17:14, 18:12, 18:14, 18:19, 19:1, 19:8, 19:16, 19:20, 20:3, 35:21, 35:22, 36:23, 38:22, 38:25, 39:1, 40:10, 40:12
**FEE** [1] - 42:23
**FEES** [1] - 42:23
**few** [2] - 3:22, 7:11
**fewer** [1] - 27:8
**fight** [1] - 9:20
**final** [1] - 12:6
**fine** [3] - 34:5, 34:6, 35:2
**fine-tune** [1] - 34:5
**fine-tuned** [1] - 34:6
**fine-tuning** [1] - 35:2
**finish** [1] - 33:7
**first** [4] - 8:14, 8:23, 16:23, 25:19
**FLOOR** [1] - 2:4
**flying** [1] - 20:1
**focused** [1] - 22:18
**FOIA** [13] - 14:4, 14:24, 15:5, 16:19, 17:10, 17:13, 17:24, 18:23, 21:23, 22:2, 22:22, 39:24, 42:6
**following** [1] - 27:9
**FOR** [1] - 42:23
**force** [1] - 15:9

**forced** [1] - 21:17
**FOREGOING** [1] - 42:20
**forms** [2] - 28:6, 31:9
**Foster** [1] - 5:19
**four** [1] - 39:18
**FOURTH** [1] - 1:24
**frankly** [1] - 6:18
**Freedom** [1] - 17:11
**freedom** [1] - 40:16
**FRIDAY** [2] - 1:19, 3:1
**friend** [5] - 13:19, 13:23, 27:1, 39:21, 40:20
**fudge** [1] - 13:25
**function** [1] - 21:15
**functioning** [2] - 18:19, 19:17
**fundamental** [2] - 6:5, 6:17
**furnished** [3] - 18:8, 28:4, 28:7

## G

**Gannett** [5] - 8:9, 8:12, 12:8, 15:15, 25:2
**gay** [1] - 6:21
**general** [1] - 42:5
**generally** [1] - 17:24
**given** [1] - 38:6
**GJA** [1] - 20:13
**glaring** [1] - 9:13
**gleaned** [1] - 19:8
**glowing** [1] - 32:19
**government** [24] - 5:25, 7:6, 9:17, 11:23, 16:20, 17:1, 17:2, 17:9, 17:14, 17:24, 18:12, 18:19, 19:1, 19:17, 19:20, 20:17, 29:2, 35:21, 35:22, 36:23, 38:22, 38:25, 39:1, 40:12
**government's** [1] - 19:8
**governments** [2] - 17:13, 35:20
**Governor** [1] - 13:2
**grant** [7] - 17:1, 18:12, 19:19, 20:3, 37:4, 37:6, 37:9
**granting** [1] - 27:11
**grants** [2] - 19:21, 38:19
**granular** [1] - 20:18
**great** [5] - 4:1, 11:5, 11:21, 14:3, 16:14
**greater** [1] - 34:12
**greatest** [1] - 15:24
**greatly** [1] - 32:14
**ground** [1] - 39:19
**guess** [10] - 6:17, 9:4, 13:20, 14:20, 22:5, 22:20, 25:17, 30:1, 30:6, 30:19
**guys** [1] - 38:4

## H

**hand** [1] - 26:1
**hands** [2] - 35:21, 35:25
**happy** [4] - 4:4, 13:10, 13:11, 13:16, 15:14, 26:22, 33:6
**harass** [2] - 37:2, 37:8
**harassed** [1] - 7:18
**harassment** [1] - 39:23

**hard** [3] - 8:5, 12:22, 31:15
**hat** [1] - 26:1
**health** [4] - 10:17, 13:3, 41:9, 41:10
**heart** [1] - 28:12
**heightened** [1] - 10:10
**held** [1] - 10:24
**helpful** [3] - 8:24, 12:19, 13:17
**helps** [1] - 11:17
**HEREBY** [1] - 42:20
**hidden** [2] - 39:4, 39:5
**high** [2] - 40:24
**high-profile** [2] - 40:24
**higher** [1] - 34:14
**histories** [1] - 11:2
**history** [3] - 7:9, 21:18, 29:23
**hold** [1] - 18:14
**holes** [1] - 5:2
**home** [4] - 5:10, 36:21, 36:25, 37:2
**Honor** [15] - 3:10, 3:18, 3:19, 3:23, 13:20, 14:25, 16:12, 18:20, 20:1, 22:17, 26:23, 33:11, 33:25, 39:19, 42:14
**Honor's** [2] - 20:4, 25:2
**HONORABLE** [1] - 1:3
**hospital** [1] - 35:17
**housed** [1] - 30:3
**HSU** [1] - 1:3
**huge** [2] - 14:11, 30:8
**hundred** [1] - 38:14
**hundreds** [2] - 14:12, 18:17
**hypothetical** [2] - 6:18, 7:22
**hypothetically** [1] - 18:10

## I

**I's** [1] - 21:11
**ideally** [1] - 9:5
**identifiable** [3] - 14:3, 36:19, 41:18
**identification** [1] - 13:3
**Identifications** [1] - 13:1
**identified** [1] - 4:25
**identifiers** [2] - 4:25, 5:1
**identify** [1] - 8:14
**illness** [4] - 8:18, 8:19, 32:9, 37:17
**illuminate** [1] - 11:17
**illustrating** [1] - 19:16
**illustrative** [1] - 28:8
**images** [1] - 5:18
**immigrant** [1] - 10:21
**imperfect** [1] - 13:23
**implementing** [1] - 41:22
**implicated** [1] - 14:21
**import** [1] - 28:24
**importance** [1] - 31:22
**important** [7] - 18:22, 31:18, 32:7, 32:20, 34:10, 34:11, 35:12
**improvement** [1] - 18:1
**IN** [2] - 42:21, 42:24
**in-prison** [1] - 41:8

**INC** [1] - 1:4
**Inc** [1] - 3:6
**inclination** [1] - 25:2
**include** [1] - 29:24
**included** [1] - 7:18
**incredibly** [1] - 21:2
**independently** [1] - 31:3
**individual** [3] - 20:18, 40:8, 42:11
**individually** [1] - 8:15
**individuals** [1] - 14:2
**Informatics** [1] - 12:25
**information** [50] - 5:6, 5:12, 5:13, 6:1, 6:16, 6:25, 7:17, 8:4, 8:7, 8:16, 10:12, 10:25, 11:10, 11:17, 11:20, 14:13, 14:19, 14:22, 14:23, 16:9, 19:1, 19:2, 19:8, 21:11, 22:1, 29:10, 30:4, 30:20, 31:2, 31:8, 31:9, 31:23, 32:17, 35:16, 35:23, 35:24, 36:19, 37:15, 37:21, 38:3, 38:10, 38:20, 39:9, 40:2, 40:13, 40:16, 40:18, 41:14, 41:15
**Information** [2] - 13:2, 17:11
**informs** [1] - 18:5
**inmate** [1] - 6:19
**insignificant** [1] - 29:5
**insomnia** [1] - 7:19
**instance** [1] - 8:1
**instances** [1] - 11:20
**instead** [1] - 12:10
**institutions** [2] - 26:10, 30:5
**intended** [1] - 29:19
**intent** [1] - 21:25
**interacting** [1] - 17:2
**interaction** [1] - 25:3
**interacts** [1] - 25:4
**interest** [48] - 4:13, 4:15, 4:16, 4:22, 6:9, 6:10, 6:14, 6:15, 6:24, 7:11, 7:21, 9:8, 12:2, 12:11, 15:24, 16:2, 16:8, 16:13, 16:14, 16:18, 16:25, 17:4, 17:5, 17:8, 17:13, 17:17, 17:19, 17:20, 17:22, 18:1, 18:11, 18:19, 18:23, 19:12, 19:15, 19:16, 20:19, 36:16, 37:20, 38:1, 41:20, 42:5, 42:6
**interested** [5] - 7:1, 12:13, 12:20, 16:15, 20:13
**interests** [5] - 4:21, 7:12, 7:16, 32:14, 39:11
**interns** [1] - 37:5
**involved** [2] - 36:11, 36:12
**IS** [1] - 42:20
**issue** [5] - 4:1, 4:9, 7:21, 8:24, 42:16
**issues** [1] - 31:14
**itself** [2] - 25:6, 40:2

## J

**jail** [2] - 26:18, 31:8
**jails** [5] - 25:20, 25:23, 31:2, 31:3, 31:6
**Jeffrey** [1] - 36:9
**John** [1] - 18:4
**Jones** [1] - 13:5

**Journal** [1] - 12:24
**JUDGE** [1] - 1:3
**judgment** [2] - 3:15, 27:12
**JUDICIAL** [1] - 42:25
**jurisdictions** [1] - 26:8
**justice** [2] - 17:2, 23:17
**Justice** [2] - 3:7, 19:25
**JUSTICE** [3] - 1:10, 2:11
**JUSTICE'S** [2] - 1:10, 2:11
**Justices** [1] - 3:6
**juvenile** [1] - 30:10

## K

**K-anonymity** [26] - 4:10, 4:23, 4:24, 6:13, 7:25, 8:8, 11:7, 12:20, 12:22, 13:6, 13:22, 14:19, 15:11, 32:23, 34:1, 34:4, 34:5, 35:3, 35:8, 35:10, 36:15, 37:22, 37:23, 39:7, 40:23, 41:3
**keep** [1] - 36:13
**keeping** [1] - 6:24
**kept** [1] - 35:16
**kind** [16] - 5:9, 8:4, 12:17, 15:5, 17:5, 20:18, 29:3, 30:25, 31:14, 31:15, 33:17, 33:18, 38:1, 38:2, 42:5
**kinds** [1] - 19:2
**knowing** [1] - 18:4
**knowledge** [2] - 6:2, 32:3
**known** [3] - 18:15, 41:13, 42:1
**knows** [1] - 31:24

## L

**lack** [1] - 30:10
**lapsed** [3] - 28:19, 28:25, 29:6
**large** [5] - 16:15, 21:22, 29:17, 33:15, 40:9
**larger** [1] - 40:21
**last** [3] - 3:16, 5:23, 5:24
**law** [4] - 15:4, 35:5, 40:8, 40:19
**laws** [3] - 17:11, 24:25, 40:16
**lawyer** [2] - 9:24, 33:4
**lawyer-only** [2] - 9:24, 33:4
**learning** [2] - 19:4, 19:5
**least** [5] - 7:4, 11:3, 14:13, 15:14, 27:8
**leave** [1] - 33:5
**leaving** [1] - 14:17
**LEENA** [1] - 2:3
**Leena** [1] - 3:9
**left** [2] - 4:9, 13:19
**Legal** [1] - 10:19
**legal** [3] - 28:19, 29:13, 31:15
**legally** [1] - 29:5
**legislative** [1] - 29:23
**less** [1] - 42:10
**LESS** [1] - 42:23
**letters** [1] - 41:23
**level** [2] - 20:18, 38:17
**levers** [1] - 38:19

**LGTB** [1] - 10:19
**light** [1] - 17:12
**likely** [1] - 41:4
**limited** [7] - 4:22, 16:19, 32:21, 35:9, 38:10, 38:12
**line** [7] - 15:3, 19:18, 32:7, 33:16
**line-by-line** [3] - 15:3, 32:7, 33:16
**link** [1] - 41:6
**list** [1] - 8:14
**living** [2] - 32:20, 38:7
**LLP** [1] - 2:3
**local** [13] - 17:12, 25:12, 25:20, 25:23, 26:6, 26:10, 26:18, 30:5, 30:24, 31:2, 31:3, 31:6, 31:7
**logic** [3] - 25:14, 27:9, 37:10
**logs** [1] - 36:10
**look** [8] - 5:8, 8:10, 8:14, 12:7, 20:5, 28:13, 40:1, 41:13
**looking** [9] - 8:3, 8:13, 17:20, 20:6, 20:8, 20:14, 37:4, 37:11, 38:5
**looks** [1] - 15:14
**LOS** [2] - 1:18, 3:1
**loses** [1] - 34:24
**love** [1] - 8:24
**low** [1] - 38:13
**lowest** [1] - 34:7

**M**

**machine** [2] - 19:4, 19:5
**mail** [1] - 5:11
**main** [2] - 13:12, 24:21
**maintained** [1] - 38:18
**major** [1] - 31:13
**malpractice** [1] - 11:9
**man** [1] - 5:19
**mandate** [6] - 24:7, 25:14, 29:9, 30:8, 31:4, 31:11
**mandated** [1] - 36:2
**mandates** [2] - 28:17, 38:8
**marginal** [1] - 18:1
**matter** [6] - 3:14, 16:17, 25:18, 29:13, 40:8, 42:16
**MATTER** [1] - 42:22
**MCI** [1] - 25:24
**mean** [8] - 10:9, 14:18, 18:10, 21:12, 22:5, 23:13, 29:5, 29:6
**means** [1] - 25:18
**mechanism** [2] - 9:5, 9:16
**medals** [1] - 32:19
**medical** [5] - 7:2, 7:9, 11:2, 38:24, 41:11
**Medical** [2] - 12:24, 13:2
**members** [2] - 36:23, 36:24
**men** [1] - 38:13
**mental** [2] - 41:9
**mention** [1] - 37:25
**mentioned** [8] - 27:2, 28:5, 38:2, 38:5, 39:24, 40:4, 40:20, 41:20
**merits** [1] - 27:1

**metaphor** [1] - 28:11
**method** [3] - 4:23, 4:24, 40:23
**might** [4] - 19:6, 20:13, 22:16, 33:9
**mind** [2] - 9:4, 10:14
**minimal** [3] - 8:5, 12:4, 39:13
**minimally** [1] - 36:17
**minimis** [1] - 17:19
**minor** [1] - 25:7
**minutes** [1] - 4:7
**MIRIAM** [2] - 1:23, 43:3
**Miriam** [1] - 43:2
**misunderstanding** [2] - 22:17, 40:22
**moment** [1] - 25:17
**money** [4] - 17:1, 18:12, 19:19, 20:3
**month** [1] - 14:17
**months** [1] - 12:9
**moot** [1] - 33:9
**mooted** [1] - 27:20
**morning** [3] - 3:10, 3:12, 4:5
**mortem** [1] - 7:10
**most** [4] - 4:6, 9:13, 12:15, 35:5, 35:12, 35:25, 36:2, 41:4
**motion** [1] - 3:14
**motivate** [1] - 29:6
**moving** [1] - 26:25
**MR** [54] - 3:10, 3:19, 3:22, 13:16, 13:19, 14:6, 14:25, 15:20, 16:4, 16:11, 17:10, 18:20, 19:11, 19:24, 20:8, 20:21, 20:25, 21:6, 21:10, 22:9, 22:16, 23:1, 23:3, 23:5, 23:8, 23:10, 23:14, 23:20, 24:4, 24:7, 24:9, 24:14, 24:18, 24:24, 25:19, 25:23, 26:4, 26:8, 26:12, 26:14, 26:16, 26:22, 26:25, 27:7, 27:14, 27:19, 33:6, 33:10, 33:21, 33:24, 34:22, 35:1, 39:18, 42:14
**MS** [18] - 3:9, 3:18, 4:1, 4:4, 4:7, 6:2, 7:7, 9:12, 10:5, 10:7, 10:13, 12:3, 12:17, 13:14, 27:24, 29:11, 30:6, 35:7
**municipal** [1] - 31:6
**must** [4] - 9:5, 25:12, 26:4, 26:5

**N**

**name** [5] - 5:16, 10:20, 34:9, 37:12, 41:4
**names** [8] - 5:3, 12:8, 12:12, 12:14, 36:5, 36:12, 36:24, 37:5
**narrow** [1] - 18:9
**NASA** [2] - 5:20, 7:14
**National** [1] - 11:8, 11:11
**nature** [1] - 40:2
**necessarily** [5] - 10:24, 23:13, 28:20, 32:17, 35:1
**necessary** [2] - 32:11, 36:16
**need** [18] - 8:22, 9:7, 12:4, 12:5, 14:13, 14:22, 22:7, 33:17, 36:16, 37:17, 37:21, 37:22, 37:23, 39:8, 39:12, 39:13, 42:10
**needed** [2] - 30:13, 33:19
**needs** [1] - 36:17
**neglected** [2] - 10:23, 38:22

**neutral** [1] - 39:25
**never** [1] - 6:20
**NEW** [2] - 2:5
**news** [1] - 40:25
**next** [1] - 30:23
**night** [1] - 3:16
**nightmares** [1] - 7:20
**nine** [1] - 28:25
**non** [2] - 27:3, 30:25
**non-point** [1] - 30:25
**nonetheless** [1] - 32:21
**normally** [2] - 26:1, 35:16
**note** [1] - 10:16
**noted** [2] - 31:14, 31:17
**nothing** [1] - 6:6
**number** [3] - 32:6, 34:7, 34:12
**nurse's** [1] - 37:11
**NW** [1] - 2:11

**O**

**obliged** [2] - 14:6, 15:6
**obscured** [1] - 29:12
**obviously** [5] - 7:8, 16:5, 17:7, 32:18, 37:7
**occur** [1] - 18:15
**occurring** [1] - 32:2
**October** [1] - 21:3
**OCTOBER** [2] - 1:19, 3:1
**OF** [13] - 1:2, 1:10, 1:10, 1:17, 2:3, 2:4, 2:10, 2:10, 2:11, 2:10, 42:21, 42:25
**off-site** [1] - 41:9
**offer** [1] - 13:11
**office** [1] - 19:25
**OFFICE** [2] - 1:10, 2:11
**Office** [1] - 3:6
**OFFICIAL** [2] - 1:23, 43:3
**often** [2] - 10:18, 38:12
**OIG** [2] - 38:7, 41:22
**OJP** [2] - 19:21, 19:24
**ON** [2] - 2:3, 2:10
**once** [3] - 22:1, 27:19, 34:17
**one** [16] - 4:1, 4:9, 8:13, 10:2, 11:21, 12:13, 12:21, 20:6, 20:22, 21:17, 24:10, 25:7, 32:9, 34:16, 34:23, 35:5
**one-shot** [1] - 34:16
**open** [2] - 6:12, 6:13
**operating** [2] - 17:6, 17:15
**operation** [1] - 23:16
**operations** [1] - 17:12
**opine** [1] - 9:2
**opinion** [3] - 20:23, 25:14, 40:4
**opportunity** [1] - 3:17
**oppose** [1] - 5:25
**option** [1] - 14:4
**options** [1] - 32:8
**order** [4] - 7:6, 9:23, 27:16, 42:17
**ordered** [1] - 10:11
**ordering** [1] - 6:15

organic [1] - 23:18
otherwise [1] - 31:11
outside [1] - 23:21
outsourced [1] - 30:2
outweigh [3] - 4:13, 4:15, 4:21
outweighs [2] - 6:9, 6:14
overarching [1] - 17:16
own [3] - 7:12, 17:11, 22:15

**P**

pages [2] - 27:4, 31:16
paper [1] - 13:5
parameters [1] - 34:4
parse [1] - 36:4
part [10] - 14:9, 17:17, 17:22, 19:21, 20:23, 25:5, 25:13, 27:3, 27:11, 27:12
participate [1] - 25:24
participating [1] - 25:20
particular [5] - 7:15, 17:22, 20:22, 28:1, 41:18
particularly [3] - 19:3, 24:25, 25:6
parts [2] - 41:7, 41:16
party [1] - 27:12
past [1] - 18:16
penalty [1] - 32:5
people [10] - 8:15, 11:2, 19:13, 24:21, 32:3, 32:4, 32:18, 35:17, 37:8, 41:24
percent [2] - 38:12, 38:13
period [7] - 4:8, 22:8, 22:18, 24:1, 28:2, 28:3, 29:8
person [3] - 6:22, 8:13, 41:18
personal [2] - 5:11, 36:19
perspectives [1] - 41:24
persuade [1] - 29:7
persuasive [1] - 9:14
phrase [1] - 16:13
phrased [1] - 21:2
pick [1] - 13:19
picked [1] - 9:13
picking [1] - 35:11
pictures [1] - 5:18
pieces [1] - 8:3
Plaintiff [1] - 1:6
plaintiff [4] - 9:7, 16:9, 16:10, 36:14
PLAINTIFF [1] - 2:3
plaintiff's [1] - 33:17
plaintiffs [13] - 3:9, 15:13, 16:24, 17:23, 17:25, 21:7, 26:5, 32:13, 34:2, 34:15, 35:3, 37:1, 40:17
plaintiffs' [1] - 21:25
plan [1] - 31:16
point [15] - 7:11, 16:17, 16:24, 17:16, 18:21, 18:22, 30:23, 30:25, 32:12, 32:23, 34:18, 40:9, 40:21, 40:22, 41:19
pointed [1] - 11:4
points [7] - 27:1, 27:25, 31:13, 31:19, 31:21, 31:22, 39:19

policy [1] - 38:23
position [6] - 13:22, 20:17, 21:7, 25:11, 25:25, 26:14
positive [1] - 32:17
possession [1] - 19:9
possible [2] - 34:2, 35:11
post [2] - 7:10, 18:15
post-mortem [1] - 7:10
post-trial [1] - 18:15
posted [1] - 3:16
potential [2] - 39:23, 42:4
potentially [1] - 13:20
power [3] - 24:2, 24:4, 38:19
practical [1] - 25:18
practically [1] - 21:15
Practitioner [1] - 11:8
Practitioners [1] - 11:11
pre [1] - 7:10
pre-mortem [1] - 7:10
preference [1] - 34:11
prepared [1] - 32:13
PRESIDING [1] - 1:3
press [1] - 40:25
pretty [1] - 22:13
primarily [1] - 18:25
principle [1] - 6:5
priority [1] - 34:14
prison [3] - 40:6, 41:8, 41:11
prisons [1] - 32:5
privacy [19] - 4:21, 6:9, 6:10, 6:14, 6:23, 7:12, 7:21, 9:8, 9:10, 9:22, 10:9, 13:4, 14:21, 15:23, 16:2, 17:19, 32:14, 39:11
Privacy [1] - 12:21
private [6] - 4:13, 4:16, 35:23, 36:7, 36:13, 40:2
problem [3] - 12:15, 22:1, 35:14
procedural [1] - 27:1
PROCEEDINGS [2] - 1:17, 42:21
Proceedings [1] - 42:18
produce [1] - 15:6
produced [1] - 9:25
production [1] - 27:16
profile [2] - 40:24
program [1] - 28:20
Programs [2] - 3:7, 19:25
PROGRAMS [2] - 1:11, 2:11
promote [1] - 29:22
prong [2] - 17:25, 18:23
proper [3] - 31:8, 31:9
properly [4] - 6:10, 38:18, 39:2, 39:4
proposal [1] - 37:6
protect [3] - 13:24, 41:15, 41:17
protected [1] - 9:22
Protecting [1] - 12:21
protections [1] - 13:4
protects [1] - 15:23
provide [4] - 18:12, 23:17, 31:4, 41:1
provided [2] - 22:12, 31:3

provides [1] - 14:19
providing [2] - 15:18, 31:8
provision [10] - 21:12, 21:20, 22:10, 22:15, 23:24, 25:4, 25:15, 29:17, 29:21, 29:25
psychiatric [1] - 41:11
public [46] - 4:12, 4:15, 4:21, 6:9, 6:14, 7:19, 8:7, 10:25, 12:2, 16:8, 16:13, 16:14, 16:15, 16:18, 17:5, 17:13, 17:17, 17:20, 17:22, 18:1, 18:6, 18:11, 18:18, 18:23, 20:9, 20:12, 20:15, 20:16, 21:22, 29:19, 29:22, 35:16, 35:19, 35:24, 37:15, 37:25, 38:9, 40:5, 40:15, 40:18, 41:4, 41:20, 42:5, 42:6, 42:7, 42:8
publications [1] - 13:24
publicly [2] - 41:13, 42:1
publish [1] - 42:2
published [1] - 20:11
publishing [1] - 40:14
purpose [4] - 14:23, 21:24, 22:3, 22:11
purposes [5] - 14:24, 19:13, 21:22, 22:17, 40:12
pursuant [1] - 24:2
pursue [1] - 40:17
pushed [1] - 29:15
put [1] - 8:3
putting [3] - 24:4, 29:20, 40:11

**Q**

quality [1] - 34:17
quasi [1] - 5:1
quasi-identifiers [1] - 5:1
questions [1] - 36:7
quickly [1] - 12:23
quite [2] - 19:20, 32:21
quote [1] - 34:14
quote-unquote [1] - 34:14

**R**

raise [2] - 3:22, 20:23
raised [5] - 7:13, 11:22, 13:23, 16:18, 27:10
raises [1] - 11:23
raising [1] - 33:12
random [1] - 32:24
randomly [1] - 8:17
rap [1] - 19:14
rather [2] - 11:14, 15:18
rationale [1] - 6:3
Re [1] - 13:1
Re-Identifications [1] - 13:1
reading [1] - 12:21
realize [1] - 29:2
really [6] - 7:1, 34:9, 35:15, 37:13, 38:5, 38:16
reason [11] - 7:24, 7:25, 8:22, 14:10, 16:9, 21:15, 33:12, 34:15, 37:8, 37:10,

41:2
**reasonable** [1] - 37:1
**reasonably** [1] - 15:24
**reasons** [2] - 7:17, 33:24
**receive** [4] - 4:17, 15:15, 27:7, 34:17
**received** [5] - 8:9, 27:4, 30:14, 34:2, 41:10
**recent** [1] - 11:3
**recipe** [3] - 28:12, 28:15, 28:17
**recognized** [1] - 17:10
**recommendations** [1] - 32:19
**record** [5] - 9:6, 10:17, 40:6, 41:16, 41:17
**RECORDED** [1] - 42:21
**records** [1] - 14:7
**redact** [5] - 11:10, 11:15, 14:16, 36:18, 37:21
**redacted** [16] - 5:9, 5:10, 5:22, 8:17, 10:14, 10:15, 12:6, 12:9, 27:4, 32:11, 32:16, 34:23, 36:11, 37:18, 39:14
**redacting** [1] - 41:16
**redaction** [4] - 4:23, 4:24, 6:11, 15:10
**redactions** [17] - 4:18, 4:20, 8:23, 9:23, 12:4, 12:7, 15:16, 27:8, 32:21, 32:25, 34:7, 34:13, 35:9, 35:13, 36:15, 37:22, 39:12
**reduce** [1] - 38:19
**REDUCTION** [1] - 42:24
**reexamination** [1] - 13:3
**reference** [1] - 22:14
**referenced** [2] - 41:22, 41:23
**referencing** [1] - 39:22
**referring** [1] - 23:22
**refers** [1] - 23:6
**reflected** [1] - 31:25
**refused** [1] - 5:17
**regular** [1] - 36:13
**REGULATIONS** [1] - 42:25
**reinventing** [1] - 28:21
**related** [3] - 5:12, 27:14, 31:21
**relates** [1] - 30:9
**relatively** [1] - 25:7
**releasable** [1] - 40:1
**released** [4] - 7:17, 8:9, 11:3, 39:25
**releases** [3] - 38:11, 38:12, 40:25
**relevant** [1] - 36:19
**reliable** [1] - 21:19
**relies** [1] - 23:20
**rely** [1] - 15:21
**relying** [1] - 18:25
**repeating** [1] - 39:19
**rephrase** [1] - 23:25
**report** [5] - 11:3, 25:12, 26:4, 26:5, 35:18
**reported** [2] - 26:11, 26:12
**REPORTER** [2] - 1:23, 43:3
**Reporter's** [1] - 18:24
**REPORTER'S** [1] - 1:17
**reporting** [1] - 18:16

**reports** [5] - 26:19, 26:20, 40:14, 40:25, 41:22
**representations** [1] - 21:19
**request** [6] - 14:24, 16:21, 16:22, 25:9, 25:19, 40:10
**requested** [2] - 35:19, 36:23
**requester** [3] - 21:23, 37:4, 39:25
**requesters** [1] - 37:1
**requests** [1] - 19:23
**require** [1] - 32:7
**required** [5] - 26:16, 26:17, 28:8, 28:9, 35:9
**requirement** [1] - 28:19
**requirements** [1] - 38:24
**researching** [1] - 30:9
**resolve** [2] - 9:21, 10:2
**respectfully** [1] - 25:1
**respond** [1] - 33:2
**responding** [1] - 35:7
**responses** [1] - 37:14
**responsible** [1] - 31:5
**rest** [2] - 3:20, 36:20
**result** [2] - 5:1, 34:13
**resulted** [1] - 35:12
**results** [1] - 13:6
**return** [1] - 41:19
**reveal** [1] - 34:21
**revealed** [2] - 34:14, 41:6
**review** [9] - 3:17, 9:24, 13:21, 15:3, 15:5, 32:7, 32:24, 33:3, 33:4
**reviewed** [1] - 14:14
**reviews** [1] - 32:8
**rights** [1] - 9:10
**risks** [1] - 13:3
**Rose** [1] - 15:8
**round** [4] - 11:12, 11:14, 14:1
**rounded** [1] - 12:10
**rounding** [1] - 14:18
**row** [1] - 32:4
**ruining** [1] - 13:7
**ruling** [4] - 4:5, 13:12, 31:17, 32:5
**run** [1] - 29:21

## S

**SANTA** [1] - 1:25
**satisfactory** [1] - 10:1
**satisfy** [1] - 14:23
**scene** [1] - 5:18
**second** [2] - 33:1, 40:4
**secret** [1] - 10:24
**see** [19] - 4:4, 6:4, 8:23, 10:14, 12:5, 12:14, 18:5, 20:20, 23:25, 24:11, 24:17, 24:23, 25:22, 26:3, 26:13, 33:20, 34:25, 38:3, 38:4
**seeking** [5] - 5:7, 16:9, 16:10, 18:2, 40:5
**seem** [1] - 6:22
**self** [1] - 12:11
**self-interest** [1] - 12:11

**senators** [1] - 41:23
**sense** [4] - 12:16, 15:3, 19:15, 34:17
**senses** [1] - 17:7
**sensitive** [9] - 7:9, 7:24, 10:16, 11:7, 11:10, 11:17, 11:20, 39:10, 41:15
**separate** [1] - 24:19
**series** [1] - 5:1
**set** [2] - 35:25, 36:2
**settlement** [2] - 11:12, 11:13
**several** [1] - 13:23
**shed** [1] - 17:12
**sheer** [1] - 32:6
**sheets** [1] - 19:15
**shocking** [1] - 7:10
**shot** [1] - 34:16
**show** [4] - 18:1, 31:22, 32:20, 42:5
**showing** [3] - 7:20, 31:1, 39:23
**shown** [1] - 31:11
**side** [1] - 10:2
**sides** [1] - 3:16
**significant** [1] - 6:23
**similarly** [2] - 20:3, 37:3
**simply** [4] - 5:22, 5:23, 30:22, 37:16
**site** [1] - 41:9
**situation** [3] - 7:7, 8:2, 24:18
**situations** [2] - 5:15, 7:5
**size** [3] - 15:1, 15:25, 33:13
**skirt** [1] - 29:19
**slate** [1] - 6:15
**sliced** [1] - 19:2
**slightly** [1] - 24:18
**slow** [1] - 12:23
**solution** [1] - 39:8
**someone** [2] - 8:15, 37:12
**sometimes** [1] - 37:16
**somewhat** [1] - 16:2
**soon** [1] - 42:17
**sophisticated** [1] - 15:12
**sorry** [10] - 12:23, 15:17, 18:7, 19:5, 19:24, 22:24, 26:17, 33:10, 36:22, 39:21
**sort** [4] - 10:10, 29:24, 33:3
**source** [1] - 24:19
**speaking** [1] - 18:10
**specific** [11] - 7:16, 8:1, 8:13, 11:10, 18:2, 29:17, 30:13, 30:19, 36:18, 37:23, 39:11
**specifically** [2] - 19:16, 25:19
**specification** [2] - 12:11, 12:12
**specified** [1] - 8:19
**spirit** [1] - 15:7
**stage** [1] - 17:20
**standard** [1] - 39:23
**start** [3] - 3:24, 13:16, 27:25
**state** [21] - 10:13, 10:18, 17:2, 18:5, 18:13, 26:9, 26:19, 26:20, 30:24, 31:4, 31:5, 31:10, 32:3, 32:18, 35:20, 40:9, 40:11, 40:15, 40:16, 40:18
**state's** [1] - 40:8

**States** [1] - 3:6
**states** [11] - 8:6, 17:11, 17:12, 25:12, 25:16, 26:4, 26:5, 26:8, 28:8, 30:4
**STATES** [5] - 1:1, 1:10, 2:10, 42:25
**statistical** [4] - 21:22, 21:24, 21:25, 23:16
**statistically** [1] - 19:3
**statistics** [1] - 30:14
**statute** [2] - 18:7, 23:18
**statutory** [8] - 22:7, 22:9, 24:19, 28:25, 35:23, 38:6, 38:8, 41:21
**stay** [1] - 27:15
**STENOGRAPHICALLY** [1] - 42:21
**step** [1] - 23:14
**stick** [1] - 19:19
**sticking** [1] - 20:21
**still** [12] - 9:10, 9:11, 10:18, 10:23, 11:20, 15:13, 15:16, 15:25, 22:7, 28:3, 28:16, 33:15
**stop** [1] - 33:1
**STREET** [2] - 1:24, 2:11
**strictly** [1] - 21:21
**strongly** [1] - 24:5
**studies** [1] - 12:19
**study** [1] - 13:1
**stuff** [1] - 23:12
**subcomponent** [2] - 29:20, 30:15
**subject** [5] - 21:11, 22:22, 25:13, 25:15, 27:10
**submission** [1] - 42:16
**submits** [1] - 9:17
**substance** [1] - 20:22
**substances** [1] - 11:24
**substantial** [1] - 15:16
**substantially** [1] - 20:19
**subtle** [1] - 18:22
**suddenly** [1] - 34:23
**suggest** [2] - 19:18, 28:23
**suggested** [1] - 13:20
**suggesting** [1] - 39:21
**suggestion** [2] - 33:2, 33:18
**Suicide** [1] - 37:16
**SUITE** [1] - 1:24
**suits** [1] - 11:9
**summary** [2] - 3:14, 27:12
**support** [1] - 15:21
**supporting** [1] - 15:4
**suppose** [1] - 24:7
**suppress** [1] - 34:11
**Supreme** [2] - 18:24, 19:14
**surgical** [1] - 41:11
**sympathize** [1] - 22:5
**system** [2] - 17:3, 23:17

## T

**table** [1] - 35:8
**tailored** [3] - 15:12, 32:23, 36:16
**tailoring** [1] - 15:23

**ten** [1] - 4:7
**tends** [1] - 36:18
**tens** [3] - 14:11, 31:24, 32:2
**tentative** [8] - 3:16, 3:21, 4:5, 13:12, 25:14, 27:10, 28:5, 31:17
**terms** [3] - 7:5, 14:9, 20:16
**Texas** [1] - 8:6
**THAT** [1] - 42:20
**THE** [81] - 1:4, 2:3, 2:3, 2:4, 2:10, 3:5, 3:12, 3:20, 3:24, 4:3, 4:6, 5:25, 6:4, 9:1, 9:13, 10:6, 10:8, 12:1, 12:16, 13:13, 13:15, 13:18, 14:5, 14:15, 15:18, 16:1, 16:7, 17:9, 18:9, 19:10, 20:7, 20:20, 20:24, 21:5, 21:9, 22:5, 22:13, 22:20, 23:2, 23:4, 23:6, 23:9, 23:11, 23:19, 23:25, 24:6, 24:8, 24:11, 24:17, 24:23, 25:17, 25:22, 26:3, 26:7, 26:10, 26:13, 26:15, 26:21, 26:24, 27:6, 27:13, 27:18, 27:21, 28:22, 30:1, 33:1, 33:8, 33:20, 33:22, 34:21, 34:25, 35:6, 39:16, 42:13, 42:15, 42:20, 42:21, 42:22, 42:24, 42:25
**themselves** [3] - 17:6, 26:7, 28:6
**therefore** [3] - 4:17, 6:15, 13:7
**they've** [1] - 4:25
**third** [4] - 16:21, 16:22, 40:10, 40:20
**THIS** [1] - 42:23
**thorough** [1] - 11:5
**thousands** [4] - 14:12, 31:25, 32:2
**threat** [1] - 21:14
**three** [1] - 4:25
**throw** [1] - 28:15
**throwing** [1] - 13:8
**Title** [15] - 21:11, 23:7, 23:13, 23:16, 23:23, 23:24, 24:3, 24:8, 24:12, 24:15, 24:16, 25:4, 25:5, 29:8
**together** [1] - 8:3
**took** [1] - 21:4
**total** [1] - 34:12
**totally** [1] - 10:20
**trans** [1] - 10:19
**TRANSCRIPT** [3] - 1:17, 42:21, 42:23
**Transgender** [1] - 10:19
**transgender** [1] - 10:22
**transparency** [1] - 29:23
**transparent** [3] - 19:20, 19:22, 20:2
**treat** [1] - 34:10
**treating** [1] - 21:11
**treatment** [1] - 7:3
**TREMAINE** [1] - 2:3
**trial** [2] - 18:15
**tries** [1] - 30:24
**true** [1] - 12:1
**TRUE** [1] - 42:20
**trust** [1] - 21:18
**try** [2] - 4:8, 39:19
**trying** [8] - 6:7, 8:3, 9:2, 12:22, 15:7, 28:10, 30:19, 36:4, 41:15
**tune** [1] - 34:5

**tuned** [1] - 34:6
**tuning** [1] - 35:2
**turn** [3] - 14:6, 21:17, 24:10
**turned** [6] - 21:21, 22:11, 25:16, 25:20, 27:2, 27:19
**two** [5] - 5:14, 8:6, 9:19, 16:23, 24:1
**type** [2] - 6:10, 11:7
**types** [1] - 38:21

## U

**U.S** [1] - 1:23
**under** [13] - 14:4, 16:19, 17:10, 18:8, 18:17, 22:2, 23:15, 23:22, 24:2, 24:8, 26:9, 26:16, 28:4, 28:7, 28:9, 28:16, 29:20, 30:5, 31:10, 39:24, 40:18, 42:16
**understandings** [1] - 19:12
**understood** [1] - 14:25
**union** [2] - 36:23, 36:24
**unit** [2] - 41:9, 41:10
**UNITED** [5] - 1:1, 1:10, 2:10, 42:25
**United** [1] - 3:6
**unknown** [1] - 37:17
**unless** [2] - 31:11, 37:11
**unmanageably** [1] - 33:15
**unquote** [1] - 34:14
**unredacted** [4] - 8:10, 9:19, 39:9, 41:14
**unusual** [1] - 24:18
**up** [9] - 11:12, 12:10, 13:19, 14:1, 21:18, 31:19, 34:15, 37:12, 38:8
**upshot** [1] - 21:23
**useless** [1] - 5:2

## V

**vague** [1] - 17:19
**vast** [1] - 19:1
**VELIZBAIRDMIRIAM@GMAIL.COM** [1] - 1:25
**version** [2] - 21:1, 34:23
**victimization** [2] - 30:9, 30:10
**view** [2] - 15:2, 15:11
**viewing** [1] - 9:18
**views** [2] - 21:13, 41:21
**virtue** [1] - 24:15
**voluntary** [4] - 21:16, 23:21, 24:9
**Vs** [1] - 1:8

## W

**wants** [1] - 26:23
**WASHINGTON** [1] - 2:12
**ways** [2] - 13:23, 34:3
**weighing** [1] - 17:21
**weight** [1] - 9:11
**Weld** [1] - 13:2
**WESLEY** [1] - 1:3
**WEST** [1] - 1:24
**whatnot** [1] - 32:11

**whereas** [1] - 7:22
**whole** [1] - 41:17
**wholesale** [2] - 10:12, 15:10
**William** [1] - 13:2
**WITH** [1] - 42:24
**withheld** [1] - 5:22
**withhold** [1] - 6:3
**women** [1] - 38:13
**wondering** [1] - 9:16
**word** [5] - 12:22, 17:7, 19:12, 27:4,
  30:11
**words** [5] - 5:23, 5:24, 16:12, 24:12,
  32:10
**works** [2] - 18:23, 34:4
**WRIGHT** [1] - 2:3
**writ** [1] - 29:17
**write** [1] - 28:13

## Y

**year** [2] - 14:17, 18:17
**years** [4] - 12:9, 20:25, 21:6, 29:1
**YORK** [2] - 2:5